XAVIER BECERRA
Attorney General of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SATOSHI YANAI
Supervising Deputy Attorney General
SARAH E. BELTON
LEE I. SHERMAN (SBN 272271)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6404
  Fax:  (213) 897-7605
  E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, ex rel, XAVIER BECERRA, in his official capacity as Attorney General of the State of California,**<br><br>Plaintiff,<br><br>v.<br><br>**JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States; LAURA L. ROGERS, in her official capacity as Acting Assistant Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; and DOES 1-100,**<br><br>Defendants. | Case No.<br><br><br>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |

1.     Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General ("Plaintiff" or "California"), brings this complaint to protect California from the latest attempt by the Trump Administration to strip law enforcement funding from the State unless the State and local governments in California agree to participate in the Administration's immigration enforcement program.

2.     Congress has appropriated $28.9 million in law enforcement funding to California and its political subdivisions pursuant to the Edward Byrne Memorial Justice Assistance Grant ("JAG") program.  The United States Department of Justice ("USDOJ"), led by Attorney General Jefferson B. Sessions III, and the Office of Justice Programs ("OJP"), led by Acting Assistant Attorney General Laura L. Rogers (collectively, with USDOJ and Attorney General Sessions, the "Defendants"), are responsible for administering these grants.  JAG awards are provided to each state, and certain local jurisdictions within each state, to, among other things, support law enforcement programs, reduce recidivism, conduct crime prevention and education programs for at-risk youth, and support programs for crime victims and witnesses.  Every state is entitled by law to a share of these funds.

3.     In fiscal year (FY) 2017, Defendants added unprecedented immigration enforcement conditions to JAG funding.  Courts across the country have struck those conditions down as unconstitutional.  *See Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018); *Chicago v. Sessions*, No. 17-cv-5720, ---F. Supp. 3d.---, 2018 WL 3608564, at *12 (N.D. Ill. July 27, 2018), *appeal docketed*, 18-2649 (7th Cir. Aug. 1, 2018); *Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018), *appeal docketed*, 18-2648 (3d Cir. July 26, 2018).

4.     Rather than re-consider the lawfulness of the conditions, in the JAG FY 2018 Solicitations for state and local jurisdictions,[1] Defendants have maintained a requirement that the chief law officer of the jurisdiction applying for funding (the Attorney General in the case of the State) must certify compliance with 8 U.S.C. § 1373, which prohibits restrictions on certain

---

[1] U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2018 State Solicitation (2018) ("JAG State Solicitation) (attached as Ex. A); *see also* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2018 Local Solicitation (2018) ("JAG Local Solicitation," collectively with the JAG State Solicitation, "JAG Solicitations") (attached as Ex. B).

exchanges of information regarding a person's immigration or citizenship status. Three federal courts have recently called into question the legality of § 1373 or declared it unconstitutional. In order to receive FY 2018 JAG funding, Defendants also require that jurisdictions certify compliance with 8 U.S.C. § 1644, certify to not violating or aiding or abetting a violation of 8 U.S.C. § 1324(a), and certify to not "imped[ing] the exercise by federal officers of authority" under or relating to 8 U.S.C. §§ 1226(a) & (c), 1357(a), and 1366(1) & (3). Plaintiff refers to these requirements collectively as the "Certification Requirements."

5.     Defendants claim that these are "applicable Federal laws." But jurisdictions have never been required to certify compliance with any of the laws that have been added to the FY 2018 JAG Solicitations. Congress has not tied any of these laws, including § 1373, to federal grant-making. Most of these laws have no applicability to state and local governments. In addition, these requirements conflict with Congress's intent to not condition federal funding on immigration enforcement related activities.

6.     In addition, since Congress did not attach these requirements to federal funding, Defendants lack authority under the JAG authorizing statute to interpret "applicable Federal laws" in a manner that would result in commandeering state and local government functions in violation of the Tenth Amendment of the U.S. Constitution. These Certification Requirements intrude on the sovereignty of California and its local jurisdictions by interpreting federal law to prevent the State from declining participation in federal immigration enforcement.

7.     Defendants have exceeded constitutional limits under the Spending Clause of the United States Constitution. The Certification Requirements are not sufficiently related to the federal purpose areas of the JAG funding scheme designed by Congress and are too ambiguous to provide clear notice to the State or its political subdivisions as to what is needed to comply. These Certification Requirements are so vague that it is unclear whether to comply with the Certification Requirements, law enforcement agencies ("LEAs") would have to comply with detainer holds that require jurisdictions to hold persons in custody beyond their ordinary release. Courts throughout the country have found detainer holds violate the Fourth Amendment because they are typically not supported by the requisite probable cause. If Defendants read the

2

Certification Requirements as requiring jurisdictions to comply with detainer holds, or requiring that state and local governments allow their law enforcement officers to comply with detainer holds, then the Certification Requirements are unconstitutional for this additional reason.

8.    The Certification Requirements also violate the Administrative Procedure Act ("APA") because of their constitutional infirmities, and because Defendants acted in excess of their statutory authority and in an arbitrary and capricious manner.

9.    California complies with all of the requirements identified in the JAG authorizing statute, and that apply to federal grantees under federal law.  While California's laws comply with the Immigration and Nationality Act ("INA"), since the Certification Requirements are ambiguous and exceed what may be required under "applicable Federal law," California will most certainly face an enforcement action if it agrees to the Certification Requirements. Defendants have already withheld JAG awards from all state entities and local jurisdictions in California because under their theory, California does not comply with § 1373.  The United States already sued California in the Eastern District of California, unsuccessfully claiming that Senate Bill 54, which consists of the Amended Transparency and Responsibility Using State Tools Act ("TRUST Act"), Cal. Gov't Code §§ 7282-7282.5, and the California Values Act, Cal. Gov't Code §§ 7284-7284.12, "impedes" federal immigration officials in violation of federal law. However, as that court found, California's laws do not stand as an obstacle to prevent immigration authorities from doing their jobs using their own resources.  Instead, California's laws are designed to foster community trust between law enforcement and the communities they serve, and to allocate limited law enforcement resources in a manner that is in the best interest of the State's public safety.  Defendants cannot enforce the "applicable Federal laws" in the manner that they intend to because such an erroneous interpretation of these federal laws would allow the federal government to commandeer the State's direction of its law enforcement.

10.    Not only are these Certification Requirements unlawful, but agreeing to them will cause California harm by requiring that the State and local jurisdictions terminate their public safety oriented laws and policies.  This means that the State and its localities will lose control of their ability to focus their resources on fighting crime and instead will devote resources to federal

Complaint for Declaratory, Injunctive, and Mandamus Relief

1    immigration enforcement.  The trust and cooperation that the State's laws and local ordinances

2    are intended to build between law enforcement and immigrant communities will be eroded.

3    Alternatively, if the State refuses to comply with the Certification Requirements, important public

4    safety programs that JAG is intended to fund will likely need to be cut to the detriment of state

5    and local law enforcement agencies and their budgets.

6        11.    For these reasons, and those discussed below, the Court should declare the

7    Certification Requirements are unconstitutional and/or a violation of the APA, enjoin their

8    imposition, and pursuant to 28 U.S.C. § 1361 require that Defendants issue JAG awards and

9    funding to the State and its local jurisdictions that comply with the requirements enumerated by

10    Congress.

11                        **JURISDICTION AND VENUE**

12        12.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this case

13    involves a civil action arising under the Constitution and the laws of the United States.  The Court

14    also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal

15    government founded upon the Constitution and an Act of Congress.  Jurisdiction is proper under

16    the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-06.  The

17    Court has authority to provide relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and

18    the Mandamus Statute, 28 U.S.C. § 1361.

19        13.    Pursuant to 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of

20    California because the Attorney General and the State of California have offices at 455 Golden

21    Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and

22    Defendants have offices at 450 Golden Gate Avenue, San Francisco, California.

23                        **INTRADISTRICT ASSIGNMENT**

24        14.    Assignment to the San Francisco Division of this District is proper pursuant to Civil

25    Local Rule 3-2(c)-(d) because Plaintiff, the State of California, and Defendants both maintain

26    offices in the District in San Francisco.

27                                **PARTIES**

28        15.    Plaintiff State of California is a sovereign state in the United States of America.

16.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its sovereignty as a State caused by the challenged federal actions. The inclusion of unconstitutional and unlawful Certification Requirements as part of the JAG award impairs the State's exercise of its police power in a manner it deems necessary to protect the public safety.  The Certification Requirements burden California's exercise of its sovereign power to enforce its laws, and place a regulatory burden on California as a funding recipient, obligating the State to continuously monitor compliance of all subgrantees throughout the State, which will result in increased staff time and expenses.

17.     As a result of Defendants' unconstitutional and unlawful actions, the State of California, including its political subdivisions, is in imminent danger of losing $28.9 million this fiscal year, including $18 million that is owed to the State itself.

18.     Plaintiff Attorney General Xavier Becerra is the chief law officer of the State and the head of the California Department of Justice.  Cal. Const., art. V, § 13; Cal. Gov't Code § 12510. Attorney General Becerra, on behalf of California, has standing to bring this action because funding for law enforcement throughout the State is at stake.  *See Pierce v. Super. Ct.*, 1 Cal.2d 759, 761-62 (1934) (Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").  As the Chief Law Officer, the Attorney General is responsible for ensuring that the laws of the State are enforced.  Cal. Const., art. V, § 13.  The Certification Requirements undermine California statutes.  In addition, the Attorney General has standing on the basis of the requirement that he personally agree to the Certification Requirements.

19.     Defendant U.S. Department of Justice ("USDOJ") is an executive department of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. § 702, and is named as a defendant in this action pursuant to 5 U.S.C. § 702.  USDOJ is responsible for administering the JAG funds appropriated by Congress.

20.    Defendant Jefferson B. Sessions III, is Attorney General of the United States, and oversees USDOJ, including the Office of Justice Programs ("OJP").  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

21.    Defendant Laura L. Rogers is Acting Assistant Attorney General in charge of OJP, which administers JAG funding.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.

22.    Each of the Defendants named in this Complaint are acting in their official capacity for the United States government bearing responsibility, in whole or in part, for the acts enumerated in this Complaint.

23.    The true names and capacities of Defendants identified as DOES 1-100 are unknown to Plaintiff, and Plaintiff will amend this Complaint to insert the true names and capacities of those fictitiously named Defendants when they are ascertained.

## FACTUAL ALLEGATIONS

**I.    CALIFORNIA'S LAWS SEEK TO PROTECT THE SAFETY AND WELFARE OF THE STATE'S RESIDENTS BY FOCUSING LAW ENFORCEMENT ON CRIMINAL ACTIVITY AND BUILDING TRUST BETWEEN LAW ENFORCEMENT AND COMMUNITIES**

24.    California state and local law enforcement agencies ("LEAs"), guided by the duly enacted laws of the State and ordinances of local jurisdictions, are tasked with effectively policing, protecting, and serving all residents, including more than 10 million foreign-born individuals who live in the State.  California's laws implicated in this suit are a valid exercise of the State's police power to regulate regarding the health, welfare, and public safety of its residents.  These laws strengthen community policing efforts by encouraging undocumented victims to report crimes to local law enforcement so that perpetrators are apprehended before harming others.

25.    The purpose of these California laws is to ensure that law enforcement resources are focused on a core public safety mission and to build trust and cooperation between law enforcement and the State's immigrant communities.  When local and state LEAs engage in immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less likely to come forward to report crimes.

26.     California's laws are not unique.  Many jurisdictions across the country, including local jurisdictions in California, have policies that define the circumstances under which local law enforcement personnel may expend time and resources in furtherance of federal immigration enforcement.  Those jurisdictions variously impose limits on compliance with Immigration and Customs Enforcement ("ICE") detainer requests, ICE notification requests about release dates, and ICE's access to detainees, or provide additional procedural protections for individuals prior to an interview with immigration authorities.

### A.     The TRUST Act

27.     In 2013, California enacted the TRUST Act, Cal. Gov't Code §§ 7282-7282.5. The TRUST Act defined the circumstances under which local LEAs may detain an individual at the request of federal immigration authorities.  The TRUST Act went into effect on January 1, 2014.

28.     The TRUST Act was intended to address numerous public safety concerns regarding the federal practice of issuing detainers to local law enforcement.  Among the Legislature's concerns were that federal courts have concluded that detainer requests do not provide sufficient probable cause to satisfy the requirements of the Fourth Amendment, and data showing that detainer requests "have erroneously been placed on United States citizens, as well as immigrants who are not deportable."  Assem. Bill No. 4, 1st Reg. Sess. (Cal. 2013) § 1(c).

29.     The TRUST Act previously set forth two conditions that local law enforcement must meet to have discretion to detain a person pursuant to an "immigration hold" (also known as a "detainer request" or "detainer hold"), which is when an immigration authority requests that the law enforcement official "maintain custody of the individual for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays."  Cal. Gov't Code § 7282(c) (prior to amendments codified on Oct. 5, 2017).  First, the detention could not "violate any federal, state, or local law, or any local policy," which includes the Fourth Amendment of the U.S. Constitution.  *Id.* § 7282.5(a) (prior to amendments codified on Oct. 5, 2017).  Second, law enforcement could only detain someone with certain, specified criminal backgrounds, an individual on the California Sex and Arson Registry, or a person charged with a serious or violent felony who was the subject of a probable cause determination from a magistrate judge.  *Id.* § 7282.5(a)(1)-(6) (prior to

7

amendments codified on Oct. 5, 2017).  Only when both of these conditions were met could local law enforcement detain an individual "on the basis of an immigration hold after the individual becomes eligible for release from custody."  *Id.* § 7282.5(b).

**B.    The TRUTH Act**

30.    In 2016, California enacted the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2, which took effect on January 1, 2017.  The purpose of the TRUTH Act is to increase transparency about immigration enforcement and "to promote public safety and preserve limited local resources because entanglement between local law enforcement and ICE undermines community policing strategies and drains local resources."  Assem. Bill No. 2792, Reg. Sess. (Cal. 2016) § 2(a)-(c), (g)-(i).

31.    Under the TRUTH Act, prior to ICE interviewing someone being held in custody, a law enforcement officer must provide the detained individual with a "written consent form that explains the purpose of the interview, that the interview is voluntary, and that he or she may decline to be interviewed or may choose to be interviewed only with his or her attorney present." Cal. Gov't Code § 7283.1(a).  In addition, when a LEA receives a detainer, notification, or transfer request, the LEA must "provide a copy of the request to the [detained] individual and inform him or her whether the law enforcement agency intends to comply with the request."  *Id.* § 7283.1(b).  If the LEA complies with ICE's request to notify ICE as to when the individual will be released, it must also "promptly provide the same notification in writing to the individual and to his or her attorney or to one additional person who the individual shall be permitted to designate."  *Id.*

**C.    The California Values Act**

32.    On October 5, 2017, Governor Edmund G. Brown Jr. signed into law the California Values Act, Cal. Gov't Code §§ 7284-7284.12, which took effect on January 4, 2018.  In conjunction with this measure, California amended the TRUST Act.

33.    The Values Act sets the parameters under which California law enforcement agencies may participate in immigration enforcement.  The California Department of Corrections and

8

1    Rehabilitation ("CDCR") is not considered a "California law enforcement agency" for purposes

2    of the Values Act.  Cal. Gov't Code § 7284.4(a).

3         34.    Consistent with the Legislature's purpose in passing the TRUST and TRUTH Acts, in

4    its findings, the Legislature emphasized that "[a] relationship of trust between California's

5    immigrant community and state and local agencies is central to the public safety of the people of

6    California." *Id.* § 7284.2(b).  The Legislature recognized "[t]his trust is threatened when state and

7    local agencies are entangled with federal immigration enforcement, with the result that immigrant

8    community members fear approaching police when they are victims of, and witnesses to, crimes,

9    seeking basic health services, or attending school, to the detriment of public safety and the well-

10   being of all Californians." *Id.* § 7284.2(c).  The Legislature declared that the focus of the Values

11   Act is "to ensure effective policing, to protect the safety, well-being, and constitutional rights of

12   the people of California, and to direct the state's limited resources to matters of greatest concern

13   to state and local governments." *Id.* § 7284.2(f).

14        35.    The Values Act generally prohibits California law enforcement agencies from using

15   agency money or personnel to ask an individual about his or her immigration status for

16   immigration enforcement purposes.  *Id.* § 7284.6(a)(1)(A).

17        36.    The Values Act, expanding upon the limitations contained in the prior iteration of the

18   TRUST Act, prohibits compliance with detainer requests.  *See id.* § 7284.6(a)(1)(B).  In doing so,

19   the Legislature recognized that federal courts have found state and local law enforcement

20   compliance with detainer holds to be in violation of the Fourth Amendment when the detainer

21   holds are not supported by the requisite probable cause.  *See id.* § 7284.2(e).  Presently, it is ICE

22   policy to attach an administrative warrant to a detainer hold.[2]  However, that administrative

23   warrant is signed by an administrative officer, and not a federal judge.  *See id.*  The administrative

24   warrant only provides "probable cause . . . that the subject is an alien who is removable from the

25   United States," but does not provide probable cause that the subject of the detainer hold is

26   believed to have violated a criminal offense.  *Id.*

27        [2] U.S. Immigration and Customs Enforcement, Issuance of Immigration Detainers by ICE
     Immigration Officers, § 2.4 (Mar. 24, 2017),
28   https://www.ice.gov/sites/default/files/documents/2017/10074-2.pdf.

37.     In conjunction with the passage of the Values Act, the TRUST Act was amended to identify the circumstances when local law enforcement has discretion to respond to notification requests.  *Id.* § 7282.5(a).  "Notification request[s]" are requests by an immigration authority asking that a law enforcement official inform it "of the release date and time in advance of the public of an individual in its custody."  *Id.* §§ 7282(c), 7283(f).  Notification requests are made by immigration authorities on the I-247A form that also includes a detainer request.[3]

38.     Under the Values Act, LEAs have discretion to comply with notification requests if doing so would not "violate any federal, state, or local law, or local policy."  Cal. Gov't Code § 7282.5(a); *see id.* § 7284.6(a)(1)(C).  In addition, the Values Act allows LEAs to comply with notification requests under one of two scenarios.  First, LEAs may respond to notification requests regarding someone who was previously convicted of one or more of a multitude of felonies or misdemeanors identified in the TRUST Act, a person charged with one or more of an array of felonies who was subject to a probable cause determination from a magistrate judge, or an individual on the California Sex and Arson Registry.  *Id.* § 7282.5.  Alternatively, LEAs may comply with a notification request if the information requested is already "available to the public."  *Id.* § 7284.6(a)(1)(C).

39.     The Values Act prohibits LEAs from using agency or department money or personnel to "[p]rovid[e] personal information, as defined in Section 1798.3 of the Civil Code, about an individual" "for immigration enforcement purposes," unless that information is publicly available.  *Id.* § 7284.6(a)(1)(D).  "Personal information" is defined in the Civil Code as any information "that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history" and "includes statements made by, or attributed to, the individual."  Cal. Civ. Code § 1798.3(a).

40.     The Values Act also limits when a LEA may transfer an individual to immigration authorities.  Cal. Gov't Code § 7284.6(a)(4).  Under the Values Act, LEAs may transfer a person

_____

[3] Department of Homeland Security, Immigration Detainer - Notice of Action, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

to immigration authorities under two scenarios.  First, the LEA may transfer a person to immigration authorities if the immigration authority presents a judicial warrant or judicial probable cause determination by a federal judge or a federal magistrate judge for a violation of federal criminal immigration law.  *Id.* §§ 7284.4(h) & (i), 7284.6(a)(4).  Second, LEAs may respond to transfer requests regarding someone who was previously convicted of one or more of a multitude of felonies or misdemeanors identified in the TRUST Act, or an individual on the California Sex and Arson Registry.  *Id.* § 7282.5(a).

41.     The Values Act expressly authorizes compliance with all aspects of §§ 1373 and 1644.  *Id.* § 7284.6(e).

42.     Neither the Values nor TRUTH Acts prohibit a jurisdiction from allowing ICE to access its jails to interview inmates.  The Values Act explicitly reaffirms the absence of any such restriction, and requires only that state and local law enforcement, including CDCR, comply with the TRUTH Act when providing such access to immigration authorities.  *Id.* §§ 7284.6(b)(5), 7284.10(a).

## II.     CONGRESS DID NOT INTEND JAG TO BE CONDITIONED ON STATE AND LOCAL LAW ENFORCEMENT ASSISTING IN FEDERAL IMMIGRATION ENFORCEMENT

43.     JAG is administered by OJP within USDOJ.  JAG funding is authorized by Congress under 34 U.S.C. §§ 10151-10158.  The authorizing statute has been amended numerous times since its inception in 1988, evolving into the JAG program as it exists today.

44.     The Anti-Drug Abuse Act of 1988 amended the Omnibus Crime Control and Safe Streets Act of 1968 to create the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs grants ("Byrne Grants") "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system."  Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4328 (1988) (repealed 2006).  Congress placed a "special emphasis" on programs that support national drug control priorities across states and jurisdictions.  *Id.*  Congress identified 21 "purpose areas" for which Byrne Grants could be used.  Many of the purpose areas

1    relate to the investigation, enforcement, and prosecution of drug offenses.  *See id.*  Immigration

2    enforcement was never specified in any of the grant purpose areas.

3        45.    In amendments between 1994 and 2000, Congress identified eight more purpose areas

4    for which Byrne funding could be used, bringing the total to 29.  42 U.S.C. § 3751(b) (as it

5    existed on Dec. 21, 2000) (repealed 2006).  Immigration enforcement was not specified in any of

6    these eight additional purpose areas.

7        46.    For FY 1996, Congress separately authorized Local Law Enforcement Block Grants

8    ("LLEBG") that directed payment to units of local government for the purpose of hiring more

9    police officers or "reducing crime and improving public safety."  Local Government Law

10   Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995).  Congress identified nine

11   "purpose areas" for LLEBG, none of which were immigration enforcement.  *Id.*

12       47.    The Byrne Grant and LLEBG programs were then merged to eliminate duplication,

13   improve their administration, and to provide state and local governments "more flexibility to

14   spend money for programs that work for them rather than to impose a 'one size fits all' solution"

15   to local law enforcement.  H.R. Rep. No. 109-233, at 89 (2005); *see also* Pub. L. No. 108-447,

16   118 Stat. 2809, 2863 (2004); 34 U.S.C. § 10151(a), (b)(1).

17       48.    Currently, the JAG authorizing statute enumerates eight purpose areas for: (A) law

18   enforcement programs; (B) prosecution and court programs; (C) prevention and education

19   programs; (D) corrections and community corrections programs; (E) drug treatments and

20   enforcement programs; (F) planning, evaluation, and technology improvement programs; (G)

21   crime victim and witness programs; and (H) mental health programs related to law enforcement

22   and corrections.  34 U.S.C. § 10152(a)(1).

23       49.    The purpose areas for these grants are to support criminal justice programs.

24   Immigration enforcement and removal procedures, however, are generally civil in nature.  *See*

25   *Arizona v. U.S.*, 567 U.S. 387, 396 (2012).  Immigration enforcement was never specified in the

26   purpose areas for any of these grants throughout this entire legislative history.

27       50.    In 2006, Congress repealed the only immigration enforcement related requirement

28   that had ever existed for JAG funding, a requirement that the chief executive officer of the state

12

receiving JAG funding provide certified records of criminal convictions of "aliens." *See* Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51 (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006). This is consistent with the statutory scheme that does not include a purpose area connected to immigration enforcement The repeal of this provision also evidences Congress' intent *not* to condition JAG funding on immigration enforcement related activities.

51.  In addition, more recently, Congress has considered but repeatedly declined to adopt legislation that would penalize cities for setting their own law enforcement priorities and attempt to impose conditions similar to those here.[4]

## III.  JAG'S STRUCTURE REQUIRES THAT STATE AND LOCAL JURISDICTIONS RECEIVE FORMULA GRANTS

### A.  The JAG Formula Structure and Conditions

52.  When creating the merged JAG funding structure in 2006, Congress set a formula to apportion JAG funds to state and local jurisdictions. 34 U.S.C. § 10156. Population and violent crime rates are used to calculate each state's allocation. *Id.* § 10156(a)(1). Congress guarantees to each state a minimum allocation of JAG funds. *Id.* § 10156(a)(2).

53.  In addition to determining the amount of money received by grantees within each state, Congress set forth how that money is to be shared between state and local jurisdictions. Under the statutory formula, 60 percent of the total allocation to a state must be given directly to the state. *Id.* § 10156(b)(1).

54.  The statutory formula also provides that 40 percent of the total allocation to a state must be given to local governments within the state. *Id.* § 10156(d)(1). Each unit of local government receives funds based on its crime rate. *Id.* § 10156(d)(2)(A).

---

[4] *See* Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018) (voted down by the House by a vote of 231-193); *see also, e.g.*, No Sanctuary for Criminals Act, H.R. 3003, 115th Cong. (2017); Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015); Sanctuary City All Funding Elimination Act of 2015, H.R. 3073, 114th Cong. (2015).

55.     According to Congress's JAG funding scheme, states and local governments that apply for JAG funds are required to make limited certifications and assurances.  Beyond ministerial requirements identified in the authorizing statute, the chief executive officer of each applicant must certify that: (A) the law enforcement programs to be funded meet all requirements of the JAG authorizing statute; (B) all information in the application is correct; (C) there was coordination with affected agencies; and (D) the applicant will comply with all provisions of the JAG authorizing statute and all other applicable Federal laws.  *Id.* § 10153(a)(5).

**B.      California's Allocation and Use of the JAG Award**

56.     Based on the formula prescribed by statute, California is expected to receive approximately $28.9 million in JAG funding in FY 2018, with $18 million going to the Board of State and Community Corrections ("BSCC"), the entity that receives the formula grant funds that are allocated to the State.

57.     The BSCC has disbursed JAG funding using subgrants predominately to local jurisdictions throughout California to fund programs that meet the purpose areas identified in the JAG authorizing statute.  Between Fiscal Years 2015-17, the BSCC funded 32 local jurisdictions and the California Department of Justice.

58.     In the past, the BSCC prioritized subgrants to those jurisdictions that focus on education and crime prevention programs, law enforcement programs, and court programs, including indigent defense.  Some examples of California jurisdictions' purpose-driven use of JAG funds include: (a) implementing programs to improve educational outcomes, increase graduation rates, and curb truancy; (b) providing youth and adult gang members with multi-disciplinary education, employment, treatment, and other support services to prevent gang involvement, reduce substance abuse, and curtail delinquency and recidivism; (c) implementing school-wide prevention and intervention initiatives for high-risk students; (d) providing comprehensive post-dispositional advocacy and reentry services to improve outcomes and reduce recidivism for juvenile probationers; (e) providing a continuum of detention alternatives to juvenile offenders who do not require secure detention, which includes assessment, referral, case advocacy, home detention, reporting centers, intensive case management, and wraparound family

14

support services; and (f) funding diversion and re-entry programs for both minors and young

adult offenders.

**IV.    DEFENDANTS' ESCALATING ADDITION OF IMMIGRATION ENFORCEMENT REQUIREMENTS TO JAG**

**A.    The Addition of the § 1373 Certification Requirements and Subsequent Actions to Withhold Funding from the State**

59.    In FY 2016, OJP first announced that 8 U.S.C. § 1373 was an "applicable Federal

law" under JAG, and would be a required condition for grantees receiving JAG funds.  Section

1373(a) provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration enforcement authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

60.    Section 1373(b) prohibits any "person or agency" from restricting federal, state, or

local government entities from "requesting" information regarding a person's immigration status,

"maintaining" such information, or "exchanging" such information with federal, state, or local

government entities.

61.    For FY 2016, OJP required that the BSCC submit a legal opinion validating its

compliance with § 1373.  On April 21, 2017, OJP sent a letter to the BSCC, as well as eight other

jurisdictions nationwide, demanding that it submit that legal opinion.[5]  On June 29, 2017, the

BSCC submitted the requested legal opinion explaining that the State's laws, including the

TRUST and TRUTH Acts, do not violate § 1373.

62.    On July 25, 2017, OJP announced the FY 2017 State JAG Solicitation, and on August

3, 2017, OJP announced the FY 2017 JAG Local Solicitation.  For the first time, the Solicitations

required that state and local jurisdictions make the following certifications with respect to § 1373

in order to receive a grant or subgrant:

- The chief law officer of the jurisdiction, including the California Attorney General in the

---

[5] Press Release, U.S. Dep't of Justice, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373* (Apr. 21, 2017), https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

case of California, must sign an affidavit certifying compliance with § 1373 on behalf of the State and "any entity, agency, or official" of the State as applicable to the "program or activity" to be funded.

- The chief executive officer of the jurisdiction, including the Governor of the State of California, must sign an affidavit making a number of assurances, including that the chief executive adopts the chief law officer's certification of compliance with § 1373.

- The subrecipients must certify compliance with § 1373, as applicable to the program and award to be funded, and assure that they will comply with all award conditions.

63.    On August 25, 2017, the BSCC submitted the State's application for JAG.  In that application, the BSCC stated that it "withholds any commitment at this time concerning new grant conditions, pending receipt of the award documents."

64.    On November 1, 2017, after the enactment of the Values Act, OJP sent the State a preliminary compliance assessment letter asserting that three provisions of the Values Act may "violate 8 U.S.C. § 1373, depending on how [the State] interprets and applies them."  Those are the provisions regulating: (i) inquiries into an individual's immigration status (Cal. Gov't Code § 7284.6(a)(1)(A)); (ii) responses to notification requests (*id.* § 7284.6(a)(1)(C)); and (iii) the sharing of "personal information" (*id.* § 7284.6(a)(1)(D)).  As to the first provision, OJP said that to comply with § 1373, the State must certify that it interprets that provision as "not restrict[ing] California officers and employees from requesting information regarding immigration status from federal immigration officers."  For the notification request and personal information provisions to comply with § 1373, OJP said the State must certify that "it interprets and applies these provisions to not restrict California officers from sharing information regarding immigration status with federal immigration officers, including information regarding release date[s] and home address[es]."  If the State cannot so "certify," then "[USDOJ] has determined that these provisions violate [Section 1373]."  OJP further "reserve[d] [its] right to identify additional bases of potential violation of 8 U.S.C. § 1373."

16

65.     On November 13, 2017, the BSCC responded and certified that the Values Act does not restrict law enforcement from inquiring about an individual's immigration status with other governmental entities.  The BSCC could not provide the requested certification as to the other two provisions, and informed OJP that the Values Act regulates the sharing of release date information and home addresses because that information is not covered by § 1373.

66.     On January 24, 2018, OJP responded that it still has concerns about the State's compliance with § 1373, and asked the BSCC, and simultaneously, eight other local jurisdictions in California, to produce by February 23, under threat of subpoena, "orders, directives instructions, or guidance to your law enforcement employees" about communicating with USDOJ, the Department of Homeland Security ("DHS"), and ICE.[6]  The BSCC responded to that letter asserting that it is not a law enforcement agency, so has limited requested documents, but produced the documents that were responsive.  In the meantime, the State filed a lawsuit challenging, among other things, the FY 2017 § 1373 Certification Requirement as unconstitutional and unlawful, and seeking a declaration that the State's laws comply with § 1373.  Am. Compl. for Decl. and Inj. Relief, *State of California v. Sessions*, No. 17-cv-4701 (N.D. Cal.  Oct. 13, 2017), ECF No. 11.

67.     On March 6, 2018, the United States filed a lawsuit against the State of California in the Eastern District of California alleging that the provisions of SB 54 [the Values Act] that regulate compliance with notification requests, restrict the sharing of personal information for immigration enforcement purposes, and limit transfers of individuals to immigration authorities are preempted under federal immigration law, and that the notification request and personal information provisions also violate § 1373.  *See* Compl., *United States v. California*, No. 18-cv-490, ECF No. 1, ¶ 65 (E.D. Cal. Mar. 6, 2018).  In its motion to preliminarily enjoin SB 54, the United States argued that these provisions "impede[]" the United States' enforcement of the

---

[6] Press Release, U.S. Dep't of Justice, *Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. § 1373 Compliance Review* (Jan. 24, 2018), https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373.

1   immigration laws.  Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Supp., *United States v.*

2   *California*, No. 18-cv-490, ECF No. 2-1 at 4, 27, 29, 32, 35, 37 (E.D. Cal. Mar. 6, 2018).

3       68.    The Eastern District court disagreed.  In denying the federal government's motion to

4   enjoin the Values Act, Judge Mendez concluded that § 1373 does not encompass addresses and

5   release dates, "Section 1373 and the information sharing provisions of SB 54 do not directly

6   conflict," and SB 54 was not an obstacle to the federal government's goals because "[s]tanding

7   aside does not equate to standing in the way."  *United States v. California*, No. 18-cv-490, --- F.

8   Supp. 3d ---, 2018 WL 3301414, at *15-18 (E.D. Cal. July 5, 2018), *appeal docketed*, No. 18-

9   16496 (9th Cir. Aug. 9, 2018).  The court found the constitutionality of § 1373 "highly suspect,"

10  *id.* at *14, and "that a Congressional mandate prohibiting states from restricting their law

11  enforcement agencies' involvement in immigration enforcement activities—apart from, perhaps a

12  narrowly drawn information sharing provision—would likely violate the Tenth Amendment . . . .

13  If Congress lacks the authority to direct state action in this manner, then preemption cannot and

14  should not be used to achieve the same result."  *Id.* at *21.  The court further dismissed the United

15  States' claim against the Values Act without leave to amend.  Order re: State of California's Mot.

16  to Dismiss, *United States v. California*, No. 18-cv-490, ECF No. 197 at 5, 7 (E.D. Cal. July 9,

17  2018).

18      69.    Two other federal courts, when considering challenges to the FY 2017 § 1373 JAG

19  Condition, declared § 1373 unconstitutional on its face, and thus, held that the statute cannot be

20  an "applicable federal law" for JAG funding.  *Chicago*, 2018 WL 3608564, at *7-11;

21  *Philadelphia*, 309 F. Supp. 3d at 329-31.

22      70.    Nonetheless, in June 2018, when Defendants issued FY 2017 JAG awards to state and

23  local jurisdictions, Defendants withheld awards from the BSCC and local jurisdictions throughout

24  California because of Defendants' view that the Values Act does not comply with § 1373.  As of

25  the date of this Complaint, Plaintiff is not aware of any jurisdiction in California that has received

26  FY 2017 JAG funds.

27

28

18

**B.    The Addition of the Access and Notification Requirements to JAG Funding**

71.    In addition to the requirement that jurisdictions certify compliance with § 1373, for the first time in FY 2017, OJP announced two substantive "special conditions" related to federal immigration enforcement.  To receive a JAG award, a jurisdiction must:

- permit personnel of DHS to access any correctional or detention facility in order to meet with an "alien" (or an individual believed to be an "alien") and inquire as to his or her right to be or remain in the United States (the "Access Condition"); and

- provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an "alien" in the jurisdiction's custody when DHS requests such notice in order to take custody of the individual pursuant to the INA (the "Notification Condition").

Defendants later identified what the final award conditions would consist of in court filings, which confirmed the imposition of the Access and Notification Conditions for FY 2017 JAG funding.  *See, e.g., State of California v. Sessions*, No. 17-cv-4701, ECF No. 125-2, ¶ 55(1) (July 31, 2018).

72.    Paragraph 56 of the represented final conditions impose similar obligations on local government recipients and subrecipients.  Recipients that disburse funding to subrecipients must "monitor[] subrecipient compliance with the requirements of this condition."  *Id.* ¶ 55(2).

73.    Two federal district courts have determined that the Access and Notification Conditions are unconstitutional because USDOJ exceeded its statutory authority in imposing them.  *Chicago*, 2018 WL 3608564, at *12; *Philadelphia*, 309 F. Supp. 3d at 321.  The Seventh Circuit affirmed the district court's decision to preliminarily enjoin the Access and Notification Conditions.  *Chicago*, 888 F.3d. at 293 (7th Cir. 2018).  California is currently challenging the FY 2017 Access and Notification Conditions, as well as the § 1373 Condition, in *California v. Sessions*.

**C.    FY 2018 JAG State and Local Solicitations**

74.    On July 20, 2018, Defendants released the FY 2018 JAG Solicitations.  The Chief Legal Officer of the jurisdiction must execute two certifications in order for that jurisdiction to receive JAG funding.  The first certification is entitled "FY 2018 Certification of Compliance

with 8 U.S.C. §§ 1373 & 1644." As with FY 2017, the first certification requires each grant recipient's Chief Legal Officer to sign a standard affidavit, affirming compliance with § 1373 on behalf of the State and "any entity, agency, or official" of the State as applicable to the "program or activity to be funded." Ex. A, Appx B; Ex. B, App. B. Unlike last year, applicants must also submit an answer to the following questions surrounding the jurisdiction's "Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)":

- Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
- Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meets the description in question 1?
- If yes to either:
  - Please provide a copy of each law or policy.
  - Please describe each practice.
  - Please explain how the law, policy, or practice complies with section 1373.

Ex. A at 27-28; Ex. B at 27-28. A jurisdiction will "not receive award funds (and its award will include a condition that withholds funds) until it submits these responses." Ex. A at 28; Ex. B at 28.[7]

75.    In this first certification, for the first time this year, the Chief Legal Officer must certify compliance with 8 U.S.C. § 1644. Ex. A, Appx B; Ex. B, Appx. B. Section 1644 exists in a chapter within the INA for "Restricting Welfare and Public Benefits for Aliens." Like § 1373, § 1644 prohibits state and local governments from restricting the "sending to or receiving" from immigration authorities "information regarding the immigration status" of "an alien."

76.    Also, for the first time this year, Defendants require that the Chief Legal Officer separately execute a second certification entitled "FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)." While removing the Access

---

[7] For purposes of this action, these required responses are part of the Certification Requirements that California is challenging.

1  Condition that has been struck down by the courts, Defendants add a requirement that the Chief

2  Legal Officer certify that the jurisdiction does not have in effect or is bound to any law, rule,

3  policy, or practice, applicable to the "program or activity" to be funded, which "impede the

4  exercise by federal officers of authority under 8 U.S.C. § 1357(a)." Ex. A, Appx. C; Ex. B,

5  Appx. C.  The certification describes § 1357(a) as providing authority to immigration officers to

6  "interrogate any alien or person believed to be an alien as to his right to be or to remain in the

7  United States." *Id.*  The JAG Solicitations describe the certification as "requiring . . . recipients to

8  permit DHS agents to have access to any correctional facility in order to meet with an alien (or an

9  individual believed to be an alien) and inquire as to his right to be or remain in the United States."

10  Ex. A at 37; Ex. B at 37.

11       77.     While removing the Notification Condition that has been struck down by the courts,

12  in this second certification, Defendants add a requirement that the Chief Legal Officer certify that

13  the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice, applicable

14  to the "program or activity" to be funded, which "impede[s] the exercise by federal officers of

15  authority relating to 8 U.S.C. § 1226(a) & (c)." Ex. A, Appx. C; Ex. B, Appx. C.  Section 1226

16  directs the Attorney General to take custody of inadmissible and deportable persons after they

17  have committed certain offenses or have been sentenced to a term of imprisonment.  The

18  certification also identifies 8 U.S.C. § 1231(a)(4), which the certification represents as limiting

19  the federal government from "remov[ing] an alien who is sentenced to imprisonment until the

20  alien is released from imprisonment." *Id.*  The JAG Solicitations describe the certification as

21  "requiring . . . recipients to provide (where feasible) at least 48 hours' advance notice to DHS

22  regarding the scheduled release date and time of an alien in the recipient's custody when DHS

23  requests such notice in order to take custody of the alien pursuant to the Immigration and

24  Nationality Act." Ex. A at 37; Ex. B at 36-37.[8]

25       78.     That second certification requires that the Chief Legal Officer certify for the first time

26  that the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice,

27          [8] The JAG Solicitations identify "8 U.S.C. § 1266(a) & (c)" on this page, but since that

28  law does not exist, and does not appear anywhere else in the Solicitations, California presumes that Defendants meant to cite to 8 U.S.C. § 1226 here instead.

21

applicable to the "program or activity" to be funded," which "impede[s] the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3)." Ex. A, Appx. C; Ex. B, Appx. C. The 8 U.S.C. § 1366 certification requirement is not described anywhere else in the JAG Solicitations, and Defendants do not explain why they are adding this statute as an "applicable law." The Certification describes § 1366 as "requiring the Attorney General annually to submit to Congress 'a report detailing . . . (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense, [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal.'" *Id.*

79.    That second certification also requires that the Chief Legal Officer certify that the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice, applicable to the "program or activity" to be funded, which "violate[s], or aid[s] or abets any violation of, 8 U.S.C. § 1324(a)." Ex. A, Appx. C; Ex. B, Appx. C. The certification describes § 1324(a) as "forbidding any 'person,' in 'knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law,' to 'conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation' or to 'engage in any conspiracy to commit any of the preceding acts . . . or aid[] or abet[] the commission of any of the preceding acts.'" *Id.*

80.    8 U.S.C. § 1324(a) does not apply to states. The INA defines "person" as an "individual" or an "organization." 8 U.S.C. § 1101(b)(3). A "State" is defined separately in 8 U.S.C. § 1101(a)(36), and the term "State" is not in any way part of 8 U.S.C. § 1324(a).

81.    The Chief Executive of the Applicant Government, identified as the Governor for states, must execute a separate certification acknowledging that the Chief Executive examined the Certification of Compliance with 8 U.S.C. § 1373 & 1644 and the Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3), and "adopt th[e] certification[s] as my own on behalf of that government." Ex. A, Appx A; Ex. B, Appx. A.

82.    The Chief Legal Officer and the Chief Executive must make the following acknowledgement in connection with the certifications for each of these laws:

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and or 34 U.S.C. § 10271-10273), and also may subject me and the applicant [entity] to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812).

Ex. A, Appx A-C; Ex. B, Appx. A-C.

83.    The JAG State Solicitation provides that "in order to validly accept a fiscal year (FY) 2018 JAG award, the chief legal officer of the applicant state must properly execute, and the state must submit, the specific certifications regarding compliance with certain federal laws attached to this solicitation as Appendix B and Appendix C." Ex. A at 1, 18, 27, 35-36.  The same applies to local governments.  Ex. B at 1, 18, 27, 35.  The State is required to collect these certifications from all subrecipients.  Ex. A at 24.

84.    Underneath the FY 2018 JAG Solicitations on the OJP website, there is a link to Frequently Asked Questions with respect to the § 1373 Certification.[9]  These represent that the certification "must be signed by the jurisdiction's chief legal officer, who may not delegate, assign, or designate the task to another."[10]  The document states that the "State 'Attorney General' typically will be the title of the chief legal officer." *Id.* No. 9.

85.    OJP anticipates that it will issue award notifications by September 30, 2018.  Ex. A at 35; Ex. B at 35.  The USDOJ Financial Guide explains that jurisdictions "have 45 days from the award date to accept [an] OJP . . . award document or the award may be rescinded."[11]

86.    Defendants have provided no explanation as to how the new Certification Requirements are consistent with Congress's intent in adopting and authorizing funds for JAG.

87.    On August 21, 2018, the BSCC submitted a FY 2018 JAG application.  As part of that application, the BSCC is required to certify compliance that "the Applicant will comply with

---

[9] *See* Office of Justice Programs, BJA Edward Byrne Memorial Justice Assistance Grant Program, https://www.bja.gov/jag/.
[10] Bureau of Justice Assistance, Questions & Answers related to 8 U.S.C. § 1373 and new express conditions on Department of Homeland Security Access and Notice Requirements, No. 8, https://www.bja.gov/publications/8U.S.C.1373QuestionsandAnswers.pdf.
[11] U.S. Dep't of Justice, *2015 DOJ Grants Financial Guide,* § 2.2, https://www.justice.gov/ovw/file/892031/download.

23

. . . all federal statutes and regulations applicable to the award" and that it will "require all subrecipients to comply with all applicable award requirements and all applicable federal statutes and regulations." OJP informed the BSCC that it had to make that certification at the time of application. In a supplemental document, the BSCC stated that it would so certify as to any laws that were lawfully identified as applicable laws. But the BSCC disavowed the inclusion of the new Certification Requirements, and asserted that it was not making any "certifications or assurances about any federal statutes that have been selected by the Office of Justice Programs (OJP) as 'applicable' to the JAG program and imposed unlawfully." The BSCC continued that it "does not agree to comply with any other unlawfully imposed award conditions or requirements."

## V.    THE CERTIFICATION REQUIREMENTS ARE UNCONSTITUTIONAL AND UNLAWFUL

### A.    Defendants Lack Statutory Authority to Impose the Certification Requirements

88.    JAG's authorizing statute provides no authority for OJP to impose the Certification Requirements. Interpreting OJP's authority to permit it to impose these substantive conditions with respect to formula grants, like JAG, beyond what is allowed under federal law conflicts with congressional intent in establishing a prescribed formula grant structure. Congress designed JAG so that "*each State*" receives an allocation according to a precise statutory formula. 34 U.S.C. § 10156(a) (emphasis added). Likewise, Congress's formula provides allocation to "*each* unit of local government." *Id.* § 10156(d)(2) (emphasis added). As such, if USDOJ makes grants from funds that Congress appropriated to JAG, OJP must disburse the funds according to the statutory formula enacted by Congress so long as the jurisdiction complies with the conditions that exist in federal law.

89.    The Certification Requirements are also contrary to congressional intent as immigration enforcement has never been a purpose area for JAG funding, and Congress has repeatedly rejected numerous attempts to attach immigration enforcement requirements to receipt of JAG funding.

90.    Defendants claim that all of the statutes identified in the certification are "applicable Federal laws" that applicants must comply with under 34 U.S.C. § 10153(a)(5) in the JAG

24

authorizing statute. *See* Ex. A at 10; Ex. B. at 10.  The JAG authorizing statute does not permit Defendants to add these statutes as "applicable Federal laws."

91.    8 U.S.C. §§ 1373 and 1644 cannot be "applicable Federal laws" because they are unconstitutional under the Tenth Amendment's anti-commandeering doctrine, and thus, Defendants lack the statutory authority to identify those statutes as "applicable laws."

92.    8 U.S.C. §§ 1226, 1231, 1357, and 1366 are not "applicable Federal laws" as they are not laws that are applicable to applicant state and local jurisdictions.  These laws only impose obligations on the federal government.  In addition, 8 U.S.C. § 1324 only applies to individuals and organizations, not to state and local jurisdictions.

93.    None of the federal laws identified in the certifications are "applicable" because the term "other applicable Federal laws" is best understood as referring to laws that are expressly connected to federal grant-making.  Prior to 2016, the only laws that USDOJ identified as "applicable" were those that specifically address the administration of federal funding in the text of the statute.  There is no provision in the INA, or any federal law, that requires jurisdictions to assist with otherwise voluntary immigration enforcement related activities in order to receive these federal funds.

94.    Defendants exceed their statutory authority by adding the Certification Requirements because these purported "applicable Federal laws" cannot be constitutionally applied to California's laws under the anti-commandeering doctrine.  Defendants exceed their statutory authority by interpreting statutes such as 8 U.S.C. §§ 1226, 1231, and 1357(a), as requiring state and local jurisdictions to comply with notification requests or allowing immigration authorities access to detention facilities, although those statutes impose no requirements on state and local jurisdictions.  *See* Ex. A at 37; Ex. B at 36-37.

95.    These Certification Requirements are further undercut by 34 U.S.C. § 10228(a), which is codified in the same chapter as the JAG authorizing statute, and prohibits the use of federal law enforcement grants to exercise "any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."

**B.    The Certification Requirements do not Provide Jurisdictions with Clear Notice of what they Require**

96.    It is ambiguous what the Certification Requirements mandate or prohibit grant recipients from doing.  For example, it is unclear what activities Defendants perceive as "impeding" federal immigration officials.  Federal law does not prohibit state and local jurisdictions from limiting their law enforcement officers from engaging in immigration enforcement.  However, the federal government, in another litigation, has staked its position that it views such practices as "impeding" immigration officials.  It is, therefore, uncertain what actions that jurisdictions must take in order to satisfy the federal government's view of these requirements, when there is no federal law that broadly prohibits jurisdictions from "impeding" immigration officials.  It is just as unclear what Defendants consider to be "aid[ing] or abet[ing]" a violation of 8 U.S.C. § 1324(a).

97.    It is ambiguous whether the requirement to certify that grant recipients "permit DHS agents to have access to any correctional facility in order to meet with an alien . . . and inquire as to his right to be or remain in the United States" prohibits grant recipients from informing inmates of their right to have a lawyer present or decline an interview with ICE, which would implicate the notice requirements in the TRUTH Act.  It is also ambiguous as to whether the Certification Requirements prohibit jurisdictions from restricting their employees from asking a person about his or her immigration status, or complying with requests to hold a person after his or her ordinary release, activities which are both generally prohibited under the Values Act.

**C.    Interpreting the Certification Requirements as Requiring Jurisdictions to Hold an Individual Past His or Her Ordinary Release would mean Defendants are Conditioning Funding on Unconstitutional Activities**

98.    If Defendants interpret the ambiguous Certification Requirements as requiring jurisdictions to hold an individual beyond his or her scheduled release date and time in order to comply, Defendants would be forcing jurisdictions to violate the Fourth Amendment of the U.S. Constitution in order to receive federal funding.  That is because jurisdictions would be required to detain individuals beyond when they would otherwise be eligible for release even if a jurisdiction lacks the probable cause to do so.

26

99.   As a matter of practice, when issuing a I-247A detainer form to a local jurisdiction, ICE merely checks a box identifying whether: (a) there is a final order of removal; (b) removal proceedings are pending as to the individual; (c) "[b]iometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law;" and/or (d) "[s]tatements made by the alien to an immigration officer and/or reliable evidence that affirmatively indicate that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."[12]

100.   The I-247A form alone does not provide a jurisdiction with any individually particularized information about the alleged basis for removability.  Detainer requests are typically only accompanied by an ICE administrative warrant, which has not been reviewed and approved by a neutral magistrate.  As federal courts throughout the country have determined, jurisdictions that hold individuals beyond their ordinary release date pursuant to ICE detainer requests violate the Fourth Amendment if the detainer requests are not supported by independent probable cause or a judicial warrant.  *See, e.g.*, *Roy v. Cty. of L.A.*, No. 12-cv-9012, 2018 WL 914773, *23-24 (C.D. Cal. Feb. 7, 2018); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 510-11 (N.D. Cal. 2017).

101.   It is unclear whether Defendants consider jurisdictions that limit compliance with detainer requests as "imped[ing]" immigration officials.  To cure this ambiguity and the Fourth Amendment problems with the Certification Requirements, Defendants would need to explicitly state that jurisdictions do not need to detain an individual beyond his or her ordinary release in order to comply with the Certification Requirements.

## VI.   THE IMPOSITION OF THE CERTIFICATION REQUIREMENTS CREATE IRREPARABLE HARM TO THE STATE AND ITS LOCAL JURISDICTIONS

102.   These Certification Requirements mean that the State and its local jurisdictions will have to decide whether they can or should accept their JAG awards under these ambiguous and

---

[12] *See* Department of Homeland Security, Immigration Detainer – Notice of Action, Form I-247A, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

1   unlawful requirements.  If the State and its local jurisdictions cannot accept the awards, the State

2   will lose $28.9 million in critical funds that would otherwise go toward programs throughout the

3   State that reduce recidivism for at-risk youth, counter the distribution of illegal drugs, advance

4   community policing, and improve educational outcomes.

5       103.   It is likely that in order for the State and many of its localities to accept the funding,

6   they will have to change their public safety oriented laws and policies in order to ensure they are

7   viewed as complying with these ambiguous Certification Requirements.  Abandoning these

8   policies that law enforcement has found to be effective in their communities would divert

9   resources away from fighting crime and erode trust between the State and local governments and

10  their immigrant communities that the TRUST, TRUTH, and Values Acts, as well as local

11  ordinances, are intended to build.

12      104.   By their actions, Defendants are compelling state and local governments to make a

13  decision about whether to modify or abandon public safety policies or forego federal funding

14  without providing clarity about the scope of the conditions.  This forces jurisdictions to sign an

15  unqualified certification within 45 days of receiving final award conditions despite the

16  ambiguities the Defendants have created.  California and its local jurisdictions must make this

17  decision under the shadow of the federal government's actions that they have already taken and

18  threats they have made against California on the basis of the State's laws.  In addition to suing the

19  State for adopting laws that the United States alleges "impede" immigration authorities, after the

20  Values Act went into effect, then-ICE Acting Director Thomas Homan called for USDOJ to

21  "charge" elected officials for jurisdictions with policies like California for violating 8 U.S.C. §

22  1324(a) if they do not meet the Administration's immigration enforcement demands.[13]  The DHS

23  Secretary Kirstjen Nielsen later confirmed in congressional testimony that USDOJ was

24  "reviewing" ways to charge state and local official as Acting Director Homan suggested.  By

25  trying to make § 1324(a) an "applicable Federal law" through this Certification Requirement,

26

27  _____
    [13] Fox News Interview with Thomas Homan, *Acting ICE director: California made a foolish decision* (Jan. 2, 2018), http://www.foxnews.com/transcript/2018/01/02/acting-ice-director-california-made-foolish-decision.html.

28

1   Defendants are unlawfully attempting to force elected officials to make representations, under the

2   threat of criminal prosecutions, about that federal statute.

3       105.   The State should not be faced with this Hobson's Choice of agreeing to these

4   unconstitutional Certification Requirements and facing a certain enforcement action, or not

5   agreeing to these Certification Requirements and losing critical public safety dollars to the

6   detriment of the State's communities.  Defendants' scheme undermines public safety, is

7   unconstitutional, and should be halted.

8                         **FIRST CLAIM FOR RELIEF**

9                **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

10      106.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

11      107.   Article I, Section I of the United States Constitution enumerates that "[a]ll legislative

12   Powers herein granted shall be vested in [the] Congress."

13      108.   Article I, Section VIII of the United States Constitution vests exclusively in Congress

14   the spending power to "provide for . . . the General Welfare of the United States."

15      109.   Defendants have exceeded congressional authority by adding substantive

16   Certification Requirements that are not conferred by the JAG authorizing statute or any other

17   federal law.  *See* 34 U.S.C. §§ 10151-58.  The new Certification Requirements therefore

18   unlawfully exceed the Executive Branch's powers and intrude upon the powers of Congress.

19      110.   For the reasons stated herein, the Certification Requirements in the JAG Solicitations

20   are unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.  Additionally,

21   Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue

22   California's FY 2018 JAG award without the Certification Requirements, and disbursal of

23   California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

24                         **SECOND CLAIM FOR RELIEF**

25                                 **ULTRA VIRES**

26   **(The Laws in the Certification Requirements are not "Applicable Federal Laws" within the
Meaning of the JAG Authorizing Statute)**

27      111.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

28

112.   An agency acts ultra vires when it exceeds its statutory authority conferred by Congress.

113.   None of the identified laws in the Certification Requirements are "applicable Federal laws" within the meaning of the JAG authorizing statute because they do not govern by their express terms the administration of federal funding.

114.   Additionally, 8 U.S.C. §§ 1226, 1231, 1324, and 1366 cannot be applicable laws for applicants to JAG funding because these laws impose no obligations on state and local jurisdictions.

115.   Alternatively, even if these statutes were deemed to be "applicable Federal laws," Defendants exceed their authority under the JAG authorizing statute by imposing requirements on state and local governments that are not found in these federal statutes.  For example, Defendants seek to "require[] . . . recipients to provide (where feasible) at least 48 hours' notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act," although there is no such requirement in federal law.  Similarly, Defendants "requir[e] . . . recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States," which again is not a requirement that exists in federal law.

116.   For the reasons stated herein, the Certification Requirements in the JAG Solicitations are ultra vires, and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

### **THIRD CLAIM FOR RELIEF**

**ULTRA VIRES/ANTI-COMMANDEERING**
**(The Certification Requirements Cannot be Constitutionally Applied to California's Laws under the Tenth Amendment of the Constitution)**

117.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

118.  Defendants' basis for adding the Certification Requirements are that they are premised on being "applicable Federal laws."  If the laws identified in the Certification Requirements are "applicable Federal laws," then the breadth of what Congress permitted Defendants to condition funding on is confined to what the "applicable laws" require or prohibit, as limited by the Tenth Amendment, and nothing more.

119.  The Tenth Amendment prohibits the federal government from requiring states and localities "to govern according to Congress's instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the State's officers . . . to administer or enforce a federal regulatory program."  *Printz v. United States*, 521 U.S. 898, 935 (1997).  Specifically, where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional.  *Id.* at 932.

120.  The Tenth Amendment guarantees that states have a "legitimate choice" to "decline to administer the federal program."  *New York*, 505 U.S. at 177, 185.  Prohibitions that "unequivocally dictate[] what a state legislature may and may not do" violate the anti-commandeering doctrine as much as affirmative commands.  *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).

121.  Two of the laws that are part of the Certification Requirements, 8 U.S.C. §§ 1373 and 1644, violate the Tenth Amendment on their face or as applied under Defendants' interpretation of them.  Therefore, those laws are invalid and cannot be identified as "applicable Federal laws."  *See Chicago*, 2018 WL 3608564, at 7-11; *Philadelphia*, 309 F. Supp. 3d at 329-31.

122.  In *United States v. California*, the United States has already made clear its view that the Values and TRUST Acts "impede" immigration authorities, which would run afoul of the Certification Requirements.  As was found in that case, an interpretation of federal law that "prohibit[s] states from restricting their law enforcement agencies' involvement in immigration activities—apart from, perhaps, a narrowly drawn information sharing provision—would likely violate the Tenth Amendment."  *California*, 2018 WL 3301414, at *21.

123.  Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants do not possess the statutory authority to apply the Certification Requirements as to the TRUST,

31

TRUTH, and Values Acts, as to do so, Defendants would be applying federal law in a manner that violates the Tenth Amendment of the Constitution. Defendants' statutory authority to use funding conditions to commandeer the State is also limited by 34 U.S.C. § 10228(a), which prohibits the use of federal law enforcement grants to exercise "any direction, supervision, or control over any police force or any other criminal justice agency."

124. For the reasons stated herein, the Certification Requirements in the JAG Solicitations are ultra vires, and should be set aside, or alternatively, should be set aside as to California and its local jurisdictions. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

## FOURTH CLAIM FOR RELIEF

### SPENDING CLAUSE

125. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

126. Congress' spending power is not unlimited. When "Congress desires to condition the States' receipt of federal funds," it must do so (a) "unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation;" (b) by placing conditions that are related "to the federal interest in particular national projects or programs;" and (c) to not "induce the States to engage in activities that would themselves be unconstitutional." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted).

127. To the extent that Congress delegated its authority to impose conditions on JAG funding (which Plaintiff does not concede), the Certification Requirements violate the Spending Clause of the U.S. Constitution.

128. The Certification Requirements are unrelated to the "federal interest in particular national projects or programs" for which Congress intended JAG funding to be used.

129. The Certification Requirements violate the Spending Clause because they are ambiguous and do not provide the State with notice to make a "choice knowingly" of whether to comply.

130.   Additionally, if the Certification Requirements mandate that jurisdictions hold (or not prohibit the holding of) individuals beyond their ordinary release, that requirement would also violate the independent constitutional bar prong of the Spending Clause by requiring law enforcement to comply even when doing so would violate the Fourth Amendment of the U.S. Constitution.

131.   For the reasons stated herein, the Certification Requirements in the JAG Solicitation are unlawful, and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(Constitutional Violations and Excess of Statutory Authority)**

132.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

133.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG Solicitations are "agency action[s]" under the APA, *id.* § 551(13).

134.   The JAG Solicitations constitute "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

135.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)-(C).

136.   Defendants' imposition of the Certification Requirements in the JAG Solicitations is unconstitutional because Defendants overstepped their powers by exercising lawmaking authority that is solely reserved to Congress under Article I, Section I of the U.S. Constitution.  Also, Defendants' imposition of the Certification Requirements was ultra vires in excess of their statutory authority.  Furthermore, the Certification Requirements violate the Spending Clause

33

because they are unrelated to the federal purpose of the grant, ambiguous, and/or tied to unconstitutional activities.

137.   Because Defendants acted unconstitutionally and in excess of their statutory authority through the JAG Solicitations, these actions are unlawful and should be set aside under 5 U.S.C. § 706. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

**SIXTH CLAIM FOR RELIEF**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(Arbitrary and Capricious)**

138.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

139.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG Solicitations are "agency action[s]" under the APA, *id.* § 551(13).

140.   The JAG Solicitations constitute "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

141.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

142.   The imposition of the Certification Requirements is arbitrary and capricious and an abuse of discretion because Defendants have relied on factors that Congress did not intend, failed to consider an important aspect of the program the agency is addressing, and has offered no explanation for adding the Certification Requirements that is consistent with the evidence that is before the agency. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

143.   For the reasons discussed herein, the Certification Requirements in the JAG Solicitations are unlawful and should be set aside under 5 U.S.C. § 706 for being arbitrary and capricious and an abuse of discretion. Additionally, Plaintiff is entitled to a writ of mandamus

under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the State of California, respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1. Issue a declaration that the Certification Requirements in the JAG Solicitations are unconstitutional and/or unlawful because: (a) they violate the separation of powers; (b) they exceed congressional authority conferred to the Executive Branch and are ultra vires on their face and as applied to the TRUST, TRUTH, and Values Acts; (c) to the extent there is congressional authority, they exceed Congress's spending powers under Article I of the Constitution; and/or (d) they violate the Administrative Procedure Act;

2. Permanently enjoin Defendants from using the Certification Requirements for FY 2018 JAG funding;

3. Permanently enjoin Defendants from withholding, terminating, disbarring, or making any state entity or local jurisdiction ineligible for JAG funding on account of the TRUST, TRUTH, and Values Acts;

4. Issue a writ of mandamus compelling Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds; and

5. Award the State costs and grant such other relief as the Court may deem just and proper.

Complaint for Declaratory, Injunctive, and Mandamus Relief

1   Dated:  August 23, 2018                              Respectfully Submitted,

2                                                        XAVIER BECERRA
                                                         Attorney General of California
3                                                        MICHAEL NEWMAN
                                                         Senior Assistant Attorney General
4                                                        SATOSHI YANAI
                                                         Supervising Deputy Attorney General
5
                                                         */s/ Lee I. Sherman*
6                                                        */s/ Sarah E. Belton*

7                                                        LEE I. SHERMAN
                                                         SARAH E. BELTON
8                                                        Deputy Attorneys General
                                                         *Attorneys for Plaintiff*
9                                                        *State of California*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36

# EXHIBIT A

OMB No. 1121-0329
**Approval Expires 11/30/2020**

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP), Bureau of Justice Assistance (BJA) is seeking applications for the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting state, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program
# FY 2018 State Solicitation

## Applications Due: August 22, 2018

## Eligibility

Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a state or states includes all 56 jurisdictions.)

A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

In addition, as discussed further below, in order to validly accept a fiscal year (FY) 2018 JAG award, the chief legal officer of the applicant state must properly execute, and the state must submit, the specific certifications regarding compliance with certain federal laws attached to this solicitation as Appendix B and Appendix C. (The text of the relevant federal laws appears in Appendix D.)

The expected allocations by state for the FY 2018 JAG Program can be found at: https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All recipients and subrecipients must forgo any profit or management fee.

# Deadline

Applicants must register in the OJP Grants Management System (GMS) at https://grants.ojp.usdoj.gov/ prior to submitting an application under this solicitation. All applicants must register, even those that previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by 5:00 p.m. eastern time on August 22, 2018.

For additional information, see How to Apply in Section D. Application and Submission Information.

# Contact Information

For technical assistance with submitting an application, contact the Grants Management System Support Hotline at 888–549–9901, option 3, or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline operates 24 hours a day, 7 days a week, including on federal holidays.

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service (NCJRS) Response Center at grants@ncjrs.gov **within 24 hours after the application deadline** in order to request approval to submit its application. Additional information on reporting technical issues appears under "Experiencing Unforeseen GMS Technical Issues" in How to Apply in Section D. Application and Submission Information.

For assistance with any other requirement of this solicitation, applicants may contact the NCJRS Response Center by telephone at 1–800–851–3420; via TTY at 301–240–6310 (hearing impaired only); by email at grants@ncjrs.gov; by fax to 301–240–5830, or by web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday, and 10:00 a.m. to 8:00 p.m. eastern time on the solicitation close date. Applicants also may contact the appropriate BJA State Policy Advisor.

Release date: July 20, 2018

2

# Contents

A. Program Description ................................................................................................. 5

    Overview ..................................................................................................................5

    Program-specific Information ....................................................................................5

        Permissible uses of JAG Funds – In general ........................................................5

        Limitations on the use of JAG funds ....................................................................6

        State obligations regarding use of JAG funds and units of local government .........10

        Required compliance with applicable federal laws ...............................................10

        Potential funding reductions for noncompliance with PREA and SORNA...............11

        BJA Areas of Emphasis ....................................................................................12

    Objectives and Deliverables ...................................................................................14

    Evidence-based Programs or Practices ...................................................................14

    Information Regarding Potential Evaluation of Programs and Activities....................14

B. Federal Award Information ..................................................................................... 15

    Type of Award ......................................................................................................15

    Financial Management and System of Internal Controls...........................................16

    Budget and Financial Information............................................................................17

    Cost Sharing or Match Requirement .......................................................................17

    Pre-agreement Costs (also known as Pre-award Costs) ...........................................17

    Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs .......18

    Costs Associated with Language Assistance (if applicable)......................................18

C. Eligibility Information ............................................................................................ 18

D. Application and Submission Information ................................................................. 19

    What an Application Should Include.........................................................................19

    How to Apply ........................................................................................................32

E. Application Review Information .............................................................................. 34

    Review Process ....................................................................................................34

F. Federal Award Administration Information ............................................................... 35

    Federal Award Notices...........................................................................................35

    Statutory and Regulatory Requirements; Award Conditions .....................................36

    General Information about Post-federal Award Reporting Requirements ...................37

G. Federal Awarding Agency Contact(s) ..................................................................... 38

H. Other Information .................................................................................................. 38

    Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)..38

    Provide Feedback to OJP .......................................................................................39

Appendix A: Certifications and Assurances by the Chief Executive ..........................40

Appendix B: Certification of Compliance with 8 U.S.C. §§ 1373 and 1644 ...............42

Appendix C: Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3) ........................................................................44

Appendix D: Certain relevant federal laws, as in effect on June 7, 2018 ..................46

Appendix E: Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE).......................52

Appendix F: Additional Award Purposes ..................................................................53

Appendix G: Application Checklist .............................................................................56

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program
# FY 2018 State Solicitation
# CFDA #16.738

## A. Program Description

**Overview**
The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to states and units of local government. BJA will award JAG Program funds to eligible states under this FY 2018 JAG Program State Solicitation. (A separate solicitation will be issued for applications to BJA directly from units of local government.)

**Statutory Authority:** The JAG Program statute is Subpart I of Part E of Title I of the Omnibus Crime Control and Safe Streets Act of 1968. Title I of Public Law No. 90-351 (generally codified at 34 U.S.C. 10151-10158), including subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).

**Program-specific Information**

**Permissible uses of JAG Funds – In general**
In general, JAG funds awarded to a state under this FY 2018 solicitation may be used to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for **criminal justice**, including for any one or more of the following:

- Law enforcement programs
- Prosecution and court programs
- Prevention and education programs
- Corrections and community corrections programs
- Drug treatment and enforcement programs
- Planning, evaluation, and technology improvement programs
- Crime victim and witness programs (other than compensation)
- Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams

Additionally, JAG funds awarded to a state under this FY 2018 solicitation may be used for any purpose indicated in Appendix F.

In connection with the all of the above purposes (including those indicated in the appendix), it should be noted that the statute defines "criminal justice" as "activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not

5

limited to prosecutorial and defender services, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency."

Under the JAG Program, states may use award funds for broadband deployment and adoption activities as they relate to criminal justice activities.

**Limitations on the use of JAG funds**
*Prohibited uses of funds* – JAG funds may not be used (whether directly or indirectly) for any purpose prohibited by federal statute or regulation, including those purposes specifically prohibited by the JAG Program statute as set out at 34 U.S.C. § 10152.

JAG funds may not be used (directly or indirectly) for security enhancements or equipment for nongovernmental entities not engaged in criminal justice or public safety. Additionally, **JAG funds may not be used (directly or indirectly) to pay for any of the following items unless the BJA Director certifies that extraordinary and exigent circumstances exist,** making them essential to the maintenance of public safety and good order:

- Vehicles, vessels, or aircraft*
- Luxury items
- Real estate
- Construction projects (other than penal or correctional institutions)
- Any similar items

**\*Police cruisers, police boats, and police helicopters are allowable vehicles under JAG and do not require BJA certification.**

For information about requesting a waiver to obtain BJA certification for a listed prohibited item, or for examples of allowable vehicles that do not require BJA certification, refer to the JAG FAQs.

*Cap on use of JAG award funds for administrative costs* – Up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award.

*Prohibition of supplanting; prohibition on use of JAG funds as match* – JAG funds may not be used to supplant state or local funds but must be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities. See the JAG FAQs for examples of supplanting.

Although supplanting is prohibited, as discussed under What An Application Should Include, leveraging of federal funding is encouraged.

Absent specific federal statutory authority to do so, JAG award funds may not be used as a match for the purposes of other federal awards.

*Other restrictions on use of funds* – If a state chooses to use its FY 2018 JAG funds for particular, defined types of expenditures, it must satisfy certain preconditions.

▪ Body-Worn Cameras (BWCs)
A state that proposes to use FY 2018 JAG award funds to purchase BWC equipment, or to implement or enhance BWC programs, must provide to OJP a certification(s) that each state law enforcement agency receiving the equipment or implementing the program has policies and procedures in place related to BWC equipment usage, data storage and access, privacy considerations, and training. The certification form related to BWC policies and procedures can be found at https://www.bja.gov/Funding/BodyWornCameraCert.pdf.

A state that proposes to use JAG funds for BWC-related expenses will have funds withheld until the required certification is submitted and approved by OJP. If the state proposes to change project activities to utilize JAG funds for BWC-related expenses after the award is accepted, the state must submit the signed certification to OJP at that time.

Further, before making any subaward for BWC-related expenses, the state JAG recipient must collect a completed BWC certification from the proposed subrecipient. Any such certifications must be maintained by the state JAG recipient, and made available to OJP upon request.

**The BJA BWC Toolkit provides model BWC policies and best practices to assist criminal justice departments in implementing BWC programs.**

Apart from the JAG Program, BJA provides funds under the Body-Worn Camera Policy and Implementation (BWC) Program. The BWC Program allows jurisdictions to develop and implement policies and practices required for effective program adoption, and to address program factors including the purchase, deployment, and maintenance of camera systems and equipment; data storage and access; and privacy considerations. Interested states may wish to refer to the BWC Program web page for more information. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BWC Program.

▪ Body Armor
Body armor purchased with FY 2018 JAG funds may be purchased at any threat level designation, make, or model from any distributor or manufacturer, as long as the body armor has been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. Further, body armor or armor vests purchased with FY 2018 JAG funds must also be "uniquely fitted vests" as this term is used in the context of the Bulletproof Vest Partnership (BVP) Program (see 34 U.S.C. § 10202(c)(1)(A)) requiring that grantees using JAG funds to purchase armor vests or body armor comply with requirements established for BVP grants. For these purposes, "uniquely fitted vests" means protective (ballistic or stab-resistant) armor vests that conform to the individual wearer to provide the best possible fit and coverage, through a combination of: (1) correctly sized panels and carrier, determined through appropriate measurement, and (2) properly adjusted straps, harnesses, fasteners, flaps, or other adjustable features. The requirement that body armor be "uniquely fitted" does **not** require body armor that is individually manufactured based on the measurements of an individual wearer. In support of OJP's efforts to improve officer safety, the American Society for Testing and Materials (ASTM) International has made available the Standard Practice for Body Armor Wearer Measurement and Fitting of Armor (Active Standard ASTM E3003) available at no cost. The Personal Armor Fit Assessment checklist is excerpted from ASTM E3003.

7

A state that proposes to use FY 2018 JAG award funds to purchase body armor must provide OJP with a certification(s) that each state law enforcement agency receiving body armor has a written "mandatory wear" policy in effect. *See* 34 U.S.C. § 10202(c). The certification form related to mandatory wear can be found at www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

A state that proposes to use JAG funds to purchase body armor will have funds withheld until the required certification is submitted and approved by OJP. If the state proposes to change project activities to utilize JAG funds to purchase body armor after the award is accepted, the state must submit the signed certification to OJP at that time.

Further, before making any subaward for the purchase of body armor, the state JAG recipient must collect a completed mandatory wear certification from the proposed subrecipient. Any such certifications must be maintained by the state JAG recipient, and made available to OJP upon request.

A mandatory wear concept and issues paper and a model policy are available at the BVP Customer Support Center, at vests@usdoj.gov or toll free at 1–877–758–3787. Additional information and FAQs related to the mandatory wear policy and certifications can be found at https://www.bja.gov/Funding/JAGFAQ.pdf.

Apart from the JAG Program, BJA provides funds under the Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to state and local law enforcement agencies for the purchase of ballistic-resistant and stab-resistant body armor. For more information on the BVP Program, including eligibility and application, refer to the BVP web page. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BVP Program.

- Interoperable Communications
  States (and any subrecipients) that use FY 2018 JAG funds to support emergency communications activities (including the purchase of interoperable communications equipment and technologies such as Voice over Internet Protocol bridging or gateway devices, or equipment to support the build out of wireless broadband networks in the 700 MHz public safety band under the Federal Communications Commission [FCC] Waiver Order) should review 2018 SAFECOM Guidance. SAFECOM Guidance is updated annually to provide current information on emergency communications policies, eligible costs, best practices, and technical standards for state, local, tribal, and territorial grantees investing federal funds in emergency communications projects. Additionally, emergency communications projects funded with FY 2018 JAG funds should support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the full-time Statewide Interoperability Coordinator (SWIC) in the state of the project. As the central coordination point for a state's interoperability effort, the SWIC plays a critical role, and can serve as a valuable resource. SWICs are responsible for the implementation of SCIP through coordination and collaboration with the emergency response community. The U.S. Department of Homeland Security Office of Emergency Communications maintains a list of SWICs for each of the states and territories. Contact OEC@hq.dhs.gov for more information. All communications equipment purchased with FY 2018 JAG Program funding should be identified during quarterly performance metrics reporting.

Further, information-sharing projects funded with FY 2018 JAG funds must comply with DOJ's Global Justice Information Sharing Initiative guidelines, as applicable, in order to promote information sharing and enable interoperability among disparate systems across the justice and public safety community. Recipients (and subrecipients) must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://www.it.ojp.gov/gsp_grantcondition. Recipients (and subrecipients) will be required to document planned approaches to information sharing and describe compliance with GSP and an appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

For JAG applicants considering implementing communications technology projects, it is worthwhile to consider the First Responder Network Authority (FirstNet) Program. The Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. §§ 1401 *et seq.*) established the First Responder Network Authority (FirstNet) as an independent authority within the National Telecommunications and Information Administration (NTIA). FirstNet's statutory mission is to take all actions necessary to ensure the establishment of a nationwide public safety broadband network (NPSBN). The NPSBN will use the 700 MHz D block spectrum to provide Long-Term Evolution (LTE)-based broadband services and applications to public safety entities. The network is based on a single, national network architecture that will evolve with technological advances and initially consist of a core network and radio access network. While mission critical voice communications will continue to occur on land mobile radio (LMR), in time, FirstNet is expected to provide public safety entities with mission critical broadband data capabilities and services including, but not limited to: messaging; image sharing; video streaming; group text; voice; data storage; applications; location-based services; and quality of service, priority and preemption. This reliable, highly secure, interoperable, and innovative public safety communications platform will bring 21st century tools to public safety agencies and first responders, allowing them to get more information quickly and helping them to make faster and better decisions. For more information on FirstNet services, the unique value of the FirstNet network to public safety, and how to subscribe for the FirstNet service should your state or territory opt in, please visit www.FirstNet.gov. To learn about FirstNet's programs and activities, including its consultation and outreach with public safety, the state plans process, FirstNet's history and promise, and how it plans to ensure that the FirstNet network meets the needs of public safety, please visit www.FirstNet.gov or contact info@firstnet.gov.

- **DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database**
  If JAG Program funds are to be used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the FBI) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior expressed written approval from BJA.

  In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not acceptable for entry into CODIS.

- **Entry of Records into State Repositories**
  As appropriate and to the extent consistent with law, a condition may be imposed that would require the following: with respect to any "program or activity" that receives federal financial assistance under this solicitation that is likely to generate or upgrade court dispositions or other records that are relevant to National Instant Background Check

9

System (NICS) determinations (which includes any dispositions or records whatsoever that involve any "alien [who] is illegally or unlawfully in the United States" (18 U.S.C. § 922(g)(5)(A) (generally prohibiting any such alien to possess any firearm or ammunition)), a system must be in place to ensure that all such NICS-relevant dispositions or records that are generated or upgraded are made available in timely fashion to state repositories/databases that are accessed by NICS.

**State obligations regarding use of JAG funds and units of local government**
A state that applies for and receives an FY 2018 JAG award must:

- Pass through a predetermined percentage of funds to units of local government. (For purposes of the JAG Program, a "unit of local government" includes a city, county, township, town, and certain federally recognized Indian tribes.) This predetermined percentage (often referred to as the "variable pass-through" or VPT) is calculated by OJP's Bureau of Justice Statistics (BJS), based on the total criminal justice expenditures by a state and its units of local government. The variable pass-through percentages that will apply to an FY 2018 award to a recipient state can be found at: https://www.bja.gov/jag/pdfs/VPT-for-SAAs-updated-June-2017.pdf. (If a state believes the VPT percentage has been calculated incorrectly, the state may provide pertinent, verifiable data to BJA and ask OJP to reconsider.)

- Appropriately use or distribute the amount of funds that are **added** to the state's FY 2018 award because certain units of local government within the state are ineligible for a direct FY 2018 award of JAG funds due to their small size. (These small size units of local government are referred to as "less-than-$10,000 jurisdictions.") The state must provide these additional funds included in its FY 2018 award to state police departments that provide criminal justice services to the "less-than-$10,000 jurisdictions" within the state and/or subaward the funds to such jurisdictions.

**Required compliance with applicable federal laws**
By law, the chief executive (e.g., the governor) of each state that applies for an FY 2018 JAG award must certify that the state will "comply with all provisions of [the JAG program statute] and all other applicable Federal laws." To satisfy this requirement, each state applicant must submit three properly executed certifications, using the forms shown in Appendices A, B, and C.

All applicants should understand that OJP awards, including certifications provided in connection with such awards, are subject to review by DOJ, including by OJP and by the DOJ Office of the Inspector General. Applicants also should understand that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in a certification submitted to OJP in support of an application may be the subject of criminal prosecution, and also may result in civil penalties and administrative remedies for false claims or otherwise. Administrative remedies that may be available to OJP with respect to an FY 2018 award include suspension or termination of the award, placement on the DOJ high risk grantee list, disallowance of costs, and suspension or debarment of the recipient.

**National Incident-Based Reporting System (NIBRS) 3 Percent Set-aside**
In FY 2016, the Federal Bureau of Investigation (FBI) formally announced its intention to sunset the Uniform Crime Reporting (UCR) Program's traditional Summary Reporting System (SRS) and replace it with the UCR Program's National Incident-Based Reporting System (NIBRS). By January 1, 2021, the FBI intends for NIBRS to be the law enforcement crime data reporting standard for the nation.

By statute, JAG Program awards are calculated using summary Part 1 violent crime data from the FBI's UCR Program. (See 34 U.S.C. § 10156.) Once SRS has been replaced by NIBRS, JAG award amounts will be calculated using NIBRS data. In preparation for the FBI's 2021 NIBRS compliance deadline, beginning in FY 2018, BJA is requiring, through the application of a special condition, direct JAG award recipients not certified by the FBI as NIBRS compliant to dedicate 3 percent of their JAG award toward achieving full compliance with the FBI's NIBRS data submission requirements under the UCR Program. The 3 percent requirement will assist state and local jurisdictions in working toward compliance, to ensure they continue to have critical criminal justice funding available through JAG when SRS is replaced by NIBRS in FY 2021.

The requirement for a NIBRS set-aside will not be applied to subawards from states. Rather, state JAG recipients must ensure that at least 3 percent of the total award amount is used toward NIBRS compliance, unless the FBI has certified that the state is already NIBRS compliant. States must clearly indicate in their application narratives and budgets what projects will be supported with this 3 percent set-aside.

The following are examples of costs and projects that relate to NIBRS implementation at the state or local level that could be funded under the JAG Program: software, hardware, and labor that directly support or enhance a state or agency's technical capacity for collecting, processing, and analyzing data reported by local law enforcement (LE) agencies and then submitting NIBRS data to the FBI; training personnel responsible for the state's Incident Based Reporting (IBR) program on receiving, processing, analyzing, and validating incident-based data from local LE agencies in their state; training local agencies in how to collect and submit NIBRS data; and technical assistance for LE agency personnel responsible for (1) managing the agency's crime incident data, (2) processing and validating the data, and (3) extracting and submitting IBR data to the state UCR Program according to the states and/or directly to the FBI according to the NIBRS standard.

BJA will waive the set-aside requirement for states that have been certified as NIBRS compliant by the FBI as of the posting date of this solicitation. States for which the FBI certifies NIBRS compliance after that date may request a waiver of the set-aside requirement from the BJA Director. The waiver request from an appropriate state official must clearly state that the state has been certified as NIBRS compliant by the FBI, and should be submitted with the application, or, as appropriate, through a request for a Grant Adjustment Notice after an award is made. In any instance in which a waiver request is submitted, the state must retain documentation on file that demonstrates the FBI certification of NIBRS compliance. Such documentation must be made available for BJA review, upon request. The BJA Director will review all requests for waivers. If approved, states will not be subject to the 3 percent set-aside requirement.

Note: U.S. territories and tribal jurisdictions will not be subject to the 3 percent set-aside for NIBRS compliance until FY 2019. Tribal jurisdictions and the five U.S. territories will be strongly encouraged to dedicate a portion of JAG funding to NIBRS conversion; however, this is not a requirement for FY 2018 JAG funding. Utilizing this phased-in approach will allow the territories and tribal jurisdictions to plan for the change in funding direction and provide BJA with time to coordinate or provide technical assistance.

**Potential funding reductions for noncompliance with PREA and SORNA**
Prison Rape Elimination Act of 2003 (PREA). In 2012, DOJ published the National PREA Standards, which were promulgated to prevent, detect, and respond to sexual victimization and abuse in confinement settings. The PREA Standards are set out at 28 C.F.R. Part 115, and

apply to confinement facilities including adult prisons and jails, juvenile facilities, and police lockups.

Under PREA, if a state's chief executive (e.g., governor) does not certify full compliance with the National PREA Standards, the state is subject to the loss of five percent of certain DOJ grant funds, including JAG award funds, unless: (1) the chief executive submits an assurance to DOJ that no less than five percent of such funds will be used solely for the purpose of enabling the state to achieve and certify full compliance with the PREA Standards in future years; or (2) the chief executive requests that the affected funds be held in abeyance by DOJ. See 34 U.S.C. § 30307(e)(2).

A reduction of a JAG award to a state under the provisions of PREA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information concerning PREA implementation, send inquiries to the PREA Management Office at PREACompliance@usdoj.gov and/or review the PREA FAQs.

Sex Offender Registration and Notification Act (SORNA). SORNA, which is Title I of the Adam Walsh Child Protection and Safety Act of 2006, mandates a 10 percent reduction in a JAG award to a state that has failed to substantially implement SORNA. Further, states that have substantially implemented SORNA have an ongoing obligation to maintain that status each year. A JAG reduction will be applied for each year a jurisdiction has failed to have substantially implemented SORNA.

A reduction of a JAG award to a state under the provisions of SORNA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information regarding SORNA implementation, including requirements and a list of states that will be affected in FY 2018 by the 10 percent reduction to the JAG award, send inquiries to AskSMART@usdoj.gov. Additional SORNA guidance can be found within the SORNA FAQs.

**BJA Areas of Emphasis**
BJA recognizes that many state and local criminal justice systems currently face challenging fiscal environments and that an important, cost-effective way to relieve those pressures is to share or leverage resources through cooperation among federal, state, and local law enforcement. BJA intends to focus much of its work on the areas of emphasis described below, and encourages each state recipient of an FY 2018 JAG award to join federal law enforcement agencies across the board in addressing these challenges.

Reducing Violent Crime – Recognizing that crime problems, including felonious possession and use of a firearm and/or gang violence, illegal drug sales and distribution, human trafficking, and other related violent crime, vary from community to community, BJA encourages states to tailor their programs to the local crime issues, and to be data-informed in their work. States should consider investing JAG funds in programs to combat firearms violence, and to improve the process for ensuring that persons prohibited from purchasing firearms (see, e.g., 18 U.S.C. § 922(g)) are prevented from doing so, by utilizing technology such as eTrace and NIBIN to analyze evidence, as well as by enhancing complete, accurate, and timely reporting to the FBI's NICS. States are also encouraged to coordinate with the United States Attorneys and Project Safe Neighborhood (PSN) grantees in order to leverage funding for violence reduction projects, and to coordinate their law enforcement activities with those of federal law

enforcement agencies such as the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Drug Enforcement Administration, and the Department of Homeland Security.

Officer Safety and Wellness – The issue of law enforcement safety and wellness is an important priority for BJA and DOJ. According to the *Preliminary 2017 Law Enforcement Officer Fatalities Report*, released by the National Law Enforcement Officers Memorial Fund (NLEOMF), as of December 28, 2017, there were 128 law enforcement line-of-duty deaths nationwide in 2017. Firearms-related deaths were the second leading cause of law enforcement deaths (44) in 2017, according to the NLEOMF report. Of those deaths, the leading circumstance was officers shot while responding to a domestic disturbance (7), followed by traffic enforcement, investigative activities, and dealing with a suspicious person or vehicle—6 instances in each circumstance. Additionally, deaths due to circumstances other than firearms- or traffic-related deaths increased by 61 percent in 2017 with 37 deaths compared to 23 in 2016. Sixteen of those deaths were due to job-related illnesses, including 10 deaths due to heart attacks.

Based on the latest reports (2016 and 2015) from the FBI's Law Enforcement Officers Killed and Assaulted (LEOKA) data, there appeared to be a continuing increase in assaults between 2015 and 2016. There were 57,180 assaults in 2016 versus 50,212 in 2015. Of those, 16,535 resulted in officer injuries in 2016 compared to 14,281 in 2015. The 2016 LEOKA data show that there were 17 officers killed in ambush situations, which is an increase from 2015 when 4 officers were killed in ambush situations.

BJA sees a vital need to focus not only on tactical officer safety concerns but also on health and wellness, as they affect officer performance and safety. It is important for law enforcement to have the tactical skills necessary, and also to be physically and mentally well, to perform, survive, and be resilient in the face of the demanding duties of the profession. BJA encourages states to use JAG funds to address these needs by providing training, and paying for tuition and travel expenses related to attending trainings such as those available through the BJA VALOR Initiative, as well as funding for health and wellness programs for law enforcement officers.

Border Security – Securing U.S. borders (and internationally accessible waterways and airports) is critically important to the reduction and prevention of transnational drug-trafficking networks and combating all forms of human trafficking within the United States (including sex and labor trafficking of foreign nationals and U.S. citizens of all sexes and ages). Smuggling and trafficking operations to, from, and within the United States contribute to a significant increase in violent crime and U.S. deaths. BJA encourages states to enhance border, waterway, and port security by using JAG funds to support law enforcement hiring, training, and technology enhancement, as well as cooperation and coordination among federal, state, local, and tribal law enforcement agencies.

Collaborative Prosecution and Law Enforcement – BJA supports strong partnerships between prosecutors and law enforcement, at all levels of government, in order to help take violent offenders off the street. BJA strongly encourages state and local law enforcement agencies to foster strong partnerships with federal law enforcement agencies, and with their own prosecutors, as well as federal prosecutors, to adopt new, cost-effective, collaborative strategies to reduce crime, particularly violent crime. (BJA's Innovative Prosecution Solutions Program is a related effort to promote partnerships between prosecutors and researchers to develop and deliver effective, data-driven, evidence-based strategies to solve chronic problems and fight crime.)

**Objectives and Deliverables**
In general, the FY 2018 JAG Program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice. Although the JAG Program provides assistance directly to states, through pass-through (and similar) requirements, the JAG Program also is designed to assist units of local government with respect to criminal justice.

As discussed in more detail in the General Information about Post-federal Award Reporting Requirements discussion, a state that receives an FY 2018 JAG award will be required to produce various types of reports and to submit data related to performance measures and accountability. The objectives and deliverables are directly related to the JAG Program accountability measures described at https://bjapmt.ojp.gov/help/jagdocs.html.

**Evidence-based Programs or Practices**
OJP strongly emphasizes the use of data and evidence in policy making and program development in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates.
- Integrating evidence into program, practice, and policy decisions within OJP and the field.
- Improving the translation of evidence into practice.

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website at https://www.crimesolutions.gov/ is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

A useful matrix of evidence-based policing programs and strategies is available through BJA's Matrix Demonstration Project. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA Innovation Suite of programs including Innovations in Policing, Prosecution, Supervision, Reentry, and others (see https://www.bja.gov/Programs/CRPPE/innovationssuite.html). BJA encourages states to use JAG funds to support these crime innovation strategies, including effective partnerships with universities and research partners and with non-traditional criminal justice partners.

**Information Regarding Potential Evaluation of Programs and Activities**
The Department of Justice has prioritized the use of evidence-based programming and deems it critical to continue to build and expand the evidence informing criminal and juvenile justice programs and crime victim services to reach the highest level of rigor possible. Therefore, applicants should note that OJP may conduct or support an evaluation of the programs and activities funded under this solicitation. Recipients and sub-recipients will be expected to cooperate with program-related assessments or evaluation efforts, including through the collection and provision of information or data requested by OJP (or its designee) for the assessment or evaluation of any activities and/or outcomes of those activities funded under this

14

solicitation. The information or data requested may be in addition to any other financial or performance data already required under this program.

**BJA Success Stories**
The BJA-sponsored Success Stories web page features projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page is a valuable resource for states, localities, territories, tribes, and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the submission of success stories annually (or more frequently).**

If a state has a success story it would like to submit, it may be submitted through the My BJA account, using "Add a Success Story" and the Success Story Submission form. Register for a My BJA account using this registration link.

# B. Federal Award Information

BJA expects to make up to 56 awards of up to $176,700,000.

BJA plans to make awards for a 4-year period of performance, to begin on October 1, 2017. An extension should not exceed 12 months. An extension beyond this period may be made on a case-by-case basis, at the discretion of BJA, and must be justified by circumstances beyond the control of the recipient and subrecipient, as well as requested via GMS, no fewer than 30 days prior to the end of the period for performance.

The expected allocations by state for the FY 2018 JAG program can be found at: https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by statute.

**Type of Award**
BJA expects that any award under this solicitation will be in the form of a grant. See Statutory and Regulatory Requirements; Award Conditions, under Section F. Federal Award Administration Information, for a brief discussion of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants.

JAG awards are based on a statutory formula as described below:

Once each fiscal year's overall JAG Program funding level is determined, BJA works with BJS to begin a four-step grant award calculation process, which, in general, consists of:

(1) Computing an initial JAG allocation for each state, based on its share of violent crime and population (weighted equally).

(2) Reviewing the initial JAG allocation amount to determine if the state allocation is less than the minimum award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the state is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG funds. Each of the remaining states

receives the minimum award plus an additional amount based on its share of violent crime and population.

(3) Dividing each state's final award amount (except for the territories and District of Columbia) between the state and its units of local governments at a rate of 60 and 40 percent, respectively.

(4) Determining unit of local government award allocations, which are based on their proportion of the state's 3-year violent crime average. If the "eligible award amount" for a particular unit of local government, as determined on this basis, is $10,000 or more, then the unit of local government is eligible to apply directly to OJP (under the JAG Local solicitation) for a JAG award. If the "eligible award amount" to a particular unit of local government, as determined on this basis, would be less than $10,000, however, the funds are not made available for a direct award to that particular unit of local government, but instead are added to the amount that otherwise would have been awarded to the state. (The state's obligations with respect to this additional amount for the "less-than-$10,000 jurisdictions" are summarized above.)

**Financial Management and System of Internal Controls**
Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities[1]) must, as described in the Part 200 Uniform Requirements[2] as set out at 2 C.F.R. 200.303:

(a) Establish and maintain effective internal control over the federal award that provides reasonable assurance that [the recipient (and any subrecipient)] is managing the federal award in compliance with federal statutes, regulations, and the terms and conditions of the federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(b) Comply with federal statutes, regulations, and the terms and conditions of the federal awards.

(c) Evaluate and monitor [the recipient's (and any subrecipient's)] compliance with statutes, regulations, and the terms and conditions of federal awards.

(d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(e) Take reasonable measures to safeguard protected personally identifiable information and other information the federal awarding agency or pass-through entity designates as sensitive or [the recipient (or any subrecipient)] considers

---

[1] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to carry out part of the funded award or program.
[2] The "Part 200 Uniform Requirements" refers to the DOJ regulation at 2 C.F.R Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

16

sensitive consistent with applicable federal, state, local, and tribal laws regarding privacy and obligations of confidentiality.

To help ensure that applicants understand administrative requirements and cost principles, OJP encourages prospective applicants to enroll, at no charge, in the DOJ Grants Financial Management Online Training, available at https://ojpfgm.webfirst.com/. (This training is required for all OJP award recipients.)

Also, applicants should be aware that OJP collects information from applicants on their financial management and systems of internal controls (among other information) which is used to make award decisions. Under Section D. Application and Submission Information, applicants may access and review the OJP Financial Management and System of Internal Controls Questionnaire (http://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf) that OJP requires **all** applicants (other than an individual applying in his/her personal capacity) to download, complete, and submit as part of the application.

**Budget and Financial Information**
Trust Fund – State administering agencies (SAAs) may draw down JAG funds either in advance or on a reimbursement basis. Non-federal entities must maintain advance payments of federal awards in interest-bearing accounts, unless regulatory exclusions apply (2 CFR 200.305(b)(8)). Subrecipients that draw down JAG funds in advance are subject to the same requirement and must first establish an interest-bearing account.

Tracking and reporting regarding JAG funds used for state administrative costs – As indicated earlier, up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award. Administrative costs (when utilized) must be tracked separately; a recipient must report in separate financial status reports (SF-425) those expenditures that specifically relate to each particular JAG Award during any particular reporting period.

No commingling – Both the state recipient and all subrecipients of JAG funds are prohibited from commingling funds on a program-by-program or project-by-project basis. **For this purpose, use of the administrative JAG funds to perform work across all active awards in any one year is not considered commingling.**

**Cost Sharing or Match Requirement**
The JAG Program does not require a match. However, if a successful application proposes a voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

For additional cost sharing and match information, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm..

**Pre-agreement Costs (also known as Pre-award Costs)**
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does **not** typically approve pre-agreement costs. An applicant must request and obtain the prior written approval of OJP for any such costs. All such costs incurred prior to award and prior to approval of the costs are incurred *at the sole risk* of the applicant. (Generally, no applicant

17

should incur project costs *before* submitting an application requesting federal funding for those costs.) Should there be extenuating circumstances that make it appropriate for OJP to consider approving pre-agreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for pre-award costs, consistent with the recipient's approved budget and applicable cost principles. See the section on "Costs Requiring Prior Approval" in the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**
OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such events, available at https://www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm. OJP policy and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients, as well as some conference, meeting, and training costs for grant recipients; and (3) set cost limits, which include a general prohibition of all food and beverage costs.

**Costs Associated with Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services, where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

# C. Eligibility Information

For eligibility information, see the title page.

For information on cost sharing or match requirements, see Section B. Federal Award Information.

Note that, as discussed in more detail below, the certifications regarding compliance with certain federal laws (see Appendices B and C) must be executed and submitted before a state can make a valid award acceptance. Also, a state may not access award funds (and its award will include a condition that withholds funds) until it submits a properly executed "Certifications and Assurances by Chief Executive of Applicant Government" (see Appendix A).

# D. Application and Submission Information

**What an Application Should Include**
This section describes in detail what an application should include. An applicant should anticipate that if it fails to submit an application that contains all of the specified elements, it may negatively affect the review of its application; and, should a decision be made to make an award, it may result in the inclusion of award conditions that preclude the recipient from accessing or using award funds until the recipient satisfies the conditions and OJP makes the funds available.

An applicant may combine the Budget Narrative and the Budget Detail Worksheet in one document. If an applicant submits only one budget document, however, it must contain **both** narrative and detail information. Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

**NOTE:** OJP has combined the Budget Detail Worksheet and Budget Narrative in a single document collectively referred to as the Budget Detail Worksheet. See "Budget Information and Associated Documentation" below for more information about the Budget Detail Worksheet and where it can be accessed.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "Budget Detail Worksheet," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

**In general, if a state fails to submit the required information or documents, OJP either will return the state's application in the Grants Management System (GMS) for submission of the missing information or documents or will attach a condition to the award that will withhold award funds until the necessary information and documents are submitted. (As discussed elsewhere in this solicitation, the certifications regarding compliance certain federal laws—which are set out at Appendix B and Appendix C—will be handled differently. Unless and until those certifications are submitted, the state will be unable to make a valid acceptance of the award.)**

1. **Information to Complete the Application for Federal Assistance (SF-424)**
   The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

   To avoid processing delays, an applicant must include an accurate legal name on its SF-424. On the SF-424, current OJP award recipients, when completing the field for "Legal Name" (box 5), should use the same legal name that appears on the prior year award document (which is also the legal name stored in OJP's financial system.) Also, these applicants should enter the Employer Identification Number (EIN) in box 6 exactly as it appears on the prior year award document. An applicant with a current, active award(s) must ensure that its GMS profile is current. If the profile is not current, the applicant should

19

submit a Grant Adjustment Notice updating the information on its GMS profile prior to applying under this solicitation.

A new applicant entity should enter its official legal name, its address, its EIN, and its Data Universal Numbering System (DUNS). A new applicant entity should attach official legal documents to its application (e.g., articles of incorporation, 501(c)(3) status documentation, organizational letterhead) to confirm the legal name, address, and EIN entered into the SF-424. OJP will use the System for Award Management (SAM) to confirm the legal name and DUNS number entered in the SF-424; therefore, an applicant should ensure that the information entered in the SF-424 matches its current registration in SAM. See the How to Apply section for more information on SAM and DUNS numbers.

**Intergovernmental Review:**
This solicitation ("funding opportunity") **is** subject to Executive Order 12372. An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/wp-content/uploads/2017/11/Intergovernmental_-Review-_SPOC_01_2018_OFFM.pdf. If the state appears on the SPOC list, the applicant must contact the state SPOC to find out about, and comply with, the state's process under E.O. 12372. In completing the SF-424, an applicant whose state appears on the SPOC list is to make the appropriate selection in response to question 16 once the applicant has complied with its state E.O. 12372 process. (An applicant whose state does not appear on the SPOC list should answer question 16 by selecting the response that the "Program is subject to E.O. 12372 but has not been selected by the state for review.")

2. **Project Identifiers**
   Applications should identify at least three and no more than 10 project identifiers that would be associated with the proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGIdentifiers.pdf.

3. **Program Narrative**
   The following sections **should** be included as part of the program narrative[3]:

   a. Description of the Issue – Identify the state's strategy/funding priorities for the FY 2018 JAG funds, the subgrant award process and timeline, and a description of the programs to be funded over the 4-year grant period. States are strongly encouraged to prioritize the funding of evidence-based projects and the data used to determine these priorities and data needed for comprehensive planning efforts. The state should describe any barriers to accessing these data, opportunities to improve cross system information sharing, and progress or challenges the state has faced in NIBRS implementation.

   b. Project Design and Implementation – Describe the state's process for engagement of stakeholders from across the justice continuum and how that input informs priorities. This should include a description of how local communities are engaged in the planning process, how state and local planning efforts are coordinated, and challenges faced in coordination. It should identify the stakeholders representing each purpose area who are participating in the strategic planning process, the gaps in the state's needed resources for criminal justice purposes, plans to improve the administration of the criminal justice

---

[3] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under Section D. Application and Submission Information.

system, and how JAG funds will be coordinated with state and related justice funds. States are strongly encouraged to utilize an evidence-informed approach to funding decisions and evidence-informed approaches to addressing and preventing (violent) crime. This includes providing support to subrecipients as they develop data-driven practices and programs.

c. Capabilities and Competencies – Describe any additional strategic planning/coordination efforts in which the state participates with other criminal justice criminal/juvenile justice agencies in the state. Please provide an overview of any evidence-informed programs that have been implemented successfully and how that program might inform implementation of plan priorities.

d. Plan for Collecting the Data Required for this Solicitation's Performance Measures – OJP will require each successful applicant to submit specific performance data that demonstrate the results of the work carried out under the award (see "General Information about Post-Federal Award Reporting Requirements" in Section F. Federal Award Administration Information). The performance data correlate to the objectives and deliverables identified under "Objectives and Deliverables" in Section A. Program Description. Post award, recipients will be required to submit quarterly performance metrics through BJA's PMT, located at https://bjapmt.ojp.gov. The application should describe the applicant's plan for collection of all of the performance measures data listed in the JAG Program accountability measures at: https://bjapmt.ojp.gov/help/jagdocs.html.

Applicants should visit OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.

BJA does not require applicants to submit performance measures data with their application. Performance measures are included as an alert that BJA will require successful applicants to submit specific performance data as part of their reporting requirements. For the application, applicants should indicate an understanding of these requirements and discuss how they will gather the required data, should they receive funding.

**Note on Project Evaluations**

An applicant that proposes to use award funds through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements, likely do not constitute "research." Each applicant should provide sufficient information for OJP to determine whether the particular project it proposes would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research that appears at 28 C.F.R. Part 46 ("Protection of Human Subjects").

Research, for the purposes of human subjects protection for OJP-funded programs, is defined as "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge." 28 C.F.R. 46.102(d).

21

For additional information on determining whether a proposed activity would constitute research for purposes of human subjects protection, applicants should consult the decision tree in the "Research and the Protection of Human Subjects" section of the "Requirements related to Research" web page of the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" available through the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. Every prospective applicant whose application may propose a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

4. **Budget and Associated Documentation**
   The Budget Detail Worksheet and the Budget Narrative are now combined in a single document collectively referred to as the Budget Detail Worksheet. The Budget Detail Worksheet is a user-friendly, fillable, Microsoft Excel-based document designed to calculate totals. Additionally, the Excel workbook contains worksheets for multiple budget years that can be completed as necessary. **All applicants should use the Excel version when completing the proposed budget in an application, except in cases where the applicant does not have access to Microsoft Excel or experiences technical difficulties.** If an applicant does not have access to Microsoft Excel or experiences technical difficulties with the Excel version, then the applicant should use the 508-compliant accessible Adobe Portable Document Format (PDF) version.

   Both versions of the Budget Detail Worksheet can be accessed at https://ojp.gov/funding/Apply/Forms/BudgetDetailWorksheet.htm.

   a. **Budget Detail Worksheet**
      The Budget Detail Worksheet should provide the detailed computation for each budget line item, listing the total cost of each and showing how it was calculated by the applicant. For example, costs for personnel should show the annual salary rate and the percentage of time devoted to the project for each employee paid with grant funds. The Budget Detail Worksheet should present a complete itemization of all proposed costs.

      For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm.

   b. **Budget Narrative**
      The budget narrative should thoroughly and clearly describe **every** category of expense listed in the proposed budget detail worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities). **This narrative should include a full description of all costs, including funds set aside for NIBRS project(s) and administrative costs (if applicable).**

      An applicant should demonstrate in its budget narrative how it will maximize cost effectiveness of award expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the objectives of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

22

The budget narrative should be mathematically sound and correspond clearly with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how those costs are necessary to the completion of the proposed project. The narrative may include tables for clarification purposes, but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the budget narrative should describe costs by year.

c. **Information on Proposed Subawards (if any), as well as on Proposed Procurement Contracts (if any)**
Applicants for OJP awards typically may propose to make *subawards*. Applicants also may propose to enter into procurement *contracts* under the award.

Whether an action—for federal grants administrative purposes—is a subaward or procurement contract is a critical distinction as significantly different rules apply to subawards and procurement contracts. If a recipient enters into an agreement that is a subaward of an OJP award, specific rules apply—many of which are set by federal statutes and DOJ regulations; others by award conditions. These rules place particular responsibilities on an OJP recipient for any subawards the OJP recipient may make. The rules determine much of what the written subaward agreement itself must require or provide. The rules also determine much of what an OJP recipient must do both before and after it makes a subaward. If a recipient enters into an agreement that is a procurement contract under an OJP award, a substantially different set of federal rules applies.

OJP has developed the following guidance documents to help clarify the differences between subawards and procurement contracts under an OJP award and outline the compliance and reporting requirements for each. This information can be accessed online at https://ojp.gov/training/training.htm.

- Subawards under OJP Awards and Procurement Contracts under Awards: A Toolkit for OJP Recipients.
- Checklist to Determine Subrecipient or Contractor Classification.
- Sole Source Justification Fact Sheet and Sole Source Review Checklist.

In general, the central question is the relationship between what the third-party will do under its agreement with the recipient and what the recipient has committed (to OJP) to do under its award to further a public purpose (e.g., services the recipient will provide, products it will develop or modify, research or evaluation it will conduct). If a third party will provide some of the services the recipient has committed (to OJP) to provide, will develop or modify all or part of a product the recipient has committed (to OJP) to develop or modify, or conduct part of the research or evaluation the recipient has committed (to OJP) to conduct, OJP will consider the agreement with the third party a subaward for purposes of federal grants administrative requirements.

This will be true **even if** the recipient, for internal or other non-federal purposes, labels or treats its agreement as a procurement, a contract, or a procurement contract. Neither the title nor the structure of an agreement determines whether the agreement—for purposes of federal grants administrative requirements—is a *subaward* or is instead a procurement *contract* under an award. The substance of the relationship should be given

23

greater consideration than the form of agreement between the recipient and the outside entity.

**(1) Information on proposed subawards and required certification regarding certain federal laws from certain subrecipients**

<u>General requirement for federal authorization of any subaward; statutory authorizations of subawards under the JAG Program statute.</u>
Generally, a recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) particular subawards, a recipient must have authorization from OJP before it may make a subaward.

**JAG subawards that are required or specifically authorized by statute (see 34 U.S.C. § 10152(a) and 34 U.S.C. § 10156) do not require prior approval to authorize subawards. This includes subawards made by states under the JAG Program.**
A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the application as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation, and is not sufficiently described and justified in the application as approved by OJP, the recipient will be required, post-award, to request and obtain written authorization from OJP before it may make the subaward.

If an applicant proposes to make one or more subawards to carry out the federal award and program, and those subawards are not specifically authorized (or required) by statute or regulation, the applicant should: (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative but also in the Budget Detail Worksheet and budget narrative.

**Required certifications, generally relating to various federal statutes, from any proposed subrecipient that is a state or local government entity.** Before a state may subaward FY 2018 award funds to a unit of local government or to a public institution of higher education, it will be required (by specific award condition, the terms of which will govern) to obtain a properly executed certification, generally relating to various specific federal laws, from the proposed subrecipient. (This requirement regarding these federal laws will not apply to subawards to Indian tribes). The specific certification the state must require from a unit of local government will vary somewhat from the specific certification it must require from a public institution of higher education. The forms will be posted and available for download at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

**(2) Information on proposed procurement contracts (with specific justification for proposed noncompetitive contracts over $150,000)**
Unlike a recipient contemplating a subaward, a recipient of an OJP award generally does not need specific prior federal authorization to enter into an agreement that—for purposes of federal grants administrative requirements—is considered a procurement contract, **provided that** (1) the recipient uses its own documented procurement

procedures and (2) those procedures conform to applicable federal law, including the Procurement Standards of the (DOJ) Part 200 Uniform Requirements (as set out at 2 C.F.R. 200.317 - 200.326). The Budget Detail Worksheet and budget narrative should identify proposed procurement contracts. (As discussed above, subawards must be identified and described separately from procurement contracts.)

The Procurement Standards in the Part 200 Uniform Requirements, however, reflect a general expectation that agreements that (for purposes of federal grants administrative requirements) constitute procurement "contracts" under awards will be entered into on the basis of full and open competition. All noncompetitive (sole source) procurement contracts must meet the OJP requirements outlined at https://ojp.gov/training/subawards-procurement.htm. If a proposed procurement contract would exceed the simplified acquisition threshold—currently, $150,000—a recipient of an OJP award may not proceed without competition unless and until the recipient receives specific authorization from OJP to use a non-competitive approach for the procurement. An applicant that (at the time of its application) intends—without competition—to enter into a procurement contract that would exceed $150,000 should include a detailed justification that explains to OJP why, in the particular circumstances, it is appropriate to proceed without competition.

If the applicant receives an award, sole source procurements that do not exceed the Simplified Acquisition Threshold (currently $150,000) must have written justification for the noncompetitive procurement action maintained in the procurement file. If a procurement file does not have the documentation that meets the criteria outlined in 2 C.F.R. 200, the procurement expenditures may not be allowable. Sole source procurement over the $150,000 Simplified Acquisition Threshold must have prior approval from OJP using a Sole Source Grant Adjustment Notice (GAN). Written documentation justifying the noncompetitive procurement must be submitted with the GAN and maintained in the procurement file.

d. **Pre-agreement Costs**
   For information on pre-agreement costs, see Section B. Federal Award Information.

5. **Indirect Cost Rate Agreement (if applicable)**
   Indirect costs may be charged to an award only if:

   (a) The recipient has a current (unexpired), federally approved indirect cost rate; or
   (b) The recipient is eligible to use, and elects to use, the "de minimis" indirect cost rate described in the (DOJ) Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

An applicant with a current (unexpired) federally approved indirect cost rate is to attach a copy of the indirect cost rate agreement to the application. An applicant that does not have a current federally approved rate may request one through its cognizant federal agency, which will review all documentation and approve a rate for the applicant entity, or, if the applicant's accounting system permits, applicants may propose to allocate costs in the direct cost categories.

For assistance with identifying the appropriate cognizant federal agency for indirect costs, please contact the Office of the Chief Financial Officer (OCFO) Customer Service Center at

25

1–800–458–0786 or at ask.ocfo@usdoj.gov. If DOJ is the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

Certain OJP recipients have the option of electing to use the "de minimis" indirect cost rate. An applicant that is eligible to use the "de minimis" rate that wishes to use the "de minimis" rate should attach written documentation to the application that advises OJP of both-- (1) the applicant's eligibility to use the "de minimis" rate, and (2) its election to do so. If an eligible applicant elects the "de minimis" rate, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. The "de minimis" rate may no longer be used once an approved federally-negotiated indirect cost rate is in place. (No entity that ever has had a federally-approved negotiated indirect cost rate is eligible to use the "de minimis" rate.) For the "de minimis" rate requirements (including additional information on eligibility to elect to use the rate), see Part 200 Uniform Requirements, at 2 C.F.R. 200.414(f).

6.  **Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high-risk status)**
    Every state is required to download, complete, and submit the OJP Financial Management and System of Internal Controls Questionnaire (Questionnaire) located at https://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf as part of its application. The Questionnaire helps OJP assess the financial management and internal control systems, and the associated potential risks of an applicant as part of the pre-award risk assessment process.

    The Questionnaire should only be completed by financial staff most familiar with the applicant's systems, policies, and procedures in order to ensure that the correct responses are recorded and submitted to OJP. The responses on the Questionnaire directly impact the pre-award risk assessment and should accurately reflect the applicant's financial management and internal control system at the time of the application. The pre-award risk assessment is only one of multiple factors and criteria used in determining funding. However, a pre-award risk assessment that indicates that an applicant poses a higher risk to OJP may affect the funding decision and/or result in additional reporting requirements, monitoring, special conditions, withholding of award funds, or other additional award requirements.

    Among other things, the form requires each applicant to disclose whether it currently is designated "high risk" by a federal grant-making agency outside of DOJ. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant. If an applicant is designated high risk by another federal awarding agency, the applicant must provide the following information:

    - The federal awarding agency that currently designates the applicant high risk.
    - The date the applicant was designated high risk.
    - The high risk point of contact at that federal awarding agency (name, phone number, and email address).
    - The reasons for the high risk status, as set out by the federal awarding agency.

26

OJP seeks this information to help ensure appropriate federal oversight of OJP awards. An applicant that is considered "high risk" by another federal awarding agency is not automatically disqualified from receiving an OJP award. OJP may, however, consider the information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document).

7. **Disclosure of Lobbying Activities**
   Each applicant must complete and submit a Disclosure of Lobbying Activities form (SF-LLL). An applicant that expends any funds for lobbying activities is to provide all of the information requested on the form. An applicant that does not expend any funds for lobbying activities is to enter "N/A" in the text boxes for item 10 ("a. Name and Address of Lobbying Registrant" and "b. Individuals Performing Services").

8. **Certifications and Assurances by the Chief Executive of the Applicant Government**
   A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

   OJP will not deny an application for an FY 2018 award for failure to submit these "Certifications and Assurances by the Chief Executive of the Applicant Government" by the application deadline, but a state will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these certifications and assurances, properly-executed by the chief executive of the state (e.g., the governor).

9. **Certifications by the Chief Legal Officer of the Applicant Government**
   The chief legal officer of an applicant state (e.g., the attorney general of the state) is to carefully review the two certifications attached to this solicitation as Appendix B and Appendix C. If the chief legal officer determines that he or she may execute the certifications, the state is to submit the certifications as part of its application.

   As discussed further in the Federal Award Notices section, a state applicant will be **unable to make a valid award acceptance** of an FY 2018 JAG award unless and until both properly executed certifications by its chief legal officer are received by OJP on or before the day the state submits an executed award document.

10. **Additional Attachments**

    a. **Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**
       Each applicant must provide responses to the following questions as an attachment to the application:
       (1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
       (2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
       (3) If yes to either:
           - Please provide a copy of each law or policy.
           - Please describe each practice.

- Please explain how the law, policy, or practice complies with section 1373.

See Appendix E for a template that applicants may use to prepare this attachment.

Note: Responses to these questions must be provided by the applicant as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding and for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

OJP will not deny an application for an FY 2018 award for failure to submit these required responses by the application deadline, but a state will not receive award funds (and its award will include a condition that withholds funds) until it submits these responses.

b. **Applicant Disclosure of Pending Applications**
Each applicant is required to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation, and (2) would cover identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. The applicant is required to disclose applications made directly to federal awarding agencies, and also applications for subawards of federal funds (e.g., applications to state agencies that will subaward ("subgrant") federal funds).

OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Each applicant that has one or more pending applications as described above is to provide the following information about pending applications submitted within the last 12 months:

- The federal or state funding agency.
- The solicitation name/project name.
- The point of contact information at the applicable federal or state funding agency.

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Federal or State Funding Agency |
|---|---|---|
| DOJ/Office of Community Oriented Policing Services (COPS) | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |

28

| Health & Human Services/ Substance Abuse & Mental Health Services Administration | Drug-Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |
|---|---|---|

Each applicant should include the table as a separate attachment to its application. The file should be named "Disclosure of Pending Applications." The applicant Legal Name on the application must match the entity named on the disclosure of pending applications statement.

Any applicant that does not have any pending applications as described above is to submit, as a separate attachment, a statement to this effect: "[Applicant on SF-424] does not have (and is not proposed as a subrecipient under) any pending applications submitted within the last 12 months for federally-funded grants or cooperative agreements (or for subawards under federal grants or cooperative agreements) that request funding to support the same project being proposed in this application to OJP and that would cover identical cost items outlined in the budget submitted as part of this application."

c. **Research and Evaluation Independence and Integrity (if applicable)**
If an application involves research (including research and development) and/or evaluation, the applicant must demonstrate research/evaluation independence and integrity, including appropriate safeguards, before it may receive award funds. The applicant must demonstrate independence and integrity regarding both this proposed research and/or evaluation, and any current or prior related projects.

Each application should include an attachment that addresses **both** i. and ii. below.

   i. For purposes of this solicitation, each applicant is to document research and evaluation independence and integrity by including one of the following two items:

      a. A specific assurance that the applicant has reviewed its application to identify any actual or potential apparent conflicts of interest (including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients), and that the applicant has identified no such conflicts of interest—whether personal or financial or organizational (including on the part of the applicant entity or on the part of staff, investigators, or subrecipients) —that could affect the independence or integrity of the research, including the design, conduct, and reporting of the research.

OR

      b. A specific description of actual or potential apparent conflicts of interest that the applicant has identified—including through review of pertinent information on the principal investigator, any co-principal investigators,

29

and any subrecipients—that could affect the independence or integrity of the research, including the design, conduct, or reporting of the research. These conflicts may be personal (e.g., on the part of investigators or other staff), financial, or organizational (related to the applicant or any subrecipient entity). Some examples of potential investigator (or other personal) conflict situations are those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization would not be given an award to evaluate a project, if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), because the organization in such an instance might appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii. In addition, for purposes of this solicitation, each applicant is to address possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

   a. If an applicant reasonably believes that no actual or potential apparent conflicts of interest (personal, financial, or organizational) exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. The applicant also is to include an explanation of the specific processes and procedures that the applicant has in place, or will put in place, to identify and prevent (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OR

   b. If the applicant has identified actual or potential apparent conflicts of interest (personal, financial, or organizational) that could affect the independence and integrity of the research, including the design, conduct, or reporting of the research, the applicant is to provide a specific and robust mitigation plan to address each of those conflicts. At a minimum, the applicant is expected to explain the specific processes and procedures that the applicant has in place, or will put in place, to identify and eliminate (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding

30

organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OJP will assess research and evaluation independence and integrity based on considerations such as the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the applicant entity (and any subrecipients) in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

d. **State Governing Body Review**
Applicants must submit information via the Certification and Assurances by the Chief Executive (see Appendix A), which documents that the JAG application was made available for review by the governing body of the state, or to an organization designated by that governing body, for a period that was not less than 30 days before the application was submitted to BJA. The same Chief Executive Certification will also specify that an opportunity to comment on this application was provided to citizens prior to the application submission to the extent applicable law or established procedures make such opportunity available. In the past, this has been accomplished via submission of specific review dates; now OJP will only accept a governor's certification to attest to these facts. States may continue to submit actual dates of review should they wish to do so, in addition to the submission of the Chief Executive Certification.

e. **State Strategic Plan (if applicable)**
For 2018 JAG applications, states are strongly encouraged to use JAG funding to implement programs identified in an existing statewide strategic plan. An applicant state should attach a current version of the state strategic plan to its application, if one exists. If a state does not have such a plan, the program narrative should describe the

---

***ALERT****: A recent amendment to the JAG Program statute requires that states create and submit a strategic plan with their FY 2019 JAG grant applications. The plan must be developed with input from a broad range of identified stakeholders; must describe evidence-based approaches used for planning, program implementation, and evaluation; and illustrate how the state will allocate funding. By law, strategic plans are to be reviewed annually and updated every 5 years.*

---

state's timeline and process for developing such a strategic plan. The state strategic plan should describe how grants received will be used to improve the administration of the criminal justice system and should contain the following elements: needs statement, priorities to be addressed with JAG funding, objectives, action steps to achieve the objectives, stakeholders engaged, process used to select programs and services to fund, data necessary to support priorities for funding and accomplish identified objectives, outcomes expected, plans for program and services evaluation, and a detailed budget. The plan may also address barriers the state and its subrecipients face to collecting and using data, and to implementing and evaluating evidence informed approaches to preventing and reducing crime. Training and technical assistance (TTA) is

available from BJA's TTA providers to assist states with the development of their strategic planning processes and plans.

To help ensure that states consider the impact of JAG funding decisions across the entire criminal justice system, BJA strongly encourages each state to involve all criminal justice system stakeholders in the strategic planning process. The strategic planning process should reflect input from all segments of the criminal justice system including local governments, judges, prosecutors, law enforcement and corrections personnel, providers of indigent defense services, victim services, juvenile justice and delinquency prevention programs, parole and probation services, and reentry services. For more information, see the National Criminal Justice Association Justice Planning website at http://www.ncja.org/ncja-services.

**How to Apply**
An applicant must submit its application through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Each applicant entity **must register in GMS for each specific funding opportunity.** Although the registration and submission deadlines are the same, OJP urges each applicant entity to **register promptly,** especially if this is the first time the applicant is using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. An applicant that experiences technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888-549-9901 (option 3), 24 hours every day, including during federal holidays. OJP recommends that each applicant **register promptly** to prevent delays in submitting an application package by the deadline.

**Note on File Types: GMS does not accept executable file types as application attachments**. These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip." GMS may reject applications with files that use these extensions. It is important to allow time to change the type of file(s) if the application is rejected.

**Unique Entity Identifier (DUNS Number) and System for Award Management (SAM)**
Every applicant entity must comply with all applicable System for Award Management (SAM) and unique entity identifier (currently, a Data Universal Numbering System [DUNS] number) requirements. SAM is the repository for certain standard information about federal financial assistance applicants, recipients, and subrecipients. A DUNS number is a unique nine-digit identification number provided by the commercial company Dun and Bradstreet. More detailed information about SAM and the DUNS number is in the numbered sections below.

If an applicant entity has not fully complied with the applicable SAM and unique identifier requirements by the time OJP makes award decisions, OJP may determine that the applicant is not qualified to receive an award and may use that determination as a basis for making the award to a different applicant.

If the applicant entity already has an Employer Identification Number (EIN), the SAM registration will take **up to two weeks to process**. If the entity does not have an EIN, then **the applicant should allow two to five weeks for obtaining the information from IRS when requesting the EIN via phone, fax, mail or Internet**. For more information about EIN, visit https://www.irs.gov/individuals/international-taxpayers/taxpayer-identification-numbers-tin.

**Registration and Submission Steps**
All applicants should complete the following steps:

1. **Acquire a unique entity identifier (currently, a DUNS number).** In general, the Office of Management and Budget requires every applicant for a federal award (other than an individual) to include a "unique entity identifier" in each application, including an application for a supplemental award. Currently, a DUNS number is the required unique entity identifier.

   This unique entity identifier is used for tracking purposes, and to validate address and point of contact information for applicants, recipients, and subrecipients. It will be used throughout the life cycle of an OJP award. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866–705–5711 to obtain a DUNS number or apply online at www.dnb.com/. A DUNS number is usually received within 2 business days.

2. **Acquire or maintain registration with SAM.** Any applicant for an OJP award creating a **new** entity registration (or updating or renewing a registration) in SAM.gov must submit an original, signed notarized letter appointing the authorized Entity Administrator within thirty (30) days of the registration activation. **Notarized letters must be submitted via U.S. Postal Service Mail. Read the Alert at www.sam.gov to learn more about what is required in the notarized letter, and read the Frequently Asked Questions (FAQs) at www.gsa.gov/samupdate to learn more about this process change.**

   All applicants for OJP awards (other than individuals) with current registration in SAM must maintain current registrations in the SAM database. Applicants will need the authorizing official of the organization and an Employer Identification Number (EIN).

   Information about SAM registration procedures can be accessed at www.sam.gov.

3. **Acquire a GMS username and password**. New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more information on how to register in GMS, go to www.ojp.gov/gmscbt. Previously registered applicants should ensure, prior to applying, that the user profile information is up-to-date in GMS (including, but not limited to, address, legal name of agency and authorized representative) as this information is populated in any new application.

4. **Verify the SAM (formerly CCR) registration in GMS.** OJP requires each applicant to verify its SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

5. **Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select "BJA" and "**FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program**."

6. **Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the "funding opportunity" (solicitation) title along with the registration and application deadlines for this solicitation. Select the "Apply Online" button in the "Action" column to register for this solicitation and create an application in the system.

33

7. **Follow the directions in GMS to submit an application consistent with this solicitation.** Once the application is submitted, GMS will display a confirmation screen stating the submission was successful. <u>**Important:**</u> In some instances, an applicant must wait for GMS approval before submitting an application. OJP urges each applicant to submit its application **at least 72 hours prior** to the application due date.

## Note: Application Versions

If an applicant submits multiple versions of the same application, OJP will review **only** the most recent system-validated version submitted.

## Experiencing Unforeseen GMS Technical Issues

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline may contact the <u>GMS Help Desk</u> or the SAM Help Desk (Federal Service Desk) at <u>https://www.fsd.gov/fsd-gov/home.do</u> to report the technical issue and receive a tracking number. The applicant is expected to email the NCJRS Response Center identified in the Contact Information section on the title page **within 24 hours after the application deadline** to request approval to submit its application after the deadline. The applicant's email must describe the technical difficulties, and must include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s).

## Note: OJP does not automatically approve requests to submit a late application.

After OJP reviews the applicant's request, and contacts the GMS Help Desk to verify the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the untimely application submission was due to the applicant's failure to follow all required procedures, OJP will deny the applicant's request to submit its application.

The following conditions generally are insufficient to justify late submissions to OJP solicitations:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete).
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website.
- Failure to follow each instruction in the OJP solicitation.
- Technical issues with the applicant's computer or information technology environment, such as issues with firewalls.

## E. Application Review Information

### Review Process

OJP is committed to ensuring a fair and open process for making awards. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to help ensure that JAG program-statute requirements have been met.

Pursuant to the Part 200 Uniform Requirements, before award decisions are made, OJP also reviews information related to the degree of risk posed by applicants. Among other things, to

34

help assess whether an applicant that has one or more prior federal awards has a satisfactory record with respect to performance, integrity, and business ethics, OJP checks whether the applicant is listed in SAM as excluded from receiving a federal award.

In addition, if OJP anticipates that an award will exceed $150,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the non-public segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee Performance and Integrity Information System; "FAPIIS").

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant. The evaluation of risks goes beyond information in SAM, however. OJP itself has in place a framework for evaluating risks posed by applicants. OJP takes into account information pertinent to matters such as:

(1) Applicant financial stability and fiscal integrity
(2) Quality of the management systems of the applicant, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide
(3) Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies
(4) Reports and findings from audits of the applicant, including audits under the (DOJ) Part 200 Uniform Requirements
(5) Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

# F. Federal Award Administration Information

**Federal Award Notices**
Award notifications are expected to be made by September 30, 2018. OJP sends award notification by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and steps to take in GMS to start the award acceptance process. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date.

**NOTE:** In order to validly accept an award under the FY 2018 JAG Program, a state must submit to GMS the certifications by its chief legal officer regarding compliance with certain federal laws, executed using the forms that appear in Appendices B and C. (The forms also may be downloaded at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.) Unless the executed certifications either (1) are submitted to OJP together with the signed award document or (2) are uploaded in GMS no later than the day the signed award document is

35

submitted, **OJP will reject as invalid** any submission by a state that purports to accept an award under this solicitation.

Rejection of an initial submission as an invalid award acceptance is not a denial of the award. Consistent with award requirements, once the state **does** submit the necessary certifications regarding compliance with certain federal laws, the state **will** be permitted to submit an award document executed by the state on or after the date of those certifications.

Also, in order for a state applicant to validly accept an award under the FY 2018 JAG Program, an individual with the necessary authority to bind the applicant will be required to log in; execute a set of legal certifications and a set of legal assurances; designate a financial point of contact; thoroughly review the award, including **all** award conditions; and sign and accept the award. The award acceptance process requires physical signature of the award document by the authorized representative and the scanning of the fully executed award document (along with the required certifications regarding compliance with certain federal laws, if not already uploaded in GMS) to OJP.

**Statutory and Regulatory Requirements; Award Conditions**
If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with award conditions, as well as all applicable requirements of federal statutes and regulations (including applicable requirements referred to in the assurances and certifications executed at the time of award acceptance). OJP strongly encourages prospective applicants to review information on post-award legal requirements and common OJP award conditions **prior** to submitting an application.

OJP strongly encourages prospective applicants to review information on post-award legal requirements generally applicable to FY 2018 OJP awards and common OJP award conditions **prior** to submitting an application.

Applicants should consult the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards", available in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. In addition, applicants should examine the following two legal documents, as each successful applicant must execute both documents before it may receive any award funds. (An applicant is not required to submit these documents as part of an application.)

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements
- Certified Standard Assurances

The web pages accessible through the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" are intended to give applicants for OJP awards a general overview of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants and cooperative agreements awarded in FY 2018. Individual OJP awards typically also will include additional award conditions. Those additional conditions may relate to the particular statute, program, or solicitation under which the award is made; to the substance of the funded application; to the recipient's performance under other federal awards; to the recipient's legal status (e.g., as a for-profit entity); or to other pertinent considerations.

Individual FY 2018 awards made pursuant to this solicitation will, as appropriate and to the extent consistent with law, include conditions that will require the recipient (and any subrecipient) that accepts the award to do various things, with respect to the "program or activity" that would receive federal financial assistance thereunder. **Although the specific terms of each of those conditions are what will govern the awards**, included among such conditions will be some that, **generally speaking**, will require the recipient (and any subrecipient) that accepts the award to do some or all of the following:

- Not to violate 8 U.S.C. § 1373 (prohibiting restrictions on—
    (1) communication to/from the Department of Homeland Security ("DHS") of information regarding the citizenship or immigration status of any individual; and
    (2) maintaining, or exchanging with any government entity, information regarding the immigration status of any individual).

- Not to violate 8 U.S.C. § 1644 (prohibiting restrictions on communication to/from DHS of information regarding the immigration status of an alien).

- Not to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal, harbor, or shield from detection, or attempt to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts. . ."or aid or abet the commission of any of the preceding acts").

- Not to impede the exercise of the authority of the federal government under 8 U.S.C. § 1266(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released") and 8 U.S.C. § 1231(a)(4) (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.

- Not to impede the exercise by DHS agents, "anywhere in or outside the United States" (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. § 1357(a)(1) to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," specifically by requiring such recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States.

The reasonable costs (to the extent not reimbursed under any other federal program) of complying with these conditions, including honoring any duly authorized request from DHS that is encompassed by these conditions, will be allowable costs under the award.

**General Information about Post-federal Award Reporting Requirements**
In addition to the deliverables described in Section A. Program Description, any recipient of an award under this solicitation will be required to submit the following reports and data.

37

<u>Required reports.</u> Recipients typically must submit quarterly financial status reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

Awards that exceed $500,000 will include an additional condition that, under specific circumstances, will require the recipient to report (to FAPIIS) information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either the OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Additional information on this reporting requirement appears in the text of the award condition posted on the OJP website at https://ojp.gov/funding/FAPIIS.htm.

<u>Data on performance measures.</u> In addition to required reports, each award recipient also must provide data that measure the results of the work done under the award. To demonstrate program progress and success, as well as to assist DOJ with fulfilling its responsibilities under the Government Performance and Results Act of 1993 (GPRA), Public Law 103-62, and the GPRA Modernization Act of 2010, Public Law 111–352, OJP will require any award recipient, post award, to provide performance data as part of regular progress reporting. Successful applicants will be required to access OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.

Accountability metrics data must be submitted through BJA's Performance Measurement Tool (PMT), available at https://bjapmt.ojp.gov. The accountability measures are available at: https://bjapmt.ojp.gov/help/jagdocs.html. (Note that if a law enforcement agency receives JAG funds from a state, the state must submit quarterly accountability metrics data related to training that officers have received on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.)

OJP may restrict access to award funds if a recipient of an OJP award fails to report required performance measure data in a timely manner.

## G. Federal Awarding Agency Contact(s)

For OJP contact(s), see the title page of this solicitation.

For contact information for GMS, see the title page.

## H. Other Information

**Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)**
All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. By law, DOJ may withhold information that is responsive to a request pursuant to FOIA if DOJ determines that the responsive information either is protected under the Privacy Act or falls within the scope of one of nine statutory exemptions under FOIA. DOJ cannot agree in advance of a request pursuant to FOIA not to release some or all portions of an application.

In its review of records that are responsive to a FOIA request, OJP will withhold information in those records that plainly falls within the scope of the Privacy Act or one of the statutory exemptions under FOIA. (Some examples include certain types of information in budgets, and names and contact information for project staff other than certain key personnel.) In appropriate circumstances, OJP will request the views of the applicant/recipient that submitted a responsive document.

For example, if OJP receives a request pursuant to FOIA for an application submitted by a nonprofit or for-profit organization or an institution of higher education, or for an application that involves research, OJP typically will contact the applicant/recipient that submitted the application and ask it to identify—quite precisely—any particular information in the application that applicant/recipient believes falls under a FOIA exemption, the specific exemption it believes applies, and why. After considering the submission by the applicant/recipient, OJP makes an independent assessment regarding withholding information. OJP generally follows a similar process for requests pursuant to FOIA for applications that may contain law-enforcement sensitive information.

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. OJP does **not** reply to messages it receives in this mailbox. A prospective applicant that has specific questions on any program or technical aspect of the solicitation **must** use the appropriate telephone number or email listed on the front of this solicitation document to obtain information. These contacts are provided to help ensure that prospective applicants can directly reach an individual who can address specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your résumé to ojpprsupport@usdoj.gov. (Do not send your résumé to the OJP Solicitation Feedback email account.) **Note:** Neither you nor anyone else from your organization or entity can be a peer reviewer in a competition in which you or your organization/entity has submitted an application.

**Appendix A**

**Certifications and Assurances by the Chief Executive of the Applicant Government**

**Template for use by the chief executive of the state (e.g., the governor)**

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**Note:** By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

## Edward Byrne Justice Assistance Grant Program FY 2018 State Solicitation

**Certifications and Assurances**
**by the Chief Executive of the Applicant Government**

On behalf of the applicant "State" named below, in support of that State's application for an award under the FY 2018 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 34 U.S.C. § 10153(a), I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant State named below, and I have the authority to make the following representations on my own behalf and on behalf of the applicant State. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant State.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the State (e.g., the State legislature), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant State will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I certify that— (a) the programs to be funded by the award (if any) that OJP makes based on the application described above meet all the requirements of the JAG Program statute (34 U.S.C. §§ 10151-10158); (b) all the information contained in that application is correct; (c) in connection with that application, there has been appropriate coordination with affected agencies, and (d) in connection with that award (if any), the applicant State will comply with all provisions of the JAG Program statute and all other applicable federal laws.

7. I have examined certification entitled "State or Local Government: FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

8. I have examined certification entitled "State or Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1357(a), & 1366(1) & (3)" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it "supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant State to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____              _____
Signature of Chief Executive of the Applicant "State"        Date of Certification

_____              _____
Printed Name of Chief Executive                Title of Chief Executive

_____
Name of Applicant State

41

**Appendix B**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1373 and 1644**

Template for use by the chief legal officer of the state (e.g., the attorney general)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

42

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State Government:  FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1)  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP).  I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

(2)  I have carefully reviewed 8 U.S.C. §§ 1373(a) & (b), and 1644, including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status. I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition ... and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. §§ 1373 & 1644 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3)  I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. §§ 1373 & 1644, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program.

(4)  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5)  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

(a)  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

(b)  any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. §§ 1373(a) & (b), and 1644, whether imposed by a State or local government entity, -agency, or -official.

(6)  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____        _____
Signature of Chief Legal Officer of the Jurisdiction        Printed Name of Chief Legal Officer


_____        _____
Date of Certification        Title of Chief Legal Officer of the Jurisdiction


_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below)

**FY 2018 OJP Program:  Byrne Justice Assistance Grant (JAG) Program: State**

43

**Appendix C**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3)**

Template for use by the chief legal officer of the state (e.g., the attorney general)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State or Local Government: FY 2018 Certification Relating to**
**8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

2. I have carefully reviewed each of the following sections of title 8, United States Code:

    a. § 1226(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released");

    b. § 1231(a)(4) (federal government may not "remove an alien who is sentenced to imprisonment until the alien is released from imprisonment");

    c. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts … or aid[] or abet[] the commission of any of the preceding acts");

    d. § 1357(a) (authorizing immigration officers, "anywhere in or outside the United States" (see 8 C.F.R. § 287.5(a)), to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); and

    e. § 1366(1) & (3) (requiring the Attorney General annually to submit to Congress "a report detailing … (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense; [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal").

3. I (and also the applicant entity) understand that USDOJ will require States and local governments (including State and local government entities, -agencies, and officials), with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program, not to violate, or to aid or abet any violation of, 8 U.S.C. § 1324(a), and not to impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a) or relating to 8 U.S.C. § 1366(1) & (3) or 8 U.S.C. § 1226(a) & (c).

4. I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or agency.

5. I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

    a. the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

    b. any laws, rules, policies, or practices potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that implicate any of the requirements relating to 8 U.S.C. §§ 1226(a) & (c), 1324(a), 1357(a), & 1366(1) & (3) that are described in ¶ 3 of this certification, whether imposed by a State or local government entity, -agency, or -official.

6. As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that would or does— (1) violate, or aid or abet any violation of, 8 U.S.C. § 1324(a); (2) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); (3) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3); or (4) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including associated certifications, are subject to review by USDOJ, including by OJP and the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Legal Officer of the Jurisdiction          Printed Name of Chief Legal Officer

_____          _____
Date of Certification          Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below

*FY 2018 OJP Program:* **Byrne Justice Assistance Grant (JAG) Program: State**

45

**Appendix D**

**Certain relevant federal laws, as in effect on June 7, 2018**

**8 U.S.C. § 1373**

**Communication between government agencies and the Immigration and Naturalization Service**

**(a) In general**
  Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**
  Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
  **(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
  **(2)** Maintaining such information.
  **(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**
  The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

**Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**8 U.S.C. § 1226(a) & (c)**

**Apprehension and detention of aliens**
(a) Arrest, detention, and release
On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

(1) may continue to detain the arrested alien; and

(2) may release the alien on--

    (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

    (B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

***

(c) Detention of criminal aliens

    (1) Custody

The Attorney General shall take into custody any alien who--

    (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

    (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

    (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence1 to a term of imprisonment of at least 1 year, or

    (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

    (2) Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

## 8 U.S.C. § 1231(a)(4)

(a) Detention, release, and removal of aliens ordered removed

***

### 4) Aliens imprisoned, arrested, or on parole, supervised release, or probation

#### (A) In general

Except as provided in section 259(a) of title 42 and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

47

**(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment-

    i.    in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title and (II) the removal of the alien is appropriate and in the best interest of the United States; or

    ii.    in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

**(C) Notice**

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

**(D) No private right**

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

**8 U.S.C. § 1324(a)**

**Bringing in and harboring certain aliens**

(a) Criminal penalties

  (1)(A) Any person who—

    i.    knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

    ii.    knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

    iii.    knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

    iv.    encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

    v.    (v)(I) engages in any conspiracy to commit any of the preceding acts, or

    vi.    (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

    I.    in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

    II.    in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

    III.    in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

    IV.    in the case of a violation of subparagraph (A)(i), (ii), (iii), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

(C) It is not a violation of clauses (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs-

    (A) be fined in accordance with title 18 or imprisoned not more than one year, or both; or

    (B) in the case of-

      (i) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

      (ii) an offense done for the purpose of commercial advantage or private financial gain, or

      (iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of

subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

   (3)(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18 or imprisoned for not more than 5 years, or both.
   (B) An alien described in this subparagraph is an alien who-
               (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and
               (ii) has been brought into the United States in violation of this subsection.

   (4) In the case of a person who has brought aliens into the United States in violation of this subsection, the sentence otherwise provided for may be increased by up to 10 years if-
               (A) the offense was part of an ongoing commercial organization or enterprise;
               (B) aliens were transported in groups of 10 or more; and
               (C)(i) aliens were transported in a manner that endangered their lives; or
               (ii) the aliens presented a life-threatening health risk to people in the United States.


## 8 U.S.C. § 1357(a)

### Powers of immigration officers and employees

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
   **(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
   **(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;
   **(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;
   **(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and
   **(5)** to make arrests-
   **(6)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

50

**(7)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

**(8)** if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

**8 U.S.C. § 1366(1) & (3)**

**Annual report on criminal aliens**
Not later than 12 months after September 30, 1996, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—
    (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;
    ***
    (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal;
    ***

BJA-2018-13625

**Appendix E**

**Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**

Each applicant must provide responses to the following questions as an attachment to the application:

(1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

(2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?

(3) If yes to either:
- Please provide a copy of each law or policy;
- Please describe each practice; and
- Please explain how the law, policy, or practice complies with section 1373.

**Note:** Responses to these questions must be provided by the applicant to BJA as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding, for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

**Appendix F**

Additional purposes for which JAG funds awarded to a state under this FY 2018 solicitation may be used:

     **(a)**     To enforce state and local laws that establish offenses similar to offenses established in 21 U.S.C. § 801 et seq., to improve the functioning of the **criminal justice** system, with emphasis on violent crime and serious offenders, by means including providing additional personnel, equipment, training, technical assistance, and information systems for the more widespread apprehension, prosecution, adjudication, detention, and rehabilitation of persons who violate these laws, and to assist the victims of such crimes (other than compensation), including—

     (1)     demand-reduction education programs in which law enforcement officers participate;

     (2)     multi-jurisdictional task-force programs that integrate federal, state, and local drug-law-enforcement agencies and prosecutors for the purpose of enhancing inter-agency co-ordination and intelligence, and facilitating multi-jurisdictional investigations;

     (3)     programs designed to target the domestic sources of controlled and illegal substances, such as precursor chemicals, diverted pharmaceuticals, clandestine laboratories, and cannabis cultivations;

     (4)     providing community and neighborhood programs that assist citizens in preventing and controlling crime, including special programs that address the problems of crimes committed against the elderly and special programs for rural jurisdictions;

     (5)     disrupting illicit commerce in stolen goods and property;

     (6)     improving the investigation and prosecution of white-collar crime, organized crime, public-corruption crimes, and fraud against the government, with priority attention to cases involving drug-related official corruption;

     (7)(A)     improving the operational effectiveness of law enforcement through the use of crime-analysis techniques, street-sales enforcement, schoolyard-violator programs, and gang-related and low-income-housing drug-control programs; and

     (B)     developing and implementing anti-terrorism plans for deep-draft ports, international airports, and other important facilities;

     (8)     career-criminal prosecution programs, including the development of proposed model drug-control legislation;

     (9)     financial investigative programs that target the identification of money-laundering operations and assets obtained through illegal drug trafficking, including the development of proposed model legislation, financial investigative training, and financial information-sharing systems;

     (10)     improving the operational effectiveness of the court process, by expanding prosecutorial, defender, and judicial resources, and implementing court-delay-reduction programs;'

     (11)     programs designed to provide additional public correctional resources and improve the corrections system, including treatment in prisons and jails, intensive-supervision programs, and long-range corrections and sentencing strategies;

     (12)     providing prison-industry projects designed to place inmates in a realistic working and training environment that will enable them to acquire

marketable skills and to make financial payments for restitution to their victims, for support of their own families, and for support of themselves in the institution;

(13)    providing programs that identify and meet the treatment needs of adult and juvenile drug-dependent and alcohol-dependent offenders;

(14)    developing and implementing programs that provide assistance to jurors and witnesses, and assistance (other than compensation) to victims of crimes;

(15)(A) developing programs to improve drug-control technology, such as pretrial drug-testing programs, programs that provide for the identification, assessment, referral to treatment, case-management and monitoring of drug-dependent offenders, and enhancement of state and local forensic laboratories; and

(B)    developing programs to improve **criminal justice** information systems (including automated fingerprint identification systems) to assist law enforcement, prosecution, courts, and corrections organizations;

(16)    innovative programs that demonstrate new and different approaches to enforcement, prosecution, and adjudication of drug offenses and other serious crimes;

(17)    addressing the problems of drug trafficking and the illegal manufacture of controlled substances in public housing;

(18)    improving the criminal and juvenile justice system's response to domestic and family violence, including spouse abuse, child abuse, and abuse of the elderly;

(19)    drug-control evaluation programs that the state and units of local government may utilize to evaluate programs and projects directed at state drug-control activities;

(20)    providing alternatives to prevent detention, jail, and prison for persons who pose no danger to the community;

(21)    programs of which the primary goal is to strengthen urban enforcement and prosecution efforts targeted at street drug sales;

(22)    programs for the prosecution of driving while intoxicated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles;

(23)    programs that address the need for effective bindover systems for the prosecution of violent 16- and 17-year-old juveniles, in courts with jurisdiction over adults, for the crimes of—

(A)    murder in the first degree;
(B)    murder in the second degree;
(C)    attempted murder;
(D)    armed robbery when armed with a firearm;
(E)    aggravated battery or assault when armed with a firearm;
(F)    criminal sexual penetration when armed with a firearm; and
(G)    drive-by shootings as described 18 U.S.C. § 36;

(24)    law-enforcement and prevention programs relating to gangs or to youth who are involved or at risk of involvement in gangs;

(25)    developing or improving, in a forensic laboratory, a capability to analyze DNA for identification purposes; and

(26)    developing and implementing anti-terrorism training programs and procuring equipment for use by local law-enforcement authorities; and

54

**(b)**    To reduce crime and improve public safety, including but not limited to, the following:

(1)(A)    hiring, training, and employing on a continuing basis new, additional law enforcement officers and necessary support personnel;

(B)    paying overtime to presently-employed law enforcement officers and necessary support personnel for the purpose of increasing the number of hours worked by such personnel; and

(C)    procuring equipment, technology, and other material directly related to basic law-enforcement functions;

(2)    enhancing security measures—

(A)    in and around schools; and

(B)    in and around any other facility or location that is considered by the unit of local government to have a special risk for incidents of crime;

(3)    establishing crime-prevention programs that may, though not exclusively, involve law-enforcement officials and that are intended to discourage, disrupt, or interfere with the commission of criminal activity, including neighborhood-watch and citizen-patrol programs, sexual-assault and domestic-violence programs, and programs intended to prevent juvenile crime;

(4)    establishing or supporting drug courts;

(5)    establishing early-intervention and -prevention programs for juveniles, in order to reduce or eliminate crime;

(6)    enhancing the adjudication process of cases involving violent offenders, including violent juvenile offenders;

(7)    enhancing programs under (**a**), above;

(8)    establishing co-operative task forces between adjoining units of local government to work co-operatively to prevent and combat criminal activity, particularly criminal activity that is exacerbated by drug- or gang-related involvement; and

(9)    establishing a multi-jurisdictional task force, particularly in rural areas, composed of law-enforcement officials representing units of local government, that works with Federal law-enforcement officials to prevent and control crime.

**Appendix G**
**Application Checklist**

**Edward Byrne Memorial Justice Assistance Grant (JAG) Program:**

**FY 2018 State Solicitation**

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
_____ Acquire a DUNS Number                                              (see page 32)
_____ Acquire or renew registration with SAM                             (see page 33)
*To Register with GMS*:
_____ For new users, acquire a GMS username and password*                (see page 33)
_____ For existing users, check GMS username and password* to ensure account access
                                                                         (see page 33)
_____ Verify SAM registration in GMS                                     (see page 33)
_____ Search for correct funding opportunity in GMS                      (see page 33)
_____ Select correct funding opportunity in GMS                          (see page 33)
_____ Register by selecting the "Apply Online" button associated with the funding opportunity
        title                                                            (see page 33)
 _____ Read OJP policy and guidance on conference approval, planning, and reporting
        available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
                                                                         (see page 18)
_____ If experiencing technical difficulties in GMS, contact the NCJRS Response Center
                                                                         (see pages 2 and 34)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist, this function is only associated with points of contact designated within GMS at the time the account was established. Neither OJP nor the GMS Help Desk will initiate a password reset unless requested by the authorized official or a designated point of contact associated with an award or application.

**Overview of Post-Award Legal Requirements:**

_____ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

**Scope Requirement:**

_____ The federal amount requested is within the allowable limit(s) of the FY 2018 JAG Allocations List as listed on BJA's JAG web page.

56

**Eligibility Requirement:**

Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a state or states includes all 56 jurisdictions.)

**What an Application Should Include:**

_____ Application for Federal Assistance (SF-424)                               (see page 19)
_____ Intergovernmental Review                                                 (see page 20)
_____ Program Narrative                                                        (see page 20)
_____ Budget Detail Worksheet                                                 (see page 22)
_____ Budget Narrative                                                        (see page 22)
_____ Indirect Cost Rate Agreement (if applicable)                             (see page 22)
_____ Financial Management and System of Internal Controls Questionnaire       (see page 25)
_____ Disclosure of Lobbying Activities (SF-LLL) (if applicable)               (see page 26)
_____ Certifications and Assurances by Chief Executive                         (see page 27)
_____ Certification of Compliance with 8 U.S.C. § 1373 by Chief Legal Officer  (see page 27)
_____ State Strategic Plan (if applicable)                                     (see page 31)
_____ Additional Attachments
        _____ Applicant Disclosure of Pending Applications                     (see page 28)
        _____ Research and Evaluation Independence and Integrity (if applicable)
                                                                              (see page 29)

# EXHIBIT B

OMB No. 1121-0329
Approval Expires 11/30/2020

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP), Bureau of Justice Assistance (BJA) is seeking applications for the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting state, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program
# FY 2018 Local Solicitation

## Applications Due: August 22, 2018

## Eligibility

Only units of local government may apply under this solicitation. By law, for purposes of the JAG Program, the term "units of local government" includes a town, township, village, parish, city, county, borough, or other general purpose political subdivision of a state; or, it may be a federally recognized Indian tribal government that performs law enforcement functions (as determined by the Secretary of the Interior). A unit of local government also may be any law enforcement district or judicial enforcement district established under applicable state law with authority to independently establish a budget and impose taxes; for example, in Louisiana, a unit of local government means a district attorney or parish sheriff.

A JAG application is not complete, and a unit of local government may not access award funds, unless the chief executive of the applicant unit of local government (e.g., a mayor) properly executes, and the unit of local government submits, the "Certifications and Assurances by Chief Executive of Applicant Government" attached to this solicitation as Appendix A.

In addition, as discussed further below, in order to validly accept a Fiscal Year (FY) 2018 JAG award, the chief legal officer of the applicant unit of local government must properly execute, and the unit of local government must submit, the specific certifications regarding compliance with certain federal laws attached to this solicitation as Appendix B and Appendix C. (Note: this requirement does not apply to Indian tribal governments.) (The text of the relevant federal laws appears in Appendix D.)

Eligible allocations under JAG are posted annually on the JAG web page.

All recipients and subrecipients (including any for-profit organization) must forgo any profit or management fee.

## Deadline

Applicants must register in the OJP Grants Management System (GMS) at https://grants.ojp.usdoj.gov/ prior to submitting an application under this solicitation. All applicants must register, even those that previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by 5 p.m. eastern time on August 22, 2018.

For additional information, see How to Apply in Section D. Application and Submission Information.

## Contact Information

For technical assistance with submitting an application, contact the Grants Management System Support Hotline at 888–549–9901, option 3, or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline operates 24 hours a day, 7 days a week, including on federal holidays.

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service (NCJRS) Response Center at grants@ncjrs.gov **within 24 hours after the application deadline** in order to request approval to submit its application. Additional information on reporting technical issues appears under "Experiencing Unforeseen GMS Technical Issues" in How to Apply in Section D. Application and Submission Information.

For assistance with any other requirement of this solicitation, applicants may contact the NCJRS Response Center by telephone at 1–800–851–3420; via TTY at 301–240–6310 (hearing impaired only); by email at grants@ncjrs.gov; by fax to 301–240–5830, or by web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday, and 10:00 a.m. to 8:00 p.m. eastern time on the solicitation close date. Applicants also may contact the appropriate BJA State Policy Advisor.

Release date: July 20, 2018

# Contents

A. Program Description ...................................................................................... 5

   Overview ....................................................................................................5

   Program-specific Information .......................................................................5

      Permissible uses of JAG Funds – In general ...........................................5

      Limitations on the use of JAG funds .......................................................6

      Requirements specific to "disparate" jurisdictions...................................10

      Required compliance with applicable federal laws ..................................10

   BJA Areas of Emphasis ............................................................................12

   Objectives and Deliverables ......................................................................13

   Evidence-based Programs or Practices .....................................................13

   Information Regarding Potential Evaluation of Programs and Activities....................14

B. Federal Award Information ............................................................................ 15

   Type of Award .........................................................................................15

   Financial Management and System of Internal Controls................................16

   Budget and Financial Information................................................................17

   Cost Sharing or Match Requirement ..........................................................17

   Pre-agreement Costs (also known as Pre-award Costs) ...............................17

   Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs .......17

   Costs Associated with Language Assistance (if applicable)...........................18

C. Eligibility Information ................................................................................... 18

D. Application and Submission Information ...................................................... 18

   What an Application Should Include ..........................................................18

   How to Apply ..........................................................................................31

E. Application Review Information .................................................................... 34

   Review Process .......................................................................................34

F. Federal Award Administration Information.................................................... 35

   Federal Award Notices .............................................................................35

   Statutory and Regulatory Requirements; Award Conditions .......................35

   General Information about Post-federal Award Reporting Requirements .................37

G. Federal Awarding Agency Contact(s) .......................................................... 38

H. Other Information ........................................................................................ 38

   Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)..38

   Provide Feedback to OJP ..........................................................................38

Appendix A: Certifications and Assurances by the Chief Executive ..........................40

Appendix B: Certification of Compliance with 8 U.S.C. §§ 1373 and 1644 ...............42

Appendix C: Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3) ........................................................................44

Appendix D: Certain relevant federal laws, as in effect on June 7, 2018 ..................46

Appendix E: Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE).......................52

Appendix F: Additional Award Purposes ...................................................................53

Appendix G: Application Checklist ............................................................................ 56

# Edward Byrne Memorial Justice Assistance (JAG)
# Grant Program
# FY 2018 Local Solicitation
# CFDA #16.738

## A. Program Description

**Overview**
The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to states and units of local government. BJA will award JAG Program funds to eligible units of local government under this FY 2018 JAG Program Local Solicitation. (A separate solicitation will be issued for applications to BJA directly from states.)

**Statutory Authority:** The JAG Program statute is Subpart I of Part E of Title I of the Omnibus Crime Control and Safe Streets Act of 1968. Title I of Pub. L. No. 90-351 (generally codified at 34 U.S.C. 10151-10158), including subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).

**Program-specific Information**

**Permissible uses of JAG Funds – In general**
In general, JAG funds awarded to a unit of local government under this FY 2018 solicitation may be used to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for **criminal justice**, including any one or more of the following:

- Law enforcement programs
- Prosecution and court programs
- Prevention and education programs
- Corrections and community corrections programs
- Drug treatment and enforcement programs
- Planning, evaluation, and technology improvement programs
- Crime victim and witness programs (other than compensation)
- Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams

Additionally, JAG funds awarded to a unit of local government under this FY 2018 solicitation may be used for any purpose indicated in Appendix F.

In connection with all of the above purposes (including those indicated in the appendix), it should be noted that the statute defines "criminal justice" as "activities pertaining to crime

5

prevention, control, or reduction, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not limited to prosecutorial and defender services, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency."

Under the JAG Program, units of local government may also use award funds for broadband deployment and adoption activities as they relate to criminal justice activities.

**Limitations on the use of JAG funds**
*Prohibited uses of funds* – JAG funds may not be used (whether directly or indirectly) for any purpose prohibited by federal statute or regulation, including those purposes specifically prohibited by the JAG Program statute as set out at 34 U.S.C. § 10152.

JAG funds may not be used (directly or indirectly) for security enhancements or equipment for nongovernmental entities not engaged in criminal justice or public safety. Additionally, **JAG funds may not be used (directly or indirectly) to pay for any of the following items unless the BJA Director certifies that extraordinary and exigent circumstances exist,** making them essential to the maintenance of public safety and good order:
- Vehicles, vessels, or aircraft*
- Luxury items
- Real estate
- Construction projects (other than penal or correctional institutions)
- Any similar items

***Police cruisers, police boats, and police helicopters are allowable vehicles under JAG and do not require BJA certification.**

For information related to requesting a waiver to obtain BJA certification for a listed prohibited item, or for examples of allowable vehicles that do not require BJA certification, refer to the JAG FAQs.

*Cap on use of JAG award funds for administrative costs* – Up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award.

*Prohibition of supplanting; no use of JAG funds as match* – JAG funds may not be used to supplant state or local funds but must be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities. See the JAG FAQs for examples of supplanting.

Although supplanting is prohibited, as discussed under What An Application Should Include, the leveraging of federal funding is encouraged.

Absent specific federal statutory authority to do so, JAG award funds may not be used as a match for the purposes of other federal awards.

*Other restrictions on use of funds* – If a unit of local government chooses to use its FY 2018 JAG funds for particular, defined types of expenditures, it must satisfy certain preconditions:

▪ Body-Worn Cameras (BWC)
   A unit of local government that proposes to use FY 2018 JAG award funds to purchase BWC equipment, or to implement or enhance BWC programs, must provide OJP with a certification(s) that each unit of local government law enforcement agency receiving the equipment or implementing the program has policies and procedures in place related to BWC equipment usage, data storage and access, privacy considerations, and training. The certification form related to BWC policies and procedures can be found at: https://www.bja.gov/Funding/BodyWornCameraCert.pdf.

   A unit of local government that proposes to use JAG funds for BWC-related expenses will have funds withheld until the required certification is submitted and approved by OJP. If the unit of local government proposes to change project activities to utilize JAG funds for BWC-related expenses after the award is accepted, the unit of local government must submit the signed certification to OJP at that time.

   Further, before making any subaward for BWC-related expenses, the unit of local government JAG recipient must collect a completed BWC certification from the proposed subrecipient. Any such certifications must be maintained by the unit of local government JAG recipient, and made available to OJP upon request.

   **The BJA BWC Toolkit provides model BWC policies and best practices to assist departments in implementing BWC programs.**

   Apart from the JAG Program, BJA provides funds under the Body-Worn Camera Policy and Implementation Program (BWC Program). The BWC Program allows jurisdictions to develop and implement policies and practices required for effective program adoption and address program factors, including the purchase, deployment, and maintenance of camera systems and equipment; data storage and access; and privacy considerations. Interested units of local government may wish to refer to the BWC web page for more information. Units of local government should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BWC Program.

▪ Body Armor
   Body armor purchased with FY 2018 JAG funds may be purchased at any threat level designation, make, or model from any distributor or manufacturer, as long as the body armor has been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. Further, body armor purchased with FY 2018 JAG funds must be made in the United States, and must be "uniquely fitted." *See* 34 U.S.C. § 10202(c)(1)(A). For a definition of "uniquely fitted" and more information about requirements associated with body armor purchases, see the JAG FAQs.

   A unit of local government that proposes to use FY 2018 JAG award funds to purchase body armor must provide OJP with a certification(s) that each unit of local government law enforcement agency receiving body armor has a written "mandatory wear" policy in effect. *See* 34 U.S.C. § 10202(c). The certification form related to mandatory wear can be found at: www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

7

A unit of local government that proposes to use JAG funds to purchase body armor will have funds withheld until the required certification is submitted and approved by OJP. If the unit of local government proposes to change project activities to utilize JAG funds to purchase body armor after the award is accepted, the unit of local government must submit the signed certification to OJP at that time.

Further, before making any subaward for the purchase of body armor, the unit of local government JAG recipient must collect a completed mandatory wear certification from the proposed subrecipient. Any such certifications must be maintained by the unit of local government JAG recipient, and made available to OJP upon request.

A mandatory wear concept and issues paper and a model policy are available at the BVP Customer Support Center, at vests@usdoj.gov or toll free at 1–877–758–3787. Additional information and FAQs related to the mandatory wear policy and certifications can be found at https://www.bja.gov/Funding/JAGFAQ.pdf.

Apart from the JAG program, BJA provides funds under the Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to state and local law enforcement agencies for the purchase of ballistic-resistant and stab-resistant body armor. For more information on the BVP Program, including eligibility and application, refer to the BVP web page. Units of local government should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BVP Program. *It is also important to note that eligibility for the BVP Program is impacted by a local jurisdiction's use of funds under a local JAG award to purchase body armor.* For additional information on the BVP Program, and eligibility restrictions related to receipt of JAG funding, review the BVP FAQs.

- Interoperable Communications
  Units of local government (and subrecipients) that use FY 2018 JAG funds to support emergency communications activities (including the purchase of interoperable communications equipment and technologies such as voice-over-internet protocol bridging or gateway devices, or equipment to support the build out of wireless broadband networks in the 700 MHz public safety band under the Federal Communications Commission Waiver Order) should review FY 2018 SAFECOM Guidance. The SAFECOM Guidance is updated annually to provide current information on emergency communications policies, eligible costs, best practices, and technical standards for state, local, tribal, and territorial grantees investing federal funds in emergency communications projects. Additionally, emergency communications projects funded with FY 2018 JAG funds should support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the fulltime Statewide Interoperability Coordinator (SWIC) in the state of the project. As the central coordination point for their state's interoperability effort, the SWIC plays a critical role, and can serve as a valuable resource. SWICs are responsible for the implementation of SCIP through coordination and collaboration with the emergency response community. The U.S. Department of Homeland Security Office of Emergency Communications maintains a list of SWICs for each of the states and territories. Contact OEC@hq.dhs.gov. All communications equipment purchased with FY 2018 JAG Program funding should be identified during quarterly performance metrics reporting.

  Further, information sharing projects funded with FY 2018 JAG funds must comply with DOJ's Global Justice Information Sharing Initiative guidelines, as applicable, in order to

promote information sharing and enable interoperability among disparate systems across the justice and public safety community. Recipients (and subrecipients) must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://www.it.ojp.gov/gsp_grantcondition. Recipients (and subrecipients) will be required to document planned approaches to information sharing and describe compliance to the GSP and an appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

For JAG applicants considering implementing communications technology projects, it is worthwhile to consider the First Responder Network Authority (FirstNet) program. The Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. §§ 1401 *et seq.*) established FirstNet as an independent authority within the National Telecommunications and Information Administration. FirstNet's statutory mission is to take all actions necessary to ensure the establishment of a nationwide public safety broadband network (NPSBN). The NPSBN will use the 700 MHz D block spectrum to provide Long-Term Evolution (LTE)-based broadband services and applications to public safety entities. The network is based on a single, national network architecture that will evolve with technological advances and initially consist of a core network and radio access network. While mission critical voice communications will continue to occur on land mobile radio, in time, FirstNet is expected to provide the public safety entities with mission critical broadband data capabilities and services including, but not limited to: messaging; image sharing; video streaming; group text; voice; data storage; applications; location-based services; and quality of service, priority, and preemption. This reliable, highly secure, interoperable, and innovative public safety communications platform will bring 21st century tools to public safety agencies and first responders, allowing them to get more information quickly and helping them to make faster and better decisions. For more information on FirstNet services, the unique value of the FirstNet network to public safety, and how to subscribe for the FirstNet service once your state or territory opts in, visit www.FirstNet.gov. To learn about FirstNet's programs and activities, including its consultation and outreach with public safety, the state plan's process, FirstNet's history and promise, and how it plans to ensure the FirstNet network meets the needs of public safety—every day and in every emergency—visit www.FirstNet.gov or contact info@firstnet.gov.

- DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database
  If JAG Program funds will be used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the FBI) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior express written approval from BJA.

  In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not acceptable for entry into CODIS.

- Entry of Records into State Repositories
  As appropriate and to the extent consistent with law, a condition may be imposed that would require the following: With respect to any "program or activity" that receives federal financial assistance under this solicitation that is likely to generate or upgrade court dispositions or other records that are relevant to National Instant Background Check System (NICS) determinations, a system must be in place to ensure that all such

9

NICS-relevant dispositions or records that are generated or upgraded are made available in timely fashion to state repositories/databases that are accessed by NICS.

**Requirements specific to "disparate" jurisdictions**
According to the JAG program statute, a "disparity" may exist between the funding eligibility of a county and its associated municipalities. *See* 34 U.S.C. § 10156(d)(4). Three different types of disparities may exist:

- The first type is a zero-county disparity. This situation exists when one or more municipalities within a county are eligible for a direct award but the county is not; yet the county is responsible for providing criminal justice services (such as prosecution and incarceration) for the municipality. In this case, the county is entitled to part of the municipality's award because it shares the cost of criminal justice operations, although it may not report crime data to the FBI. This is the most common type of disparity.

- A second type of disparity exists when both a county and a municipality within that county qualify for a direct award, but the award amount for the municipality exceeds 150 percent of the county's award amount.

- The third type of disparity occurs when a county and multiple municipalities within that county are all eligible for direct awards, but the sum of the awards for the individual municipalities exceeds 400 percent of the county's award amount.

Jurisdictions identified by BJA as disparate must identify a fiscal agent that will submit a joint application for the aggregate eligible allocation to all disparate municipalities. The joint application must determine and specify the award distribution to each unit of local government and the purposes for which the funds will be used. A memorandum of understanding (MOU) that identifies which jurisdiction will serve as the applicant or fiscal agent for joint funds must be completed and signed by the authorized representative for each participating jurisdiction. The signed MOU should be attached to the application. For a sample MOU, go to: www.bja.gov/Funding/JAGMOU.pdf.

Once an award is made, the fiscal agent will be responsible for distributing award funds to the other jurisdictions in the disparate group through subawards that include all appropriate award conditions. Unless specified differently, any reference in this solicitation to "applicant" or "recipient" includes each fiscal agent applying on behalf of a disparate group. Further, "subrecipients" includes those disparate jurisdictions that receive award funding from the fiscal agent, rather than directly from OJP.

**Required compliance with applicable federal laws**
By law, the chief executive (e.g., the mayor) of each unit of local government that applies for an FY 2018 JAG award must certify that the unit of local government will "comply with all provisions of [the JAG Program statute] and all other applicable Federal laws." To satisfy this requirement, each unit of local government applicant must submit three properly executed certifications using the forms shown in Appendices A, B, and C.

All applicants should understand that OJP awards, including certifications provided in connection with such awards, are subject to review by DOJ, including by OJP and by the DOJ Office of the Inspector General. Applicants also should understand that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in a

certification submitted to OJP in support of an application may be the subject of criminal prosecution, and also may result in civil penalties and administrative remedies for false claims or otherwise. Administrative remedies that may be available to OJP with respect to an FY 2018 award include suspension or termination of the award, placement on the DOJ high risk grantee list, disallowance of costs, and suspension or debarment of the recipient.

**National Incident-Based Reporting System (NIBRS) 3 percent set-aside**
In FY 2016, the Federal Bureau of Investigation (FBI) formally announced its intention to sunset the Uniform Crime Reporting (UCR) Program's traditional Summary Reporting System (SRS) and replace it with the UCR Program's National Incident-Based Reporting System (NIBRS). By January 1, 2021, the FBI intends for NIBRS to be the law enforcement crime data reporting standard for the nation.

By statute, JAG Program awards are calculated using summary Part 1 violent crime data from the FBI's UCR Program. *See* 34 U.S.C. § 10156. Once SRS has been replaced by NIBRS, JAG award amounts will be calculated using NIBRS data. In preparation for the FBI's 2021 NIBRS compliance deadline, beginning in FY 2018, BJA is requiring, through the application of a special condition, that direct JAG award recipients not certified by their state (or, as applicable, the FBI) as NIBRS compliant to dedicate 3 percent of their JAG award toward achieving full compliance with the FBI's NIBRS data submission requirements under the UCR Program. The 3 percent requirement will assist state and local jurisdictions in working toward compliance to ensure they continue to have critical criminal justice funding available through JAG when SRS is replaced by NIBRS in FY 2021.

The requirement for a NIBRS set-aside will be applicable to all jurisdictions in a disparate group, but will not otherwise be applied to subawards. That is, the unit of local government serving as fiscal agent for a disparate group will be required by special condition to require each of the other jurisdictions in the disparate group to set aside 3 percent of FY 2018 JAG funds received by that jurisdiction to be used for NIBRS compliance activities, unless that jurisdiction receives a waiver from the BJA Director, as described below. Units of local government must clearly indicate in their application narratives and budgets what projects will be supported with this 3 percent set-aside.

The following are examples of costs and projects that relate to NIBRS implementation at the state or local level that could be funded under the JAG Program: software, hardware, and labor that directly support or enhance a state or agency's technical capacity for collecting, processing, and analyzing data reported by local law enforcement (LE) agencies and then submitting NIBRS data to the FBI; training personnel responsible for the state's Incident Based Reporting (IBR) program on receiving, processing, analyzing, and validating incident-based data from local LE agencies in their state; training local agencies in how to collect and submit NIBRS data; and technical assistance for LE agency personnel responsible for (1) managing the agency's crime incident data, (2) processing and validating the data, and (3) extracting and submitting IBR data to the state UCR Program, according to the states, and/or directly to the FBI, according to the NIBRS standard.

Units of local government that have been certified as NIBRS compliant by their state, or directly by the FBI, may submit a waiver to the BJA Director requesting an exemption from the 3 percent set-aside requirement. The waiver request from an appropriate local official must clearly state that the unit of local government has been certified as NIBRS compliant by their state, or directly by the FBI, and should be submitted with the application, or, as appropriate, through request for a Grant Adjustment Notice after an award is made. In any instance in which a waiver

request is submitted, the unit of local government must retain documentation on file that demonstrates the state or FBI certification of NIBRS-compliance. Such documentation must be made available for BJA review, upon request. The BJA Director will review all requests for waivers. If approved, states will not be subject to the 3 percent set-aside requirement.

Note: U.S. Territories and tribal jurisdictions will not be subject to the 3 percent set-aside for NIBRS-compliance until FY 2019. Tribal jurisdictions and the five U.S. territories are strongly encouraged to dedicate a portion of JAG funding to NIBRS conversion; however, this is not a requirement for FY 2018 JAG funding. Utilizing this phased-in approach will allow the territories and tribal jurisdictions to plan for the change in funding direction and provide BJA with time to coordinate or provide any necessary technical assistance surrounding this topic.

**BJA Areas of Emphasis**
BJA recognizes that many state and local criminal justice systems currently face challenging fiscal environments, and that an important, cost-effective way to relieve those pressures is to share or leverage resources through cooperation between federal, state, and local law enforcement. BJA intends to focus much of its work on the areas of emphasis described below, and encourages each recipient of an FY 2018 JAG award to join federal law enforcement agencies in addressing these challenges.

<u>Reducing Violent Crime</u> – Recognizing that crime problems, including felonious possession and use of a firearm and/or gang violence, illegal drug sales and distribution, human trafficking, and other related violent crime, vary from community to community, BJA encourages states to tailor their programs to the local crime issues, and to be data-informed in their work. States should consider investing JAG funds in programs to combat gun violence, and to improve the process for ensuring that persons prohibited from purchasing guns (see, e.g., 18 U.S.C. § 922(g)) are prevented from doing so, by utilizing technology such as eTrace and NIBIN to analyze evidence as well as by enhancing complete, accurate, and timely reporting to the FBI's NICS. States are also encouraged to coordinate with United States Attorneys Offices and Project Safe Neighborhood (PSN) grantees in order to leverage funding for violence reduction projects, and to coordinate their law enforcement activities with those of federal law enforcement agencies, such as the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Drug Enforcement Administration, and the Department of Homeland Security.

<u>Officer Safety and Wellness</u> – The issue of law enforcement safety and wellness is an important priority for BJA and DOJ. According to the *Preliminary 2017 Law Enforcement Officer Fatalities Report*, released by the National Law Enforcement Officers Memorial Fund (NLEOMF), as of December 28, 2017, there were 128 law enforcement line-of-duty deaths nationwide in 2017. Firearms-related deaths were the second leading cause of law enforcement deaths (44) in 2017, according to the NLEOMF report. Of those deaths, the leading circumstance was officers shot while responding to a domestic disturbance (7), followed by traffic enforcement, investigative activities, and dealing with a suspicious person or vehicle—6 instances in each circumstance. Additionally, deaths due to circumstances other than firearms- or traffic-related deaths increased by 61 percent in 2017, with 37 deaths compared to 23 in 2016. Sixteen of those deaths were due to job-related illnesses, including 10 due to heart attacks.

Based on the latest reports (2016 and 2015) from the FBI's *Law Enforcement Officers Killed and Assaulted* (LEOKA) data, there appeared to be a continuing increase in assaults between 2015 and 2016. There were 57,180 assaults in 2016 versus 50,212 in 2015. Of those, 16,535 resulted in officer injuries in 2016 compared to 14,281 in 2015. The 2016 LEOKA reports that

there were 17 officers killed in ambush situations, which is an increase from 2015 when 4 officers were killed in ambush situations.

BJA sees a vital need to focus not only on tactical officer safety concerns, but also on health and wellness as they affect officer performance and safety. It is important for law enforcement to have the tactical skills necessary, and also be physically and mentally well, to perform, survive, and be resilient in the face of the demanding duties of the profession. BJA encourages states to use JAG funds to address these needs by providing training, and paying for tuition and travel expenses related to attending trainings such as those available through the BJA VALOR Initiative, as well as funding for health and wellness programs for law enforcement officers.

Border Security – Securing U.S. borders (and internationally accessible waterways and -airports) is critically important to the reduction and prevention of transnational drug-trafficking networks and combating all forms of human trafficking within the United States (including sex and labor trafficking of foreign nationals and U.S. citizens of all sexes and ages). Smuggling and trafficking operations to, from and within the United States contribute to a significant increase in violent crime and U.S. deaths. BJA encourages units of local government to enhance border, waterway, and port security by using JAG funds to support law enforcement hiring, training, and technology enhancement, as well as cooperation and coordination among federal, state, local, and tribal law enforcement agencies.

Collaborative Prosecution and Law Enforcement – BJA supports strong partnerships between prosecutors and law enforcement, at all levels of government, in order to help take violent offenders off the street. BJA strongly encourages state and local law enforcement agencies to foster strong partnerships with federal law enforcement agencies, and with their own prosecutors, as well as federal prosecutors, to adopt new, cost-effective, collaborative strategies to reduce crime, particularly violent crime. (BJA's Innovative Prosecution Solutions Initiative is a related effort to promote partnerships between prosecutors and researchers to develop and deliver effective, data-driven, evidence-based strategies to solve chronic problems and fight crime.)

**Objectives and Deliverables**
In general, the FY 2018 JAG Program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice. Although the JAG Program provides assistance directly to states, through pass-through (and similar) requirements, the JAG Program also is designed to assist units of local government with respect to criminal justice.

As discussed in more detail in the General Information about Post-federal Award Reporting Requirements discussion, a state that receives an FY 2018 JAG award will be required to produce various types of reports and to submit data related to performance measures and accountability. The objectives and deliverables are directly related to the JAG Program accountability measures at https://bjapmt.ojp.gov/help/jagdocs.html.

**Evidence-based Programs or Practices**
OJP strongly emphasizes the use of data and evidence in policy making and program development in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates.

- Integrating evidence into program, practice, and policy decisions within OJP and the field.
- Improving the translation of evidence into practice.

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website at https://www.crimesolutions.gov/ is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

A useful matrix of evidence-based policing programs and strategies is available through BJA's Matrix Demonstration Project. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA "Innovation Suite" of programs including Innovations in Policing, Prosecution, Supervision, Reentry, and others (see https://www.bja.gov/Programs/CRPPE/innovationssuite.html). BJA encourages states to use JAG funds to support these "crime innovation" strategies, including effective partnerships with universities and research partners and with non-traditional criminal justice partners.

**Information Regarding Potential Evaluation of Programs and Activities**
The Department of Justice has prioritized the use of evidence-based programming and deems it critical to continue to build and expand the evidence informing criminal and juvenile justice programs and crime victim services to reach the highest level of rigor possible. Therefore, applicants should note that OJP may conduct or support an evaluation of the programs and activities funded under this solicitation. Recipients and subrecipients will be expected to cooperate with program-related assessments or evaluation efforts, including through the collection and provision of information or data requested by OJP (or its designee) for the assessment or evaluation of any activities and/or outcomes of those activities funded under this solicitation. The information or data requested may be in addition to any other financial or performance data already required under this program.

**BJA Success Stories**
The BJA-sponsored Success Stories web page features projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page is a valuable resource for states, localities, territories, tribes, and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the recipient to submit success stories annually (or more frequently).**

If a state has a success story it would like to submit, it may be submitted through My BJA account, using "add a Success Story" and the Success Story Submission form. Register for a **My** BJA account using this registration link.

# B. Federal Award Information

BJA estimates that it will make up to 1,147 local awards totaling an estimated $84,500,000.

Awards of at least $25,000 are 4 years in length, and performance periods will be from October 1, 2017 through September 30, 2021. Extensions beyond this period may be made on a case-by-case basis at the discretion of BJA and must be requested via GMS no fewer than 30 days prior to the grant end date.

Awards of less than $25,000 are 2 years in length, and performance periods will be from October 1, 2017 through September 30, 2019. Extensions of up to 2 years can be requested for these awards via GMS no fewer than 30 days prior to the grant end date, and will be automatically granted upon request.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by statute.

**Type of Award**
BJA expects that any award under this solicitation will be in the form of a grant. See Statutory and Regulatory Requirements; Award Conditions, under Section F. Federal Award Administration Information, for a brief discussion of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants.

JAG awards are based on a statutory formula as described below:

Once each fiscal year's overall JAG Program funding level is determined, BJA works with the Bureau of Justice Statistics (BJS) to begin a four-step grant award calculation process, which, in general, consists of:

(1) Computing an initial JAG allocation for each state, based on its share of violent crime and population (weighted equally).

(2) Reviewing the initial JAG allocation amount to determine if the state allocation is less than the minimum award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the state is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG funds. Each of the remaining states receives the minimum award plus an additional amount based on its share of violent crime and population.

(3) Dividing each state's final award amount (except for the territories and District of Columbia) between the state and its units of local governments at a rate of 60 and 40 percent, respectively.

(4) Determining unit of local government award allocations, which are based on their proportion of the state's 3-year violent crime average. If the "eligible award amount" for a particular unit of local government, as determined on this basis, is $10,000 or more, then the unit of local government is eligible to apply directly to OJP (under the JAG Local solicitation) for a JAG award. If the "eligible award amount" to a particular unit of local government, as determined on this basis, is less than $10,000, however, the funds are not made available for a direct award to that particular unit of local government, but

15

instead are added to the amount that otherwise would have been awarded to the state. (Additional requirements related to "disparate" jurisdictions are summarized above).

**Financial Management and System of Internal Controls**
Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities[1]) must, as described in the Part 200 Uniform Requirements[2] as set out at 2 C.F.R. 200.303:

(a) Establish and maintain effective internal control over the Federal award that provides reasonable assurance that [the recipient (and any subrecipient)] is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(b) Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards.

(c) Evaluate and monitor [the recipient's (and any subrecipient's)] compliance with statutes, regulations, and the terms and conditions of Federal awards.

(d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(e) Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or [the recipient (or any subrecipient)] considers sensitive consistent with applicable Federal, State, local, and tribal laws regarding privacy and obligations of confidentiality.

To help ensure that applicants understand the administrative requirements and cost principles, OJP encourages prospective applicants to enroll, at no charge, in the DOJ Grants Financial Management Online Training, available at https://ojpfgm.webfirst.com/. (This training is required for all OJP award recipients.)

Also, applicants should be aware that OJP collects information from applicants on their financial management and systems of internal controls (among other information) which is used to make award decisions. Under Section D. Application and Submission Information, applicants may access and review the OJP Financial Management and System of Internal Controls Questionnaire (https://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf) that OJP requires **all** applicants (other than an individual applying in his/her personal capacity) to download, complete, and submit as part of the application.

---

[1] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to carry out part of the funded award or program.

[2] The "Part 200 Uniform Requirements" refers to the DOJ regulation at 2 C.F.R Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

**Budget and Financial Information**

Trust Fund – Units of local government may draw down JAG funds either in advance or on a reimbursement basis. Non-federal entities must maintain advance payments of federal awards in interest-bearing accounts, unless regulatory exclusions apply (2 CFR 200.305(b)(8)). Subrecipients that draw down JAG funds in advance are subject to the same requirement and must first establish an interest-bearing account.

Tracking and reporting regarding JAG funds used for administrative costs – As indicated earlier, up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award. Administrative costs (when utilized) must be tracked separately; a recipient must report in separate financial status reports (SF-425) those expenditures that specifically relate to each particular JAG award during any particular reporting period.

No commingling – Both the unit of local government recipient and all subrecipients of JAG funds are prohibited from commingling funds on a program-by-program or project-by-project basis. **For this purpose, use of the administrative JAG funds to perform work across all active awards in any one year is not considered commingling.**

**Cost Sharing or Match Requirement**

The JAG Program does not require a match. However, if a successful application proposes a voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

For additional cost sharing and match information, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm.

**Pre-agreement Costs (also known as Pre-award Costs)**

Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does **not** typically approve pre-agreement costs. An applicant must request and obtain the prior written approval of OJP for any such costs. All such costs incurred prior to award and prior to approval of the costs are incurred *at the sole risk* of the applicant. (Generally, no applicant should incur project costs *before* submitting an application requesting federal funding for those costs.)

Should there be extenuating circumstances that make it appropriate for OJP to consider approving pre-agreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for pre-agreement costs, consistent with the recipient's approved budget and applicable cost principles. See the section on Costs Requiring Prior Approval in the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**

OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such

17

events, available at:
https://www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm. OJP policy
and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require
prior written approval (which may affect project timelines) of most conference, meeting, and
training costs for cooperative agreement recipients, as well as some conference, meeting, and
training costs for grant recipients; and (3) set cost limits, which include a general prohibition of
all food and beverage costs.

**Costs Associated with Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to
individuals, the costs of taking reasonable steps to provide meaningful access to those services
or benefits for individuals with limited English proficiency may be allowable. Reasonable steps
to provide meaningful access to services or benefits may include interpretation or translation
services, where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Overview of Legal
Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018
Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

# C. Eligibility Information

For information on eligibility, see the title page.

Note that, as discussed in more detail below, the certifications regarding compliance with certain
federal laws. (See Appendices B and C) must be executed and submitted before a unit of local
government (other than an Indian tribal government) can make a valid award acceptance. Also,
a unit of local government may not access award funds (and its award will include a condition
that withholds funds) until it submits a properly executed "Certifications and Assurances by
Chief Executive of Applicant Government." (See Appendix A).

# D. Application and Submission Information

**What an Application Should Include**
This section describes in detail what an application should include. An applicant should
anticipate that if it fails to submit an application that contains all of the specified elements, it may
negatively affect the review of its application; and, should a decision be made to make an
award, it may result in the inclusion of award conditions that preclude the recipient from
accessing or using award funds until the recipient satisfies the conditions and OJP makes the
funds available.

NOTE: OJP has combined the Budget Detail Worksheet and Budget Narrative in a single
document collectively referred to as the Budget Detail Worksheet. See "Budget Information and
Associated Documentation" below for more information about the Budget Detail Worksheet and
where it can be accessed.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g.,
"Program Narrative," "Budget Detail Worksheet," "Timelines," "Memoranda of Understanding,"

"Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

**In general, if a unit of local government fails to submit required information or documents, OJP either will return the unit of local government's application in the Grants Management System (GMS) for submission of the missing information or documents, or will attach a condition to the award that will withhold award funds until the necessary information and documents are submitted. (As discussed elsewhere in this solicitation, the certification regarding compliance with certain federal laws—which are set out at Appendix B and Appendix C—will be handled differently. Unless and until those certifications are submitted, the unit of local government (other than an Indian tribal government) will be unable to make a valid acceptance of the award.)**

1. **Information to Complete the Application for Federal Assistance (SF-424)**
   The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

   To avoid processing delays, an applicant must include an accurate legal name on its SF-424. Current OJP award recipients, when completing the field for "Legal Name," should use the same legal name that appears on the prior year award document, which is also the legal name stored in OJP's financial system. On the SF-424, enter the Legal Name in box 5 and Employer Identification Number (EIN) in box 6 exactly as it appears on the prior year award document. An applicant with a current, active award(s) must ensure that its GMS profile is current. If the profile is not current, the applicant should submit a Grant Adjustment Notice updating the information on its GMS profile prior to applying under this solicitation.

   A new applicant entity should enter its official legal name, its address, its EIN, and its Data Universal Numbering System (DUNS). A new applicant entity should attach official legal documents to its application (e.g., articles of incorporation, 501(c)(3) status documentation, organizational letterhead) to confirm the legal name, address, and EIN entered into the SF-424. OJP will use the System for Award Management (SAM) to confirm the legal name and DUNS number entered in the SF-424; therefore, an applicant should ensure that the information entered in the SF-424 matches its current registration in SAM. See the How to Apply section for more information on SAM and DUNS numbers.

   **Intergovernmental Review:**
   This solicitation ("funding opportunity") **is** subject to Executive Order 12372. An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/wp-content/uploads/2017/11/Intergovernmental_-Review-_SPOC_01_2018_OFFM.pdf. If the state appears on the SPOC list, the applicant must contact the state SPOC to find out about, and comply with, the state's process under E.O. 12372. In completing the SF-424, an applicant whose state appears on the SPOC list is to make the appropriate selection in response to question 16 once the applicant has complied with its State E.O. 12372 process. (An applicant whose state does not appear on the SPOC list should answer question 16 by

selecting the response that the "Program is subject to E.O. 12372 but has not been selected by the State for review.")

2.  **Project Identifiers**
    Applications should identify at least three and no more than ten project identifiers that would be associated with proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGIdentifiers.pdf.

3.  **Program Narrative**
    The following sections **should** be included as part of the program narrative[3]:

    a.  Description of the Issues – Identify the unit of local government's strategy/funding priorities for the FY 2018 JAG funds, the subgrant award process and timeline, and a description of the programs to be funded over the grant period. Units of local government are strongly encouraged to prioritize the funding on evidence-based projects.

    b.  Project Design and Implementation – Describe the unit of local government's strategic planning process, if any, that guides its priorities and funding strategy. This should include a description of how the local community is engaged in the planning process and the data and analysis utilized to support the plan; it should identify the stakeholders currently participating in the strategic planning process, the gaps in the needed resources for criminal justice purposes, and how JAG funds will be coordinated with state and related justice funds.

    c.  Capabilities and Competencies – Describe any additional strategic planning/coordination efforts in which the units of local government participates with other criminal justice criminal/juvenile justice agencies in the state.

    d.  Plan for Collecting the Data Required for this Solicitation's Performance Measures – OJP will require each successful applicant to submit specific performance measures that demonstrate the results of the work carried out under the award (see "General Information about Post-Federal Award Reporting Requirements" in Section F. Federal Award Administration Information). The performance measures data directly relate to the objectives and deliverables identified under Objectives and Deliverables in Section A. Program Description.

    Applicants should visit OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.

    Post award, recipients will be required to submit quarterly performance metrics through BJA's Performance Measurement Tool (PMT), located at: https://bjapmt.ojp.gov. The application should describe the applicant's plan for collection of all of the performance measures data listed in the JAG Program accountability measures at: https://bjapmt.ojp.gov/help/jagdocs.html.

---

[3] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under Section D. Application and Submission Information.

The application should demonstrate the applicant's understanding of the performance data reporting requirements for this grant program and detail how the applicant will gather the required data should it receive funding.

Please note that applicants are **not** required to submit performance data with the application. Performance measures information is included as an alert that successful applicants will be required to submit performance data as part of the reporting requirements under an award.

**Note on Project Evaluations**
An applicant that proposes to use award funds through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements, likely do not constitute "research." Each applicant should provide sufficient information for OJP to determine whether the particular project it proposes would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research that appears at 28 C.F.R. Part 46 ("Protection of Human Subjects").

Research, for the purposes of human subjects protection for OJP-funded programs, is defined as "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge." 28 C.F.R. 46.102(d).

For additional information on determining whether a proposed activity would constitute research for purposes of human subjects protection, applicants should consult the decision tree in the "Research and the Protection of Human Subjects" section of the "Requirements related to Research" web page of the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" available through the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. Every prospective applicant whose application may propose a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

4. **Budget and Associated Documentation**
The Budget Detail Worksheet and the Budget Narrative are now combined in a single document collectively referred to as the Budget Detail Worksheet. The Budget Detail Worksheet is a user-friendly, fillable, Microsoft Excel-based document designed to calculate totals. Additionally, the Excel workbook contains worksheets for multiple budget years that can be completed as necessary. **All applicants should use the Excel version when completing the proposed budget in an application, except in cases where the applicant does not have access to Microsoft Excel or experiences technical difficulties.** If an applicant does not have access to Microsoft Excel or experiences technical difficulties with the Excel version, then the applicant should use the 508-compliant accessible Adobe Portable Document Format (PDF) version.

Both versions of the Budget Detail Worksheet can be accessed at
https://ojp.gov/funding/Apply/Forms/BudgetDetailWorksheet.htm.

a. **Budget Detail Worksheet**
The Budget Detail Worksheet should provide the detailed computation for each budget
line item, listing the total cost of each and showing how it was calculated by the
applicant. For example, costs for personnel should show the annual salary rate and the
percentage of time devoted to the project for each employee paid with grant funds. The
Budget Detail Worksheet should present a complete itemization of all proposed costs.

For questions pertaining to budget and examples of allowable and unallowable costs,
see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm.

b. **Budget Narrative**
The budget narrative should thoroughly and clearly describe <u>every</u> category of expense
listed in the proposed budget detail worksheet. OJP expects proposed budgets to be
complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for
project activities). **This narrative should include a full description of all costs,
including funds set aside for NIBRS project(s) and administrative costs (if
applicable).**

An applicant should demonstrate in its budget narrative how it will maximize cost
effectiveness of award expenditures. Budget narratives should generally describe cost
effectiveness in relation to potential alternatives and the objectives of the project. For
example, a budget narrative should detail why planned in-person meetings are
necessary, or how technology and collaboration with outside organizations could be
used to reduce costs, without compromising quality.

The budget narrative should be mathematically sound and correspond clearly with the
information and figures provided in the Budget Detail Worksheet. The narrative should
explain how the applicant estimated and calculated all costs, and how those costs are
necessary to the completion of the proposed project. The narrative may include tables
for clarification purposes, but need not be in a spreadsheet format. As with the Budget
Detail Worksheet, the budget narrative should describe costs by year

c. **Information on Proposed Subawards (if any), as well as on Proposed Procurement
Contracts (if any)**
Applicants for OJP awards typically may propose to make "subawards." Applicants also
may propose to enter into procurement "contracts" under the award.

Whether an action—for federal grants administrative purposes—is a subaward or
procurement contract is a critical distinction as significantly different rules apply to
subawards and procurement contracts. If a recipient enters into an agreement that is a
subaward of an OJP award, specific rules apply—many of which are set by federal
statutes and DOJ regulations; others by award conditions. These rules place particular
responsibilities on an OJP recipient for any subawards the OJP recipient may make. The
rules determine much of what the written subaward agreement itself must require or
provide. The rules also determine much of what an OJP recipient must do both before
and after it makes a subaward. If a recipient enters into an agreement that is a

procurement contract under an OJP award, a substantially different set of federal rules applies.

OJP has developed the following guidance documents to help clarify the differences between subawards and procurement contracts under an OJP award and outline the compliance and reporting requirements for each. This information can be accessed online at https://ojp.gov/training/training.htm.

- Subawards under OJP Awards and Procurement Contracts under Awards: A Toolkit for OJP Recipients.
- Checklist to Determine Subrecipient or Contractor Classification.
- Sole Source Justification Fact Sheet and Sole Source Review Checklist.

In general, the central question is the relationship between what the third-party will do under its agreement with the recipient and what the recipient has committed (to OJP) to do under its award to further a public purpose (e.g., services the recipient will provide, products it will develop or modify, research or evaluation it will conduct). If a third party will provide some of the services the recipient has committed (to OJP) to provide, will develop or modify all or part of a product the recipient has committed (to OJP) to develop or modify, or conduct part of the research or evaluation the recipient has committed (to OJP) to conduct, OJP will consider the agreement with the third party a subaward for purposes of federal grants administrative requirements.

This will be true **even if** the recipient, for internal or other non-federal purposes, labels or treats its agreement as a procurement, a contract, or a procurement contract. Neither the title nor the structure of an agreement determines whether the agreement–for purposes of federal grants administrative requirements–is a "subaward" or is instead a procurement "contract" under an award. The substance of the relationship should be given greater consideration than the form of agreement between the recipient and the outside entity.

1. **Information on proposed subawards and required certifications regarding certain federal laws from certain subrecipients**
General requirement for federal authorization of any subaward; statutory authorizations of subawards under the JAG Program statute. Generally, a recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) particular subawards, a recipient must have authorization from OJP before it may make a subaward.

**JAG subawards that are required or specifically authorized by statute (see 34 U.S.C. § 10152(a) and 34 U.S.C. § 10156) do not require prior approval to authorize subawards. This includes subawards made by units of local government under the JAG Program.**

A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the application as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation and is not sufficiently described and justified in the

application as approved by OJP, the recipient will be required, post award, to request and obtain written authorization from OJP before it may make the subaward.

If an applicant proposes to make one or more subawards to carry out the federal award and program, and those subawards are not specifically authorized (or required) by statute or regulation, the applicant should: (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative, but also in the Budget Detail Worksheet and Budget Narrative.

Required certifications, generally relating to various federal statutes, from any proposed subrecipient that is a state or local government entity. Before a unit of local government may subaward FY 2018 award funds to another unit of local government or to a public institution of higher education, it will be required (by specific award condition, the terms of which will govern) to obtain a properly executed certification, generally relating to various specific federal laws, from the proposed subrecipient. (This requirement regarding these federal laws will not apply to subawards to Indian tribes). The specific certification the unit of local government must require from another unit of local government will vary somewhat from the specific certification it must require from a public institution of higher education. The forms will be posted and available for download at: https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

2. **Information on proposed procurement contracts (with specific justification for proposed noncompetitive contracts over $150,000)**

Unlike a recipient contemplating a subaward, a recipient of an OJP award generally does not need specific prior federal authorization to enter into an agreement that— for purposes of federal grants administrative requirements—is considered a procurement contract, **provided that** (1) the recipient uses its own documented procurement procedures and (2) those procedures conform to applicable federal law, including the Procurement Standards of the (DOJ) Part 200 Uniform Requirements (as set out at 2 C.F.R. 200.317 - 200.326). The Budget Detail Worksheet and budget narrative should identify proposed procurement contracts. (As discussed above, subawards must be identified and described separately from procurement contracts.)

The Procurement Standards in the Part 200 Uniform Requirements, however, reflect a general expectation that agreements that (for purposes of federal grants administrative requirements) constitute procurement "contracts" under awards will be entered into on the basis of full and open competition. All noncompetitive (sole source) procurement contracts must meet the OJP requirements outlined at https://ojp.gov/training/subawards-procurement.htm. If a proposed procurement contract would exceed the simplified acquisition threshold—currently, $150,000—a recipient of an OJP award may not proceed without competition unless and until the recipient receives specific advance authorization from OJP to use a non-competitive approach for the procurement. An applicant that (at the time of its application) intends—without competition—to enter into a procurement contract that would exceed $150,000 should include a detailed justification that explains to OJP why, in the particular circumstances, it is appropriate to proceed without competition.

If the applicant receives an award, sole source procurements that do not exceed the Simplified Acquisition Threshold (currently $150,000) must have written justification for the noncompetitive procurement action maintained in the procurement file. If a procurement file does not have the documentation that meets the criteria outlined in 2 C.F.R. 200, the procurement expenditures may not be allowable. Sole source procurement over the $150,000 Simplified Acquisition Threshold must have prior approval from OJP using a Sole Source Grant Adjustment Notice (GAN). Written documentation justifying the noncompetitive procurement must be submitted with the GAN and maintained in the procurement file.

**d. Pre-Agreement Costs**
For information on pre-agreement costs, see Section B. Federal Award Information.

**5. Indirect Cost Rate Agreement (if applicable)**
Indirect costs may be charged to an award only if:

(a) The recipient has a current (unexpired), federally approved indirect cost rate; or
(b) The recipient is eligible to use, and elects to use, the "de minimis" indirect cost rate described in the (DOJ) Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

**Note**: This rule does not eliminate or alter the JAG-specific restriction in federal law that charges for administrative costs may not exceed 10 percent of the award amount, regardless of the approved indirect cost rate.

An applicant with a current (unexpired) federally approved indirect cost rate is to attach a copy of the indirect cost rate agreement to the application. An applicant that does not have a current federally approved rate may request one through its cognizant federal agency, which will review all documentation and approve a rate for the applicant entity, or, if the applicant's accounting system permits, applicants may propose to allocate costs in the direct cost categories.

For assistance with identifying the appropriate cognizant federal agency for indirect costs, please contact the OCFO Customer Service Center at 1–800–458–0786 or at ask.ocfo@usdoj.gov. If DOJ is the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at: www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

Certain OJP recipients have the option of electing to use the "de minimis" indirect cost rate. An applicant that is eligible to use the "de minimis" rate that wishes to use the "de minimis" rate should attach written documentation to the application that advises OJP of both-- (1) the applicant's eligibility to use the "de minimis" rate, and (2) its election to do so. If an eligible applicant elects the "de minimis" rate, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. The "de minimis" rate may no longer be used once an approved federally-negotiated indirect cost rate is in place. (No entity that ever has had a federally-approved negotiated indirect cost rate is eligible to use the "de minimis" rate.) For the "de minimis" rate requirements (including additional information on eligibility to elect to use the rate), see Part 200 Uniform Requirements, at 2 C.F.R. 200.414(f).

6.  **Tribal Authorizing Resolution**
    A tribe, tribal organization, or third party that proposes to provide direct services or assistance to residents on tribal lands should include in its application a resolution, letter, affidavit, or other documentation, as appropriate, that demonstrates (as a legal matter) that the applicant has the requisite authorization from the tribe(s) to implement the proposed project on tribal lands. In those instances when an organization or consortium of tribes applies for an award on behalf of a tribe or multiple specific tribes, the application should include appropriate legal documentation, as described above, from all tribes that would receive services or assistance under the award. A consortium of tribes for which existing consortium bylaws allow action without support from all tribes in the consortium (i.e., without an authorizing resolution or comparable legal documentation from each tribal governing body) may submit, instead, a copy of its consortium bylaws with the application.

7.  **Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high risk status)**
    Every OJP applicant is to download, complete, and submit the OJP Financial Management and System of Internal Controls Questionnaire (Questionnaire) located at https://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf as part of its application. The Questionnaire helps OJP assess the financial management and internal control systems, and the associated potential risks of an applicant as part of the pre-award risk assessment process.

    The Questionnaire should only be completed by financial staff most familiar with the applicant's systems, policies, and procedures in order to ensure that the correct responses are recorded and submitted to OJP. The responses on the Questionnaire directly impact the pre-award risk assessment and should accurately reflect the applicant's financial management and internal control system at the time of the application. The pre-award risk assessment is only one of multiple factors and criteria used in determining funding. However, a pre-award risk assessment that indicates that an applicant poses a higher risk to OJP may affect the funding decision and/or result in additional reporting requirements, monitoring, special conditions, withholding of award funds, or other additional award requirements.

    Among other things, the form requires each applicant to disclose whether it currently is designated "high risk" by a federal grant-making agency outside of DOJ. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant. If an applicant is designated high risk by another federal awarding agency, the applicant must provide the following information:

    -   The federal awarding agency that currently designates the applicant high risk.
    -   The date the applicant was designated high risk.
    -   The high risk point of contact at that federal awarding agency (name, phone number, and email address).
    -   The reasons for the high risk status, as set out by the federal awarding agency.

    OJP seeks this information to help ensure appropriate federal oversight of OJP awards. An applicant that is considered "high risk" by another federal awarding agency is not automatically disqualified from receiving an OJP award. OJP may, however, consider the

information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document).

8. **Disclosure of Lobbying Activities**
   Each applicant must complete and submit a Disclosure of Lobbying Activities form (SF-LLL). An applicant that expends any funds for lobbying activities is to provide all of the information requested on the form. An applicant that does not expend any funds for lobbying activities is to enter "N/A" in the text boxes for item 10 ("a. Name and Address of Lobbying Registrant" and "b. Individuals Performing Services").

9. **Certifications and Assurances by the Chief Executive of the Applicant Government**
   A JAG application is not complete, and a unit of local government may not access award funds, unless the chief executive of the applicant unit of local government (e.g., the mayor) properly executes, and the unit of local government submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

   OJP will not deny an application for an FY 2018 award for failure to submit these "Certifications and Assurances by the Chief Executive of the Applicant Government" by the application deadline, but a unit of local government will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these certifications and assurances, properly executed by the chief executive of the unit of local government (e.g., the mayor).

10. **Certifications by the Chief Legal Officer of the Applicant Government**
    The chief legal officer of an applicant unit of local government (e.g., the City Attorney) is to carefully review the two certifications attached to this solicitation as Appendix B and Appendix C. If the chief legal officer determines that he or she may execute the certifications, the unit of local government is to submit the certification as part of its application. (Note: this requirement does not apply to Indian tribal governments.)

    As discussed further in the Federal Award Notices section, a unit of local government (other than an Indian tribal government) applicant will be **unable to make a valid award acceptance** of an FY 2018 JAG award unless and until both properly executed certifications by its chief legal officer are received by OJP on or before the day the unit of local government submits an executed award document.

11. **Additional Attachments**

    a. **Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**
       Each applicant must provide responses to the following questions as an attachment to the application:
       (1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
       (2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
       (3) If yes to either:
           - Please provide a copy of each law or policy;

- Please describe each practice; and
- Please explain how the law, policy, or practice complies with section 1373.

See Appendix E for a template that applicants may use to prepare this attachment.

Note: Responses to these questions must be provided by the applicant as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding, for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

OJP will not deny an application for an FY 2018 award for failure to submit these required responses by the application deadline, but a unit of local government will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these responses.

**b. Applicant Disclosure of Pending Applications**
Each applicant is to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation and (2) would cover identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. The applicant is to disclose applications made directly to federal awarding agencies, and also applications for subawards of federal funds (e.g., applications to state agencies that will subaward ("subgrant") federal funds).

OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Each applicant that has one or more pending applications as described above is to provide the following information about pending applications submitted within the last 12 months:

- The federal or state funding agency
- The solicitation name/project name
- The point of contact information at the applicable federal or state funding agency

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Federal or State Funding Agency |
|---|---|---|
| DOJ/Office of Community Oriented Policing Services (COPS) | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |
| Health & Human Services/ Substance Abuse and Mental Health Services Administration | Drug-Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |

Each applicant should include the table as a separate attachment to its application. The file should be named "Disclosure of Pending Applications." The applicant Legal Name on the application must match the entity named on the disclosure of pending applications statement.

Any applicant that does not have any pending applications as described above is to submit, as a separate attachment, a statement to this effect: "[Applicant Name on SF-424] does not have (and is not proposed as a subrecipient under) any pending applications submitted within the last 12 months for federally funded grants or cooperative agreements (or for subawards under federal grants or cooperative agreements) that request funding to support the same project being proposed in this application to OJP and that would cover identical cost items outlined in the budget submitted as part of this application."

c. **Research and Evaluation Independence and Integrity (if applicable)**
If an application involves research (including research and development) and/or evaluation, the applicant must demonstrate research/evaluation independence and integrity, including appropriate safeguards, before it may receive award funds. The applicant must demonstrate independence and integrity regarding both this proposed research and/or evaluation, and any current or prior related projects.

Each application should include an attachment that addresses **both** i. and ii. below.

   i.  For purposes of this solicitation, each applicant is to document research and evaluation independence and integrity by including one of the following two items:

      a.  A specific assurance that the applicant has reviewed its application to identify any actual or potential apparent conflicts of interest (including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients), and that the applicant has identified no such conflicts of interest—whether personal or financial or organizational (including on the part of the applicant entity or on the part of staff, investigators, or subrecipients)—that could affect the

independence or integrity of the research, including the design, conduct, and reporting of the research.

OR

b.   A specific description of actual or potential apparent conflicts of interest that the applicant has identified—including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients—that could affect the independence or integrity of the research, including the design, conduct, or reporting of the research. These conflicts may be personal (e.g., on the part of investigators or other staff), financial, or organizational (related to the applicant or any subrecipient entity). Some examples of potential investigator (or other personal) conflict situations are those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization would not be given an award to evaluate a project, if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), because the organization in such an instance might appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii.   In addition, for purposes of this solicitation, each applicant is to address possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

a.   If an applicant reasonably believes that no actual or potential apparent conflicts of interest (personal, financial, or organizational) exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. The applicant also is to include an explanation of the specific processes and procedures that the applicant has in place, or will put in place, to identify and prevent (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OR

b.   If the applicant has identified actual or potential apparent conflicts of interest (personal, financial, or organizational) that could affect the independence and integrity of the research, including the design, conduct,

or reporting of the research, the applicant is to provide a specific and robust mitigation plan to address each of those conflicts. At a minimum, the applicant is expected to explain the specific processes and procedures that the applicant has in place, or will put in place, to identify and eliminate (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OJP will assess research and evaluation independence and integrity based on considerations such as the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the applicant entity (and any subrecipients) in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

**d. Local Governing Body Review**
Applicants must submit information via the Certification and Assurances by the Chief Executive (See Appendix A) which documents that the JAG application was made available for review by the governing body of the unit of local government, or by an organization designated by that governing body, for a period that was not less than 30 days before the application was submitted to BJA. The same Chief Executive Certification will also specify that an opportunity to comment on this application was provided to citizens prior to the application submission to the extent applicable law or established procedures make such opportunity available. In the past, this has been accomplished via submission of specific review dates; now, OJP will only accept a chief executive's certification to attest to these facts. Units of local government may continue to submit actual dates of review, should they wish to do so, in addition to the submission of the Chief Executive Certification.

**How to Apply**
An applicant must submit its application through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Each applicant entity **must register in GMS for each specific funding opportunity** and should **register promptly** to meet the GMS registration deadline for this funding opportunity, especially if this is the first time the applicant is using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. An applicant that experiences technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888–549–9901 (option 3), available 24 hours a day, 7 days a week, including on federal holidays. OJP recommends that each applicant **register promptly** to prevent delays in submitting an application package by the deadline.

**Note on File Types: GMS does not accept executable file types as application attachments**. These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip." GMS may reject applications with files that use these extensions. It is important to allow time to change the type of file(s) if the application is rejected.

**Unique Entity Identifier (DUNS Number) and System for Award Management (SAM)**
Every applicant entity must comply with all applicable System for Award Management (SAM) and unique entity identifier (currently, a Data Universal Numbering System [DUNS] number) requirements. SAM is the repository for certain standard information about federal financial assistance applicants, recipients, and subrecipients. A DUNS number is a unique nine-digit identification number provided by the commercial company Dun and Bradstreet. More detailed information about SAM and the DUNS number is in the numbered sections below.

If an applicant entity has not fully complied with the applicable SAM and unique identifier requirements by the time OJP makes award decisions, OJP may determine that the applicant is not qualified to receive an award and may use that determination as a basis for making the award to a different applicant.

If the applicant entity already has an Employer Identification Number (EIN), the SAM registration will take up **to two weeks to process**. If the entity does not have an EIN, then **the applicant should allow two to five weeks for obtaining the information from IRS when requesting the EIN via phone, fax, mail or Internet**. For more information about EIN, visit https://www.irs.gov/individuals/international-taxpayers/taxpayer-identification-numbers-tin.

**Registration and Submission Steps**
All applicants should complete the following steps:

1.  **Acquire a unique entity identifier (DUNS number).** In general, the Office of Management and Budget requires every applicant for a federal award (other than an individual) to include a "unique entity identifier" in each application, including an application for a supplemental award. Currently, a DUNS number is the required unique entity identifier.

    This unique entity identifier is used for tracking purposes, and to validate address and point of contact information for applicants, recipients, and subrecipients. It will be used throughout the life cycle of an OJP award. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866–705–5711 to obtain a DUNS number or apply online at www.dnb.com/. A DUNS number is usually received within 2 business days.

2.  **Acquire or maintain registration with SAM.** Any applicant for an OJP award creating a **new** entity registration (or updating or renewing a registration) in SAM.gov must submit an original, signed notarized letter appointing the authorized Entity Administrator within thirty (30) days of the registration activation. **Notarized letters must be submitted via U.S. Postal Service Mail. Read the Alert at www.sam.gov to learn more about what is required in the notarized letter, and read the Frequently Asked Questions (FAQs) at www.gsa.gov/samupdate to learn more about this process change.**

    All applicants for OJP awards (other than individuals) must maintain current registrations in the SAM database. Applicants will need the authorizing official of the organization and an Employer Identification Number (EIN).

    Information about SAM registration procedures can be accessed at https://www.sam.gov/.

3.  **Acquire a GMS username and password**. New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more information on how to register in GMS, go to www.ojp.gov/gmscbt. Previously registered

applicants should ensure, prior to applying, that the user profile information is up-to-date in GMS (including, but not limited to, address, legal name of agency and authorized representative) as this information is populated in any new application.

4. **Verify the SAM (formerly CCR) registration in GMS.** OJP requires each applicant to verify its SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

5. **Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select "BJA" and "**FY 18 Edward Byrne Memorial Local Justice Assistance Grant (JAG) Program.**"

6. **Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the "funding opportunity" (solicitation) title along with the registration and application deadlines for this solicitation. Select the "Apply Online" button in the "Action" column to register for this solicitation and create an application in the system.

7. **Follow the directions in GMS to submit an application consistent with this solicitation.** Once the application is submitted, GMS will display a confirmation screen stating the submission was successful. **Important:** In some instances, applicants must wait for GMS approval before submitting an application. OJP urges each applicant to submit its application **at least 72 hours prior** to the application due date.

**Note: Application Versions**
If an applicant submits multiple versions of the same application, OJP will review **only** the most recent system-validated version submitted.

**Experiencing Unforeseen GMS Technical Issues**
An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline may contact the GMS Help Desk or the SAM Help Desk (Federal Service Desk) at https://www.fsd.gov/fsd-gov/home.do to report the technical issue and receive a tracking number. The applicant must email the NCJRS Response Center identified in the Contact Information section on the title page **within 24 hours after the application deadline** to request approval to submit its application after the deadline. The applicant's email must describe the technical difficulties, and must include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s).

**Note: OJP does not automatically approve requests to submit a late application.** After OJP reviews the applicant's request, and contacts the GMS Help Desk to verify the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the untimely application submission was due to the applicant's failure to follow all required procedures, OJP will deny the applicant's request to submit its application.

The following conditions generally are insufficient to justify late submissions to OJP solicitations:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete.)
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website
- Failure to follow each instruction in the OJP solicitation
- Technical issues with the applicant's computer or information technology environment such as issues with firewalls

# E. Application Review Information

**Review Process**
OJP is committed to ensuring a fair and open process for making awards. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to help ensure that JAG program-statute requirements have been met.

Pursuant to the Part 200 Uniform Requirements, before award decisions are made, OJP also reviews information related to the degree of risk posed by applicants. Among other things, to help assess whether an applicant that has one or more prior federal awards has a satisfactory record with respect to performance, integrity, and business ethics, OJP checks whether the applicant is listed in SAM as excluded from receiving a federal award.

In addition, if OJP anticipates that an award will exceed $150,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the non-public segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee Performance and Integrity Information System; "FAPIIS").

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant. The evaluation of risks goes beyond information in SAM, however. OJP itself has in place a framework for evaluating risks posed by applicants. OJP takes into account information pertinent to matters such as:

(1) Applicant financial stability and fiscal integrity
(2) Quality of the management systems of the applicant, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide
(3) Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies
(4) Reports and findings from audits of the applicant, including audits under the (DOJ) Part 200 Uniform Requirements
(5) Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

# F. Federal Award Administration Information

**Federal Award Notices**
Award notifications are expected to be made by September 30, 2018. OJP sends award notifications by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and steps to take in GMS to start the award acceptance process. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date.

**NOTE:** In order to validly accept an award under the FY 2018 JAG Program, a unit of local government (other than an Indian tribal government) must submit to GMS the certification by its chief legal officer regarding compliance with certain federal laws, executed using the forms that appear in Appendices B and C. (The forms also may be downloaded at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.) Unless the executed certifications either (1) are submitted to OJP together with the signed award document or (2) are uploaded in GMS no later than the day the signed award document is submitted, **OJP will reject as invalid** any submission by a unit of local government (other than an Indian tribal government) that purports to accept an award under this solicitation.

Rejection of an initial submission as an invalid award acceptance is not a denial of the award. Consistent with award requirements, once the unit of local government **does** submit the necessary certification regarding compliance with certain federal laws, the unit of local government **will** be permitted to submit an award document executed by the unit of local government on or after the date of those certifications.

Also, in order for an applicant validly to accept an award under the FY 2018 JAG program, an individual with the necessary authority to bind the applicant will be required to log in; execute a set of legal certifications and a set of legal assurances; designate a financial point of contact; thoroughly review the award, including **all** award conditions; and sign and accept the award. The award acceptance process requires physical signature of the award document by the authorized representative and the scanning of the fully-executed award document (along with the required certifications regarding compliance with certain federal laws, if not already uploaded in GMS) to OJP.

**Statutory and Regulatory Requirements; Award Conditions**
If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with award conditions, as well as all applicable requirements of federal statutes and regulations (including applicable requirements referred to in the assurances and certifications executed at the time of award acceptance). OJP strongly encourages prospective applicants to review information on post-award legal requirements and common OJP award conditions **prior** to submitting an application.

Applicants should consult the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards," available in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. In addition, applicants should examine the

following two legal documents, as each successful applicant must execute both documents in GMS before it may receive any award funds. (An applicant is not required to submit these documents as part of an application.)

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements

- Certified Standard Assurances

The web pages accessible through the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" are intended to give applicants for OJP awards a general overview of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants and cooperative agreements awarded in FY 2018. Individual OJP awards typically also will include additional award conditions. Those additional conditions may relate to the particular statute, program, or solicitation under which the award is made; to the substance of the funded application; to the recipient's performance under other federal awards; to the recipient's legal status (e.g., as a for-profit entity); or to other pertinent considerations.

Individual FY 2018 awards made pursuant to this solicitation will, as appropriate and to the extent consistent with law, include conditions that will require the recipient (and any subrecipient) that accepts the award to do various things, with respect to the "program or activity" that would receive federal financial assistance thereunder. **Although the specific terms of each of those conditions are what will govern the awards**, included among such conditions will be some that, **generally speaking**, will require the recipient (and any subrecipient) that accepts the award to do some or all of the following:

- Not to violate 8 U.S.C. § 1373 (prohibiting restrictions on—
    (1) communication to/from the Department of Homeland Security ("DHS") of information regarding the citizenship or immigration status of any individual; and
    (2) maintaining, or exchanging with any government entity, information regarding the immigration status of any individual).

- Not to violate 8 U.S.C. § 1644 (prohibiting restrictions on communication to/from DHS of information regarding the immigration status of an alien).

- Not to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal, harbor, or shield from detection, or attempt to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts … "or aid or abet the commission of any of the preceding acts").

- Not to impede the exercise of the authority of the federal government under 8 U.S.C. § 1266(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released") and 8 U.S.C. § 1231(a)(4) (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the

scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.

- Not to impede the exercise by DHS agents, "anywhere in or outside the United States" (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. § 1357(a)(1) to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," specifically by requiring such recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States.

The reasonable costs (to the extent not reimbursed under any other federal program) of complying with these conditions, including honoring any duly authorized requests from DHS that is encompassed by these conditions, will be allowable costs under the award.

**General Information about Post-federal Award Reporting Requirements**
In addition to the deliverables described in Section A. Program Description, any recipient of an award under this solicitation will be required to submit the following reports and data.

Required reports. Recipients typically must submit quarterly financial status reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

Awards that exceed $500,000 will include an additional condition that, under specific circumstances, will require the recipient to report (to FAPIIS) information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either the OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Additional information on this reporting requirement appears in the text of the award condition posted on the OJP website at: https://ojp.gov/funding/FAPIIS.htm.

Data on performance measures. In addition to required reports, each award recipient also must provide data that measure the results of the work done under the award. To demonstrate program progress and success, as well as to assist DOJ with fulfilling its responsibilities under the Government Performance and Results Act of 1993 (GPRA), Public Law 103-62, and the GPRA Modernization Act of 2010, Public Law 111–352, OJP will require any award recipient, post award, to provide accountability metrics data as part of regular progress reporting. Accountability metrics data must be submitted through BJA's Performance Measurement Tool (PMT), available at https://bjapmt.ojp.gov. The accountability measures are available at: https://bjapmt.ojp.gov/help/jagdocs.html. (Note: if a law enforcement agency receives JAG funds from a state, the state must submit quarterly accountability metrics data related to training that officers have received on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.) Successful applicants will be required to access OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.

OJP may restrict access to award funds if a recipient of an OJP award fails to report the required accountability metrics data in a timely manner.

# G. Federal Awarding Agency Contact(s)

For OJP contact(s), see the title page.

For contact information for GMS, see the title page.

# H. Other Information

**Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)**
All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. By law, DOJ may withhold information that is responsive to a request pursuant to FOIA if DOJ determines that the responsive information either is protected under the Privacy Act or falls within the scope of one of nine statutory exemptions under FOIA. DOJ cannot agree in advance of a request pursuant to FOIA not to release some or all portions of an application.

In its review of records that are responsive to a FOIA request, OJP will withhold information in those records that plainly falls within the scope of the Privacy Act or one of the statutory exemptions under FOIA. (Some examples include certain types of information in budgets, and names and contact information for project staff other than certain key personnel.) In appropriate circumstances, OJP will request the views of the applicant/recipient that submitted a responsive document.

For example, if OJP receives a request pursuant to FOIA for an application submitted by a nonprofit or for-profit organization or an institution of higher education, or for an application that involves research, OJP typically will contact the applicant/recipient that submitted the application and ask it to identify—quite precisely—any particular information in the application that applicant/recipient believes falls under a FOIA exemption, the specific exemption it believes applies, and why. After considering the submission by the applicant/recipient, OJP makes an independent assessment regarding withholding information. OJP generally follows a similar process for requests pursuant to FOIA for applications that may contain law-enforcement sensitive information.

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. OJP does **not** reply to messages it receives in this mailbox. A prospective applicant that has specific questions on any program or technical aspect of the solicitation **must** use the appropriate telephone number or email listed on the front of this solicitation document to obtain information. These contacts are provided to help ensure that prospective applicants can directly reach an individual who can address specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your résumé to ojpprsupport@usdoj.gov. (Do not send your résumé to the OJP Solicitation Feedback email account.) **Note:** Neither you nor anyone else from your organization or entity can be a

peer reviewer in a competition in which you or your organization/entity has submitted an application.

**Appendix A**

**Certifications and Assurances by the Chief Executive of the Applicant Government**

Template for use by chief executive of the unit of local government (e.g., the mayor)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**Note:** By law, for purposes of the JAG Program, the term "unit of local government " includes a town, township, village, parish, city, county, borough, or other general purpose political subdivision of a state; or, it may be a federally recognized Indian tribal government that performs law enforcement functions (as determined by the Secretary of the Interior). A unit of local government may be any law enforcement district or judicial enforcement district established under applicable state law with authority to independently establish a budget and impose taxes; for example, in Louisiana, a unit of local government means a district attorney or parish sheriff.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

## Edward Byrne Justice Assistance Grant Program FY 2018 Local Solicitation

### Certifications and Assurances by the Chief Executive of the Applicant Government

On behalf of the applicant unit of local government named below, in support of that locality's application for an award under the FY 2018 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 34 U.S.C. § 10153(a), I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant unit of local government named below, and I have the authority to make the following representations on my own behalf and on behalf of the applicant unit of local government. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant unit of local government.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the unit of local government (e.g., city council or county commission), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant unit of local government will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I certify that— (a) the programs to be funded by the award (if any) that OJP makes based on the application described above meet all the requirements of the JAG Program statute (34 U.S.C. §§ 10151-10158); (b) all the information contained in that application is correct; (c) in connection with that application, there has been appropriate coordination with affected agencies; and (d) in connection with that award (if any), the applicant unit of local government will comply with all provisions of the JAG Program statute and all other applicable federal laws.

7. I have examined certification entitled "State or Local Government: FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government. (This provision is not applicable to Indian tribal government applicants.)

8. I have examined certification entitled "State or Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1357(a), & 1366(1) & (3)" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government. (This provision is not applicable to Indian tribal government applicants.)

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. §§ 10271-10273), and also may subject me and the applicant unit of local government to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Executive of the Applicant Unit of          Date of Certification
Local Government

_____          _____
Printed Name of Chief Executive          Title of Chief Executive

_____
Name of Applicant Unit of Local Government

41

**Appendix B**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1373 and 1644**

Template for use by the chief legal officer of the unit of local government (e.g., the city attorney)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**Note:** This Certification is not required by Indian tribal government applicants.

# U.S. DEPARTMENT OF JUSTICE
## OFFICE OF JUSTICE PROGRAMS

### Local Government:  FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1)  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP).  I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

(2)  I have carefully reviewed 8 U.S.C. §§ 1373(a) & (b), and 1644, including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status. I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition … and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. §§ 1373 & 1644 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3)  I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. §§ 1373 & 1644, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program.

(4)  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (*see* 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (*cf.* 34 U.S.C. § 10251(a)(2)).  Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (*i.e.*, one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5)  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

(a)  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

(b)  any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. §§ 1373(a) & (b), and 1644, whether imposed by a State or local government entity, -agency, or -official.

(6)  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____
Signature of Chief Legal Officer of the Jurisdiction

_____
Printed Name of Chief Legal Officer

_____
Date of Certification

_____
Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (*i.e.*, the applicant to the FY 2018 OJP Program identified below)

*FY 2018 OJP Program*:  **Byrne Justice Assistance Grant (JAG) Program: Local**

**Appendix C**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3)**

Template for use by chief legal officer of the unit of local government (e.g., the city attorney)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**Note:** This Certification is not required by Indian tribal government applicants.

U.S. DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS

**Local Government:  FY 2018 Certification Relating to
8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief legal officer of the unit of local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

2. I have carefully reviewed each of the following sections of title 8, United States Code:

   a. § 1226(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released");

   b. § 1231(a)(4) (federal government may not "remove an alien who is sentenced to imprisonment until the alien is released from imprisonment");

   c. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts ... or aid[] or abet[] the commission of any of the preceding acts");

   d. § 1357(a) (authorizing immigration officers, "anywhere in or outside the United States" (see 8 C.F.R. § 287.5(a)), to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); and

   e. § 1366(1) & (3) (requiring the Attorney General annually to submit to Congress "a report detailing ... (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense, [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal").

3. I (and also the applicant entity) understand that USDOJ will require States and local governments (including State and local government entities, -agencies, and -officials), with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program, not to violate, or to aid or abet any violation of, 8 U.S.C. § 1324(a), and not to impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a) or relating to 8 U.S.C. § 1366(1) & (3) or 8 U.S.C. § 1226(a) & (c).

4. I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or agency.

5. I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

   a. the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

   b. any laws, rules, policies, or practices potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that implicate any of the requirements relating to 8 U.S.C. §§ 1226(a) & (c), 1324(a), 1357(a), & 1366(1) & (3) that are described in ¶ 3 of this certification, whether imposed by a State or local government entity, -agency, or -official.

6. As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that would or does— (1) violate, or aid or abet any violation of, 8 U.S.C. § 1324(a); (2) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); (3) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3); or (4) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. §§ 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including associated certifications, are subject to review by USDOJ, including by OJP and the USDOJ Office of the Inspector General.

_____         _____
Signature of Chief Legal Officer of the Jurisdiction        Printed Name of Chief Legal Officer

_____         _____
Date of Certification                                     Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below)

*FY 2018 OJP Program:*  Byrne Justice Assistance Grant (JAG) Program: Local

45

Appendix D

Certain relevant federal laws, as in effect on June 7, 2018

8 U.S.C. § 1373

**Communication between government agencies and the Immigration and Naturalization Service**

**(a) In general**
Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**
Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
**(2)** Maintaining such information.
**(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**
The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

8 U.S.C. § 1644

**Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

8 U.S.C. § 1226(a) & (c)

**Apprehension and detention of aliens**
(a) Arrest, detention, and release
On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

46

    (1) may continue to detain the arrested alien; and
    (2) may release the alien on--
        (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
        (B) conditional parole; but
    (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

\*\*\*

(c) Detention of criminal aliens
    (1) Custody
The Attorney General shall take into custody any alien who--
        (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
        (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
        (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence1 to a term of imprisonment of at least 1 year, or
        (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release
The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.


## 8 U.S.C. § 1231(a)(4)

(a) Detention, release, and removal of aliens ordered removed
\*\*\*
### 4) Aliens imprisoned, arrested, or on parole, supervised release, or probation

#### (A) In general
Except as provided in section 259(a) of title 42 and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

BJA-2018-13626

**(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment-

    i.    in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title and (II) the removal of the alien is appropriate and in the best interest of the United States; or

    ii.    in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

**(C) Notice**

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

**(D) No private right**

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.


## 8 U.S.C. § 1324(a)

**Bringing in and harboring certain aliens**

(a) Criminal penalties

  (1)(A) Any person who—

    i.    knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

    ii.    knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

    iii.    knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

      iv.   encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

      v.   (v)(I) engages in any conspiracy to commit any of the preceding acts, or

      vi.   (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

      I.   in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

      II.   in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

      III.   in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

      IV.   in the case of a violation of subparagraph (A)(i), (ii), (iii), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

(C) It is not a violation of clauses (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs-

      (A) be fined in accordance with title 18 or imprisoned not more than one year, or both; or

      (B) in the case of-

        (i) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

        (ii) an offense done for the purpose of commercial advantage or private financial gain, or

        (iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of

49

subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

    (3)(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18 or imprisoned for not more than 5 years, or both.
    (B) An alien described in this subparagraph is an alien who-
                (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and
                (ii) has been brought into the United States in violation of this subsection.

    (4) In the case of a person who has brought aliens into the United States in violation of this subsection, the sentence otherwise provided for may be increased by up to 10 years if-
                (A) the offense was part of an ongoing commercial organization or enterprise;
                (B) aliens were transported in groups of 10 or more; and
                (C)(i) aliens were transported in a manner that endangered their lives; or
                (ii) the aliens presented a life-threatening health risk to people in the United States.


## 8 U.S.C. § 1357(a)

### Powers of immigration officers and employees

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
  **(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
  **(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;
  **(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;
  **(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and
  **(5)** to make arrests-
  **(6)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

**(7)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

**(8)** if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.


**8 U.S.C. § 1366(1) & (3)**

**Annual report on criminal aliens**
Not later than 12 months after September 30, 1996, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—
   (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;
   ***
   (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal;
   ***

**Appendix E**

**Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**

Each applicant must provide responses to the following questions as an attachment to the application:

(1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

(2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?

(3) If yes to either:
- Please provide a copy of each law or policy;
- Please describe each practice; and
- Please explain how the law, policy, or practice complies with section 1373.

Note: Responses to these questions must be provided by the applicant to BJA as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding, for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

**Appendix F**

**Additional purposes for which JAG funds awarded to a state under this FY 2018 solicitation may be used:**

(a)    To enforce state and local laws that establish offenses similar to offenses established in 21 U.S.C. § 801 et seq., to improve the functioning of the **criminal justice** system, with emphasis on violent crime and serious offenders, by means including providing additional personnel, equipment, training, technical assistance, and information systems for the more widespread apprehension, prosecution, adjudication, detention, and rehabilitation of persons who violate these laws, and to assist the victims of such crimes (other than compensation), including—

(1)    demand-reduction education programs in which law enforcement officers participate;

(2)    multi-jurisdictional task-force programs that integrate federal, state, and local drug-law-enforcement agencies and prosecutors for the purpose of enhancing inter-agency co-ordination and intelligence, and facilitating multi-jurisdictional investigations;

(3)    programs designed to target the domestic sources of controlled and illegal substances, such as precursor chemicals, diverted pharmaceuticals, clandestine laboratories, and cannabis cultivations;

(4)    providing community and neighborhood programs that assist citizens in preventing and controlling crime, including special programs that address the problems of crimes committed against the elderly and special programs for rural jurisdictions;

(5)    disrupting illicit commerce in stolen goods and property;

(6)    improving the investigation and prosecution of white-collar crime, organized crime, public-corruption crimes, and fraud against the government, with priority attention to cases involving drug-related official corruption;

(7)(A)    improving the operational effectiveness of law enforcement through the use of crime-analysis techniques, street-sales enforcement, schoolyard-violator programs, and gang-related and low-income-housing drug-control programs; and

(B)    developing and implementing anti-terrorism plans for deep-draft ports, international airports, and other important facilities;

(8)    career-criminal prosecution programs, including the development of proposed model drug-control legislation;

(9)    financial investigative programs that target the identification of money-laundering operations and assets obtained through illegal drug trafficking, including the development of proposed model legislation, financial investigative training, and financial information-sharing systems;

(10)    improving the operational effectiveness of the court process, by expanding prosecutorial, defender, and judicial resources, and implementing court-delay-reduction programs;'

(11)    programs designed to provide additional public correctional resources and improve the corrections system, including treatment in prisons and jails, intensive-supervision programs, and long-range corrections and sentencing strategies;

(12)    providing prison-industry projects designed to place inmates in a realistic working and training environment that will enable them to acquire

BJA-2018-13626

marketable skills and to make financial payments for restitution to their victims, for support of their own families, and for support of themselves in the institution;

(13)    providing programs that identify and meet the treatment needs of adult and juvenile drug-dependent and alcohol-dependent offenders;

(14)    developing and implementing programs that provide assistance to jurors and witnesses, and assistance (other than compensation) to victims of crimes;

(15)(A) developing programs to improve drug-control technology, such as pretrial drug-testing programs, programs that provide for the identification, assessment, referral to treatment, case-management and monitoring of drug-dependent offenders, and enhancement of state and local forensic laboratories; and

(B)    developing programs to improve **criminal justice** information systems (including automated fingerprint identification systems) to assist law enforcement, prosecution, courts, and corrections organizations;

(16)    innovative programs that demonstrate new and different approaches to enforcement, prosecution, and adjudication of drug offenses and other serious crimes;

(17)    addressing the problems of drug trafficking and the illegal manufacture of controlled substances in public housing;

(18)    improving the criminal and juvenile justice system's response to domestic and family violence, including spouse abuse, child abuse, and abuse of the elderly;

(19)    drug-control evaluation programs that the state and units of local government may utilize to evaluate programs and projects directed at state drug-control activities;

(20)    providing alternatives to prevent detention, jail, and prison for persons who pose no danger to the community;

(21)    programs of which the primary goal is to strengthen urban enforcement and prosecution efforts targeted at street drug sales;

(22)    programs for the prosecution of driving while intoxicated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles;

(23)    programs that address the need for effective bindover systems for the prosecution of violent 16- and 17-year-old juveniles, in courts with jurisdiction over adults, for the crimes of—

(A)    murder in the first degree;
(B)    murder in the second degree;
(C)    attempted murder;
(D)    armed robbery when armed with a firearm;
(E)    aggravated battery or assault when armed with a firearm;
(F)    criminal sexual penetration when armed with a firearm; and
(G)    drive-by shootings as described 18 U.S.C. § 36;

(24)    law-enforcement and prevention programs relating to gangs or to youth who are involved or at risk of involvement in gangs;

(25)    developing or improving, in a forensic laboratory, a capability to analyze DNA for identification purposes; and

(26)    developing and implementing anti-terrorism training programs and procuring equipment for use by local law-enforcement authorities; and

**(b)**    To reduce crime and improve public safety, including but not limited to, the following:

(1)(A)    hiring, training, and employing on a continuing basis new, additional law enforcement officers and necessary support personnel;

(B)    paying overtime to presently-employed law enforcement officers and necessary support personnel for the purpose of increasing the number of hours worked by such personnel; and

(C)    procuring equipment, technology, and other material directly related to basic law-enforcement functions;

(2)    enhancing security measures—

(A)    in and around schools; and

(B)    in and around any other facility or location that is considered by the unit of local government to have a special risk for incidents of crime;

(3)    establishing crime-prevention programs that may, though not exclusively, involve law-enforcement officials and that are intended to discourage, disrupt, or interfere with the commission of criminal activity, including neighborhood-watch and citizen-patrol programs, sexual-assault and domestic-violence programs, and programs intended to prevent juvenile crime;

(4)    establishing or supporting drug courts;

(5)    establishing early-intervention and -prevention programs for juveniles, in order to reduce or eliminate crime;

(6)    enhancing the adjudication process of cases involving violent offenders, including violent juvenile offenders;

(7)    enhancing programs under **(a)**, above;

(8)    establishing co-operative task forces between adjoining units of local government to work co-operatively to prevent and combat criminal activity, particularly criminal activity that is exacerbated by drug- or gang-related involvement; and

(9)    establishing a multi-jurisdictional task force, particularly in rural areas, composed of law-enforcement officials representing units of local government, that works with Federal law-enforcement officials to prevent and control crime.

**Appendix G**
**Application Checklist**

**Edward Byrne Memorial Justice Assistance Grant (JAG) Program:**

**FY 2018 Local Solicitation**

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
_____ Acquire a DUNS Number                                           (see page 31)
_____ Acquire or renew registration with SAM                          (see page 32)
*To Register with GMS*:
_____ For new users, acquire a GMS username and password*             (see page 32)
_____ For existing users, check GMS username and password* to ensure account access
                                                                      (see page 32)
_____ Verify SAM registration in GMS                                  (see page 32)
_____ Search for correct funding opportunity in GMS                   (see page 32)
_____ Select correct funding opportunity in GMS                       (see page 32)
_____ Register by selecting the "Apply Online" button associated with the funding opportunity
       title                                                          (see page 32)
_____ Read OJP policy and guidance on conference approval, planning, and reporting
available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
                                                                      (see page 17)
_____ If experiencing technical difficulties in GMS, contact the NCJRS Response Center
                                                                      (see pages 2 and 33)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist,
this function is only associated with points of contact designated within GMS at the time the
account was established. Neither OJP nor the GMS Help Desk will initiate a password reset
unless requested by the authorized official or a designated point of contact associated with an
award or application.

**Overview of Post-Award Legal Requirements:**

_____ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and
Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at
https://ojp.gov/funding/index.htm.

**Scope Requirement:**

_____ The federal amount requested is within the allowable limit(s) of the FY 2018 JAG
Allocations List as listed on BJA's JAG web page.

**Eligibility Requirement:** Only units of local government may apply under this solicitation. By
law, for purposes of the JAG Program, the term "units of local government" includes a town,
township, village, parish, city, county, borough, or other general purpose political subdivision of

56

a state; or, it may be a federally recognized Indian tribal government that performs law enforcement functions (as determined by the Secretary of the Interior). A unit of local government also may be any law enforcement district or judicial enforcement district established under applicable state law with authority to independently establish a budget and impose taxes.

**What an Application Should Include:**

\_\_\_\_\_ Application for Federal Assistance (SF-424)                              (see page 19)
\_\_\_\_\_ Intergovernmental Review                                            (see page 19)
\_\_\_\_\_ Project Identifiers                                                 (see page 19)
\_\_\_\_\_ Program Narrative                                                   (see page 20)
\_\_\_\_\_ Budget Detail Worksheet                                            (see page 21)
\_\_\_\_\_ Budget Narrative                                                    (see page 22)
\_\_\_\_\_ Indirect Cost Rate Agreement (if applicable)                         (see page 25)
\_\_\_\_\_ Tribal Authorizing Resolution (if applicable)                        (see page 26)
\_\_\_\_\_ Financial Management and System of Internal Controls Questionnaire   (see page 26)
\_\_\_\_\_ Disclosure of Lobbying Activities (SF-LLL) (if applicable)           (see page 27)
\_\_\_\_\_ Certifications and Assurances by Chief Executive                     (see page 27)
\_\_\_\_\_ Certification of Compliance with 8 U.S.C. § 1373 by Chief Legal Officer (Note: this requirement does not apply to Indian tribal governments.)                (see page 27)
\_\_\_\_\_ OJP Certified Standard Assurances                             (see pages 39–44)
       Additional Attachments
   \_\_\_\_\_ Applicant Disclosure of Pending Applications                      (see page 28)
   \_\_\_\_\_ Research and Evaluation Independence and Integrity (if applicable)   (see page 29)

BJA-2018-13626